UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| SGP ACQUISITION, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 04-13382 (PJW) |
| | ) | |

| | | |
|---|---|---|
| SLAZENGERS LIMITED; DUNLOP | ) | |
| SLAZENGER INTERNATIONAL | ) | Civ. No. 05-cv-00563-UNA |
| LIMITED; DUNLOP SPORTS GROUP | ) | |
| AMERICAS, INC.; DUNLOP | ) | |
| SLAZENGER MANUFACTURING LLC, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| against | ) | |
| | ) | |
| SGP ACQUISITION, LLC; CREDITORS' | ) | |
| COMMITTEE of SGP ACQUISITION, | ) | |
| LLC; PROVIDENT BANK; KIMOLOS II, | ) | |
| L.P.; ZAPIS CAPITAL; and BENESCH, | ) | |
| FRIEDLANDER, COPLAN & | ) | |
| & ARONOFF LLP, | ) | |
| | ) | |
| Appellees. | ) | |

## APPELLANTS' APPENDIX IN SUPPORT OF OPENING BRIEF

**SCHULTE ROTH & ZABEL LLP**
Michael L. Cook
Sophie Kim
919 Third Avenue
New York, NY 10022
(212) 756-2000

**HAYNESWORTH SINKLER BOYD, P.A.**
Andrew J. White, Jr.
Jesse C. Belcher
75 Beattie Place
Two Liberty Square
Greenville, SC 296012
(864) 240-3200

**ZUCKERMAN SPAEDER LLP**
Thomas G. Macauley (No. 3411)
919 Market Street
Suite 990
Wilmington, DE 19801
(302) 427-0400

Dated: August 8, 2005

9936368.5

## APPELLANTS' APPENDIX
## TABLE OF CONTENTS

## PLEADINGS AND OTHER COURT DOCUMENTS

| Description | Date | Bankr. Docket No. | A |
|---|---|---|---|
| Transcript of Omnibus Hearing Dated January 7, 2005 | 1/7/05 | 142 | 1-49 |
| Notice of Motion and Motion for an Order Under 11 U.S.C. § 1112(b) Converting Chapter 11 Case to a Case Under Chapter 7 | 5/27/05 | 309 | 50-114 |
| Deposition Transcript of Richard P. Bongorno Dated June 17, 2005 | 6/17/05 | 391 | 115-121 |
| Motion of SGP Acquisition, LLC for Order Under Fed. R. Bankr. P. 9019 Approving Settlement Agreement With Dunlop Slazenger Entities | 6/22/05 | 345 | 122-156 |
| Order Under Fed. R. Bankr. P. 9019 Approving Settlement Agreement and Rejection of Executory Contracts | 6/27/05 | 357 | 157-158 |
| Notice of Motion and Motion for Entry of an Order Approving Settlement Agreement Between the Debtor and Other Key Parties in Interest in This Chapter 11 Case | 7/1/05 | 364 | 159-182 |
| Motion of SGP Acquisition, LLC to Limit Notice for Order Approving Settlement Agreement Between the Debtor and Other Key Parties in Interest in This Chapter 11 Case | 7/1/05 | 365 | 183-186 |

| Description | Date | Bankr. Docket No. | A |
|---|---|---|---|
| Order Approving Shortened Notice With Respect to Motion of SGP Acquisition, LLC to Limit Notice for Order Approving Settlement Agreement Between the Debtor and Other Key Parties in Interest in This Chapter 11 Case | 7/5/05 | 369 | 187 |
| Objection of Slazenger Group to Expedited Approval of Proposed Settlement With Insiders Under Fed. R. Bankr. P. 9019(a) | 7/11/05 | 373 | 188-193 |
| Notice of Deposition of Richard Bongorno | 7/12/05 | 375 | 194-195 |
| Notice of Deposition of Steven Sues | 7/12/05 | 376 | 196-197 |
| Response of Debtor In Possession to the Objection of Slanzenger Group to Motion for Entry of an Order Approving Settlement Agreement Between the Debtor and Other Key Parties In Interest In the Chapter 11 Case | 7/13/05 | 379 | 198-201 |
| Proposed Order Under Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement Between the Debtor and Other Key Parties In Interest In This Chapter 11 Case ("Proposed Order") | 7/13/05 | 381 | 202-228 |
| Transcript of Hearing Dated July 14, 2005 | 7/14/05 | 401 | 229-255 |
| Order Under Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement Between the Debtor and Other Key Parties In Interest In This Chapter 11 Case | 7/15/05 | 386 | 256-279 |

FILED

UNITED STATES BANKRUPTCY COURT JAN 25 PM 1:40
DISTRICT OF DELAWARE

US BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )   Case No. 04-
                                )   Chapter 11
SGP ACQUISITIONS, LLC.,         )
                                )   Courtroom No. 2
                                )   824 Market Street
                    Debtor.     )   Wilmington, Delaware 19801
                                )
                                )
                                )   January 7, 2005
                                )   4:33 P.M.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Jaspan Schlesinger Hoffman
                             By:  FREDERICK B. ROSNER, ESQ.
                             1201 North Orange Street, Suite 1001
                             Wilmington, Delaware 19801

                             Benesch, Friedlander, Coplan & Aronoff
                             By:  MARK PHILLIPS, ESQ.
                             JEFFREY SCHWARTZ, ESQ.
                             2300 BP Tower, 200 Public Square
                             Cleveland, Ohio 44114-2378

The U.S. Trustee:            Office of the U.S. Trustee
                             By:  DAVID BUCHBINDER, ESQ.
                             844 King Street
                             Wilmington, Delaware 19899

ECR Operator:                Anissa Cothran

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
#### e-mail courttranscripts@aol.com

## 215-862-1115     (FAX) 215-862-6639



2

Appearances:
(continued)

For Dunlop:                    Zuckerman Spaeder, LLP
                               By:  THOMAS G. MACAULEY, ESQ.
                               One Commerce Center
                               1201 Orange Street, Suite 650
                               Wilmington, Delaware 19801

                               Schulte Roth & Zabel LLP
                               By:  MICHAEL COOK, ESQ.
                                    SOPHIE  KIM, ESQ.
                               919 Third Avenue
                               New York, New York 10022

For the Committee:             Monzack & Monaco
                               By:  FRANCIS A. MONACO, JR., ESQ.
                               1201 N. Orange Street, Suite 400
                               Wilmington, Delaware 19801

                               Latham & Watkins
                               By:  JOSEF ATHANES, ESQ.
                               Sears Tower, Suite 5800
                               233 South Wacker Drive
                               Chicago, IL 60606

For Provident Bank:            Wolf Block Schorr & Solis-Cohen, LLP
                               By:  TODD SCHILTZ, ESQ.
                               One Rodney Square
                               920 King Street, Suite 300
                               Wilmington, Delaware 19801

                               Roetzel & Andress
                               By:  DIANE M. THIMMIG, ESQ.
                               222 South Main Street
                               Akron, Ohio 44308

For Shorewood Packaging:       Klehr Harrison Harvey
                               Branzburg & Ellers
                               By:  STEVEN K. KORTANEK, ESQ.
                               919 Market Street, Suite 1000
                               Wilmington, Delaware 19801

3

## INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RICHARD BONGORNO | | | | |
| By Mr. Phillips | 27 | | 39 | |
| By Mr. Cook | | 34 | | 41 |

| EXHIBITS | ID | EVID |
|---|---|---|
| D-1  Cover sheet, 11/8/2002 | 31 | |
| D-2  Supply agreement | 32 | |

A    3

4

1        THE COURT:  Please be seated.

2        MR. ROSNER:  Good afternoon, Your Honor.  For the

3    record, Fred Rosner with Jaspan Schlesinger Hoffman for the

4    debtor.

5        We're working from the debtor's first amended notice

6    of agenda which was filed and served yesterday.  Can I confirm

7    that the Court has received a copy of that?

8        THE COURT:  Yes.

9        MR. ROSNER:  Thank you, Your Honor.  Before we dive

10   in and push through the agenda, I'd like to make a few quick

11   introductions then.

12       To my immediate right is Jeffrey Schwartz, and to his

13   right, Mark Phillips, my cocounsel, both with the Benesch,

14   Friedlander, Coplan & Aronoff law firm from Ohio.

15       Also joining us in the court is Rich Bongorno who is

16   the Chief Executive Officer of SGP, the debtor.

17       THE COURT:  Okay.

18       MR. ROSNER:  Mr. Bongorno previously was in court in

19   connection with the first day pleadings and he was the affiant

20   for the first day relief.

21       Let me cede the podium briefly if any parties want to

22   make any other introductions.

23       MR. ATHANES:  Your Honor, Joe Athanes from Latham &

24   Watkins, proposed counsel for the Creditors' Committee and I

25   have cocounsel in the courtroom, which is Frank Monaco from

A    4

5

1  Monzack & Monaco.

2          And I also have our financial advisor in the

3  courtroom, which is Charles Burke from Mahoney Cohen.

4          THE COURT:  Okay.

5          MR. ROSNER:  Your Honor, Fred Rosner, rejoining the

6  record.

7          I understand from chambers that Items 1 through 6,

8  which were submitted separately under a CNO binder, have been

9  approved by the Court.  If the Court has any questions about

10 that, I will certainly respond to them.

11         THE COURT:  Okay.

12         MR. ROSNER:  Those were the -- basically the

13 retention applications --

14         THE COURT:  Right.

15         MR. ROSNER:  -- for various estate professionals.

16         That brings us to Item Number 7, which is the

17 debtor's request for approval of its final financing.  This was

18 noticed out to all parties.  There was spirited negotiations.

19 Those negotiations were principally spearheaded by the

20 Creditors' Committee and the bank.  And we're pleased to report

21 that the effort was cooperative and we're able to hand up a

22 consensual order.

23         I might cede the podium briefly to the Committee and

24 bank's counsel who will advise the Court of the changes made to

25 the form of order and the form of credit agreement leading up

6

1  to today.  And I do have black line copies of both the order

2  and the financing for the Court, and a revised budget.

3          THE COURT:  Okay.

4          MR. ROSNER:  Would the Court like to see those?

5          THE COURT:  Yes.

6          MR. ROSNER:  Okay.

7                      (Pause)

8          MR. ROSNER:  Your Honor, I'm approaching with the

9  black line of the order and the financing.

10         THE COURT:  Okay.

11         MR. ROSNER:  As well as the budget.

12         MR. ATHANES:  Your Honor --

13         THE COURT:  Yes?

14         MR. ATHANES:  -- Joe Athanes on behalf of the

15 Creditors' Committee.

16         I'll be brief, Your Honor, and just give you sort of

17 the highlights.  There were negotiations between the debtors,

18 the Committee and the bank regarding the final DIP financing.

19         Essentially what we agreed to was that we would have

20 a limited amount of time to object to their claims and liens.

21 And if we had no objection to their claims and liens, they

22 would get a number of protections under the DIP financing --

23 under the DIP financing order as of the day Your Honor enters

24 the order, that is today.

25         Those would include a roll up, Your Honor.  And they

7

1  would also include a limitation on 506(c) claims. And the
2  ability to essentially, as part of the roll up, pay down pre-
3  petition debt, but then reborrow it as post petition debt.
4       If, Your Honor, the Committee finds a problem with
5  their liens or claims, we have the ability to file an adversary
6  proceeding before February 1st. And if we do that,
7  notwithstanding Section 364(e) of the Bankruptcy Code, all of
8  the protections as to the roll up part of the facility as
9  opposed to the purely money part of the facility, go away.
10 506(c) limitation goes away. The follow up goes away. The
11 post petition liens and claims with respect to the rolled up
12 new loans go away. And we come before Your Honor on February
13 7th for a contested financing hearing where the bank might seek
14 those issues over objections.
15      Your Honor, we expect them to be fully perfected.
16 And if they are, there's no harm, no foul with respect to the
17 roll up and these other protections.
18      In exchange for this agreement, the debtors and the
19 Committee obtained, among other things, a three percent
20 decrease in the interest rate which is now three percent over
21 prime.
22      We also obtained a limitation on bank fees.
23 Essentially all there is now is a $10,000 closing fee and then
24 customary letters of credit fees if they issue letters of
25 credit. And an increased carve out for professionals. And an

A   7

8

1  extension of the term of the facility.  Originally it ran only

2  through March 31st, now it runs through the end of May.

3       In addition, it's set up so that the parties can, by

4  agreement, enter into additional extensions to keep the

5  facility going after May.

6       Your Honor, the Committee believes, under the

7  circumstances, the DIP is the best the debtors can do.  The

8  bank has a lien -- or at least claims a lien on substantially

9  all the debtor's assets.  We're going to investigate that.  And

10  if it turns out to be true, we believe that this financing is

11  in the best interest of the debtors and their estates and,

12  therefore, we support that.

13       THE COURT:  Okay.  All right, let me -- just give me

14  a couple of minutes.

15              (Pause)

16       THE COURT:  Okay.  This is an unusual arrangement.

17  I'm not sure I've seen this where filing of the complaint

18  triggers all the relief.

19       MR. ATHANES:  Your Honor, it's a first for me, as

20  well.

21       However, Your Honor, rather than do a second interim

22  financing, the bank wanted to go final, if we could.  And we

23  explained that we have a fiduciary duty to investigate the

24  liens.  And so this was the middle ground we struck.

25  Essentially they've agreed that if they are paid down or they

A   8

9

1  receive other benefits pursuant to the roll up, et cetera,

2  during this period between now and when that deadline comes for

3  liens, if we do object, all that will be unwound, they'll

4  disgorge the funds, et cetera.

5      So, Your Honor, we believe that it gives us the

6  benefits we need and it gives the banks the protections that

7  they demanded.

8      So, therefore, although it's unusual, I think under

9  these circumstances, it was the right way to go.

10      THE COURT: Okay.

11      MS. THIMMIG: Your Honor, Diana Thimmig of the law

12  firm of Roetzel & Andress from Cleveland, Ohio. And with me is

13  my cocounsel, Todd Schiltz from Wolf Block Schorr.

14      I just wanted to indicate to the Court that counsel

15  for the Creditors' Committee has accurately described all of

16  the proposed provisions that we've agreed to and that are

17  incorporated in the order that the Court currently has before

18  it.

19      THE COURT: Okay. Do you have the final form of

20  order?

21      MR. ROSNER: I do, Your Honor.

22              (Pause)

23      THE COURT: Okay. I've signed it.

24      MR. ROSNER: Thank you, Your Honor. Fred Rosner,

25  rejoining the record.

10

1       Your Honor, the next matter is Item Number 8, which
2   is the debtor's application to retain the law firm of Kohrman,
3   Jackson and Krantz from Ohio as corporate -- as special
4   corporate and litigation counsel pursuant to Section 327(e) of
5   the Bankruptcy Code.
6       We did receive an informal objection from the Office
7   of the United States Trustee.  They picked up in the disclosure
8   that the Kohrman Jackson firm had received certain transfers
9   pre-petition and they ask that Kohrman both provide them with a
10  Pillowtex type analysis and also to further identify the nature
11  of their role to be played in this case.
12      Kohrman Jackson has provided the U.S. Trustee with
13  both a Pillowtex analysis and a -- sort of a schedule that will
14  identify the matters that will be within the scope of their
15  retention.  And my understanding is that that satisfies the
16  U.S. Trustee's informal objection.  And I do have a form of
17  order authorizing the retention which would attach to it
18  Schedule -- which further specifies what they'll be doing.
19      MR. BUCHBINDER:  Your Honor, David Buchbinder on
20  behalf of the United States Trustee.
21      There is also a schedule that specifies matters that
22  are outside of the scope of the retention, too.  So, that is
23  clearly defined and is part of the record in the order what
24  they can do as special counsel and what they can't do as
25  special counsel.  And under the circumstances, that seemed

11

1  appropriate.

2          THE COURT:  Okay.

3          MR. ROSNER:  I do --

4          THE COURT:  Yes.

5          MR. ROSNER:  -- have that floor plan.

6                    (Pause)

7          THE COURT:  Okay.  Next?

8          MR. ROSNER:  Your Honor, the next item on the agenda

9  is a motion by the debtor to approve certain post petition

10 transactions between the debtor and Dunlop Slazenger

11 Manufacturing, LLC and Dunlop Slazenger International Limited.

12         Your Honor, there are substantial disputes by and

13 among these parties.  But notwithstanding that, the debtor and

14 the Dunlop entities have agreed on an interim basis to enter

15 into an agreement by the debtor with certain product for its

16 sales.

17         My cocounsel, Mr. Schwartz, could amplify and answer

18 any questions the Court has about the form of agreement.

19 Ordinarily this would be the type of agreement that the debtor

20 enters into in the ordinary course of business.  But given the

21 disputes, we thought it prudent to bring it to the Court's

22 attention on notice to parties.

23         If the Court has any questions, I defer to Mr.

24 Schwartz.

25         THE COURT:  I only had a very limited opportunity to

12

1  look at this.  How does this overlay on top of the existing
2  pre-petition agreement?
3          MR. ROSNER:  Let me defer to my cocounsel.
4          MR. SCHWARTZ:  Good afternoon, Your Honor.  We thank
5  you for taking this time here late in the week.
6          The notion of this agreement is very simple.  It's in
7  the parties' mutual interest to -- for us to continue to sell
8  golf balls and for the Dunlop entities to continued to provide
9  us golf balls on a non-prejudicial basis with respect to the
10  issues and dispute in the adversary proceeding.
11          And accordingly, we've entered into this arrangement.
12  It's to be totally neutral with respect to any admissions -- no
13  admissions against interest, no prejudice with regard to any
14  positions that the parties have taken or may take with respect
15  to the license agreement or supply agreement.  The notion is we
16  want to purchase golf balls, they want to sell us golf balls.
17  So we can do that and we can meet our customers' needs post
18  petition, at least for the term of this agreement, which is
19  only now through January 14th, with potential extension.  And
20  it's just an expedient way to proceed for the parties.
21          THE COURT:  Okay.
22          MR. SCHWARTZ:  To mitigate damages, for example, and
23  so forth.
24          THE COURT:  Okay.
25          MR. SCHWARTZ:  Thank you, Your Honor.

13

1      MR. MACAULEY:  Good afternoon, Your Honor.  Thomas
2 Macauley on behalf of the Dunlop entities.

3      There was one change to the agreement, which was the
4 -- a requirement that the letter of credit be presented in Ohio
5 and that if that was required, that the cost for traveling to
6 Ohio would be paid for by the debtor.  That was -- that was it.

7      THE COURT:  Okay.

8      MR. ROSNER:  I do have a form of order.

9      THE COURT:  Okay.

10             (Pause)

11      THE COURT:  Okay.  Next?

12      MR. ROSNER:  Your Honor, Items 10 and 12 are related.
13 They relate to a motion by Dunlop to transfer venue.  I thought
14 -- would the Court like to hear from the parties on that?  I
15 think -- the debtor certainly was going to make a factual
16 record in support of its opposition to the motion.  I'm not
17 sure if the Dunlop entities are going to have testimony in
18 support of the motion.  Let me make inquiry.  It's a question
19 of the order of the -- how you want to proceed today on the
20 agenda.

21      THE COURT:  Wait a minute.

22      MR. ROSNER:  The other items are -- Number 11 is the
23 KERP, which there was a limited objection.  I think we can get
24 through that very quickly.

25      THE COURT:  Why don't we dispose of that one?

A  13

1    MR. ROSNER: Yeah. Number 11, Your Honor, let's take

2 that. That is the debtor's motion to implement -- I don't want

3 to use the term loosely. It's a KERP program. Essentially

4 there were three prongs to that. And since the only objection

5 is a limited one, I thought we would spear the Court time and

6 the parties time of presenting testimony in support of it. I

7 think we could probably work through it pretty quickly, but we

8 reserve the right to do so if the Court is inclined to hear the

9 factual support. We did put in an affidavit of Mr. Bongorno in

10 support of the KERP, which details the loss of human capital

11 from the debtor's organization, including departures to the

12 Dunlop entities.

13    Let me just give an overview of what the KERP has

14 intended to do. There are three prongs to this, Your Honor.

15 First, the debtor has two key executives, Mark Belfor.

16 (phonetic), who is the debtor's controller, and Dan Sloan, who

17 serves as the debtor's Director of Information Systems.

18    And the proposal for these two key executives is to

19 -- should the Court authorize the relief, would make an initial

20 payment upon entry of an order approving the motion of 25

21 percent of their current pay. And that would be subject to

22 each of those executives saying on for a certain period of

23 time. That would be through June 30th, 2005.

24    If they receive the payment, but then depart before

25 June 30th, I would consider that a vesting day, the agreement

15

1  would be that they'd have to disgorge a pro rata amount.

2          If the Court awarded the KERP to those people, the

3  initial amount would be $43,750. And that amount is built into

4  the budget that was just approved by the Court.

5          If they stay on through consummation of a plan of

6  reorganization, they would receive a second payment of 25

7  percent of their salary. So, the total outlay from the estate

8  would be $87,500.

9          And, again, I think the motion details it. I think

10 the affidavit details the need for those two individuals, in

11 particular, to stay on. Again, there have been departures of

12 other officers. There has been no replacement of those people.

13 So, the two remaining are additionally and incrementally

14 burdened. And we believe that the relief represents the

15 prudent business judgment of the debtor.

16          Let me note, and I don't want to steal counsel's

17 thunder, the Committee did file a limited objection to the

18 program, and just to this portion of it. And what I've just

19 described to the Court actually incorporates all the points

20 raised under objection, except for one point, which I'll let

21 counsel present now.

22          The other part of the relief is not contested. So,

23 maybe we can just focus on the one piece and move forward

24 quickly.

25          MR. ATHANES: Your Honor, Joe Athanes on behalf of

16

1  the Committee.

2        I do confirm that with respect to the senior

3  management portion of the retention plan, with those changes

4  just mentioned on the record, it was fine with the Committee.

5        Your Honor, the only issue the Committee has is with

6  respect to a $22,500 portion of the retention plan, with

7  respect to which the Committee and the debtor have a small

8  disagreement.

9        While the Committee realizes that great weight should

10 be put on the debtor's business judgment, part of the debtor's

11 plan provides that nondebtor employee salespeople who are

12 independent who will receive bonuses, cash bonuses, and it was

13 the opinion of the Committee, Your Honor, that those bonuses

14 should be paid in the form of higher commissions.  They have no

15 objection to the amount of money -- the aggregate amount of

16 money, the 22,500, but they think that paying cash amounts to

17 those people will not incentivize them to sell Slazenger

18 products versus other products.  And they think by tying it to

19 the commissions, it will be a more effective incentive.

20       That's the only objection we have at this time to

21 this motion.

22       MR. ROSNER:  Your Honor, let me -- it's Fred Rosner

23 again joining the record.

24       Let me make a clarifying point.  This is -- and I

25 apologize.  This is the second prong of the relief.  It's been

17

1  a long day for all of us.  The debtor -- the first prong -- I
2  think we've incorporated all of the Committee's concepts and
3  they're fine with payments to the key executives.

4           As to the second prong, which deals with sales
5  representatives, that's where there's a small dispute.  The
6  debtor has 11 sales representatives.  Five are independent
7  contractors and six are employees.  And that program provides
8  for the following:

9           Five hundred upon approval of the motion.

10          Fifteen hundred dollars if the sales representative
11 stays employed with the company through the end of March of
12 '05.

13          And an additional twenty-five hundred dollars if the
14 representative stays employed through the end of June of '05.

15          And the Committee objected to that portion of this
16 prong which affords the independent contractors a payment,
17 unless it was tied to a larger commission.  They wanted it to
18 be a larger commission based on increased volume of the sales.

19          The response to that is that this is not free money.
20 The sales representatives, to earn those commissions, both have
21 to be employed and continue to be employed by the company.  But
22 they have to meet certain performance goals.  For example, they
23 have to obtain 50 percent of their present booked orders and
24 they have to maintain their existing level of client contact
25 and increase those client contacts in order to earn the bonus.

18

1          So, it's not free money --

2          THE COURT:  Where --

3          MR. ROSNER:  They're not being --

4          THE COURT:  Where does it say that in the motion?

5          MR. ROSNER:  Well, Your Honor, that -- and I

6  apologize.  This conversation evolved since the filing of the

7  motion.  We had a lot of discussion with the Committee and I'm

8  -- let me spend a little more time developing the facts so the

9  Court can make a decision.

10          Initially, the motion didn't describe that.  But we

11  did receive informal comments, so we sort of morphed the

12  program to track most of the comments received from the

13  Committee.  As I mentioned, with respect of the key executives,

14  we have adopted all of their comments.

15          So, on the second piece, they wanted us to flush out

16  how the independent contracts would be rewarded.  And I think

17  they're okay on the dollar amounts.  They just wanted a higher

18  threshold for earning it.  They wanted it to be tied to

19  increased commissions.

20          And being closer -- you know, obviously the debtor

21  deals with these folks every day, we think that's too high a

22  threshold.  And if that was imposed as an overlay on this

23  portion of the program, we wouldn't achieve the result, which

24  is to keep our sales force intact, but we would have

25  departures.

19

1        If we had -- I don't want to belabor this because
2   it's really a small point, an aggregate of $22,000.  And,
3   again, all these amounts are built into the budget.  We think
4   that somewhere in between -- this is not free money.  This is
5   tied to certain performance goals, which is attaining certain
6   bookings and expanding customer contacts in their respective
7   territories.

8        So, we think that this is sufficient reward for the
9   company and it reflects a proper balance between keeping people
10  on board -- we don't want to set the bar too high.

11        THE COURT:  Okay.

12        MR. ROSNER:  Let me just confer with my client if he
13  has anything he'd like me to add to the record.

14                    (Pause)

15        MR. ROSNER:  Let me add -- Your Honor, Fred Rosner
16  again.

17        Let me add one additional factor.  The independent
18  sales representatives may have other opportunities to sell
19  different products.  And in part, this program is intended to
20  have them focus on our product, the Slazenger brand.  They're
21  not limited in what they could sell, they're independents.  So,
22  we don't want to set the bar too high so they focus on other
23  products, and this is the right balance of having them focus on
24  -- to monitor awards, in aggregate, it's roughly half of
25  $22,500, and we think it's the right balance between keeping

20

1  them focused on our products, but not setting the bar too high,
2  which we think the Committee's suggestion, although we
3  appreciate it, I think it's too high a threshold in the
4  debtor's business judgment.

5       THE COURT: Okay.  I'll overrule the Committee's
6  remaining objection.  Normally I give significant deference to
7  the Committee's position on KERPs.  But we're talking about a
8  very small portion of the program, not a significant amount of
9  money.

10      And as to these independent sales reps, based upon
11 what counsel for the debtor has said, I think that reasonable
12 persons could differ on this issue and so contrary to my usual
13 practice, I'll defer to the Committee's judgment on this aspect
14 of the KERP.  And so I'll approve it.

15      MR. ATHANES:  Your Honor, all we'd ask of the debtors
16 is that when they submit an order on the KERP that it describes
17 the various changes in what the KERP is now as opposed to what
18 it was when the motion was filed.  But we understand.

19      MR. ROSNER:  Your Honor, that's acceptable.  We will
20 submit this under a certification of counsel procedure.

21      And one final note, the bank had also requested that
22 the payments all be contained within the budget.  And we will
23 provide that in the order.

24      THE COURT:  Okay.

25      MR. MACAULEY:  Good afternoon, Your Honor.  Thomas

21

1  Macauley again for Dunlop.

2          It's my pleasure to introduce Michael Cook from

3  Schulte Roth & Zabel, who will present this motion on behalf of

4  Dunlop.

5          THE COURT:  Okay.

6          MR. COOK:  I'll cut right to the chase, Your Honor.

7  This motion is made under Section 1412, justice -- interest of

8  justice and convenience of the parties.  And rather than get

9  into rhetoric, given the time of day, I'm just going to focus

10  on some hard facts.  And I think that the Court can take

11  judicial notice of some key documents in the case as I go

12  through this.  And we can hand them around, but they're key

13  documents that have already been filed in this Court, such as

14  the petition.

15          The facts, I think, will show you in no uncertain

16  terms that the center of gravity in this case -- the key -- the

17  key facts that are relevant on a motion of this kind where

18  venue is proper, if we could hand up -- and we'll hand out

19  copies to everybody else.  We'll show you precisely where the

20  creditors are, who the creditors are, where the assets are,

21  principal place of business and the relevant state of the

22  docket.

23          What we've asked the Court to do is to transfer the

24  venue of the case to the District of South Carolina, it would

25  be the Spartanburg Division.

22

1          To hone in on some hard facts, if you look at Tab 10,

2    which is the debtor's list of the 20 largest creditors, and you

3    look at the joinders filed by about 13 creditors in the case,

4    you'll see that approximately 70 percent of the claims in

5    amount -- in dollar amount are in the Southeastern part of the

6    United States.  Specifically, 11 are in South Carolina, four

7    are in Georgia, one in Florida, one in North Carolina.  That's

8    a total of 18 creditors who are in the Southeastern part -- 18

9    of the 28.

10          The 28 that is reflected -- and it's all boiled down

11    conveniently in Tab 9, which is a mere compilation of the

12    debtor's amended list of 20 largest creditors and the joinders

13    in Tab 14.  And you'll see graphically where the creditors are

14    in the Southeastern part of the United States.  There are three

15    from the Midwest, their claims total 118,000; two in Ohio; one

16    in Illinois.  In the West, one in California for 143,000.  And

17    six international creditors.  By international, I mean non-U.S.

18    creditors, it's $1.28 million, five from Hong Kong and one from

19    Japan.

20          These 28 creditors represent six point -- a total of

21    $6.2 million.  Relative to the total unsecured debt

22    indebtedness in the case, we just saw the schedules that were

23    filed this afternoon, the total unsecured debt according to the

24    debtor's schedules is 6.6 million.

25          So, you can see that in terms of dollar amount, 70

23

1 percent, 4.367 million of the 28 that you see reflected in Tabs

2 10 and 14, are in the Southeast. And in terms of number, 18 of

3 the 28 are in the Southeast.

4 When you look at the -- as I said with the schedules,

5 just a rough count, approximately 60 percent -- we just took a

6 rough count from the schedules filed just this afternoon.

7 Sixty percent of the creditors are in the Southeast.

8 In terms of the size of the debt, the Dunlop two

9 entities are the first and third largest creditors with $2.8

10 million of debt. The second largest creditor, Robinson, which

11 I believe is in Minnesota, has joined in the venue transfer

12 motion. So, that tells you something about the creditors.

13 The -- there are two landlords, one in South

14 Carolina, one in Georgia. The South Carolina landlord has

15 joined in the venue motion. We see that in Tab 14.

16 The principal assets. Again, I go to hard evidence.

17 The petition, you see at Tab 1, when asked of the form where

18 are your principal assets, and the debtor in his petition said,

19 South Carolina. For the other physical assets, the inventory

20 is in Georgia in the Southeast.

21 They now say their -- in their motion, in their

22 response to our motion that the key assets in the case are the

23 intellectual property. But they didn't mention that up front.

24 Principal place of business. Again, if you look at

25 Tab 1, the petition, the debtor admits Greenville County.

24

1          But it's not just the petition.  We counted -- again,
2   it's a rough count, at least 10 admissions by the debtor.  One,
3   in the petition, November 30th.  The first day affidavit of Mr.
4   Bongorno.  A week later, on December 6th, Paragraph 5.  The
5   notice, you'll see that in Tab 2, Page 2.  Tab 3, the notice of
6   commencement of the case, December 16th.  Tab 4, the Kohrman
7   Jackson application, Paragraph 4, that's December 14.
8          Now, the reason I mention these dates is a venue
9   transfer motion -- our venue transfer motion, we made on
10  December 7.  The Benesch Friedlander application by the debtor,
11  Tab 5, Page 2, Paragraph 4, December 3.  Again, everything's
12  headquartered in South Carolina.
13         There are other pleadings that we didn't bore you
14  with.  You look at the December 6th motion to perform under
15  their Panther Point Program, Paragraph 4.  The motion regarding
16  the bank accounts, December 6th.  Motion to pay pre-petition
17  employees, Paragraph 4, again, December 6th.  The financing
18  motion, Paragraph 4 on December 6th.  And the motion to extend
19  the time to file schedules, December 16th.  All say the
20  debtor's headquartered in Greenville, South Carolina.  Offices,
21  the petition tells you it's South Carolina, that's Tab 1.
22         The case is only five weeks old, so we can't say that
23  much has happened of a substantive nature in the case.
24         The relative docket congestion, I don't have to tell
25  Your Honor, but you'll see in Tabs 15 and 16, we have the -- a

25

1 report from this Court showing 217 bankruptcy filings in 2004,
2 requiring the services of the two sitting judges and at least
3 three or four visiting judges. And that doesn't consider the
4 backlog of prior cases.

5　　　　But more to the point, the District of South
6 Carolina, you'll see in Tab 16, the total filings in the
7 District of South Carolina in 2004 were 54 cases. That's less
8 than 25 percent of what happens in this District. And I dare
9 say, having talked to lead South Carolina counsel, these are
10 mid-sized small businesses, not large publicly held companies.

11　　　　So, I think that the hard facts, not legal argument,
12 show that the center of gravity of this case -- the hard facts,
13 the creditors, where the debtor has done its business, the
14 relative docket congestion, all point to the Southeastern part
15 of the United States, the District of South Carolina.

16　　　　The professionals in this case have just been
17 retained. Looking at the debtor's primary bankruptcy counsel,
18 the Benesch firm was just hired in November. They have a
19 national practice. The Creditors' Committee professionals,
20 Latham is a national firm with offices are around the country
21 and the world. Mahoney Cohen, the Committee's professionals
22 on their web site confirm that they have offices in New York
23 and Miami with clients throughout the United States. That's
24 their language, not mine.

25　　　　So, I think that there are a lot of reasons for

Bongorno - Direct                              26

1  transferring venue of this case.  And I would ask you to take

2  judicial notice of Tabs 1 through 6 -- Tabs 1 through 5, which

3  are the pleadings already on file with this Court, Tab 10, a

4  remanded list of 20 largest creditors, the joinders in 14, and

5  Tabs 15 and 16.

6          Now, finally, what about Spartanburg, South Carolina?

7  The argument's been made it's hard to get to.  Tab 17, my

8  colleague, Mr. Macauley, has pulled up from Travelocity the

9  numbers of flights, just flights, into the

10  Greenville/Spartanburg area.  That doesn't take into

11  consideration busses.

12          Now, I've been to South Carolina.  I've been to

13  Spartanburg.  The 4th Circuit, Court of Appeals sits in

14  Spartanburg, South Carolina.  So, it's hardly a back water.

15  So, I don't think that anybody is going to be inconvenienced by

16  taking a plane from Cleveland or Chicago to

17  Greenville/Spartanburg as opposed to Philadelphia.

18          In short, Your Honor, I think there are a lot of

19  reasons for -- good reasons for transferring this case to South

20  Carolina where it belongs.  And I will stop right here with the

21  facts.

22          Thank you.

23          THE COURT:  Okay.

24          MR. PHILLIPS:  Your Honor, Mark Phillips, on behalf

25  of the debtor.  We'd call as a witness in reply to his

Bongorno - Direct                                    27

1  presentation, Mr. Bongorno to testify specifically as to the

2  facts related to the venue motion.

3           Mr. Bongorno?

4           CLERK:  Please state your name for the record,

5  spelling your last name.

6           MR. BONGORNO:  My name is Richard Bongorno.

7           CLERK:  Spell your last name.

8           MR. BONGORNO:  B-O-N-G-O-R-N-O.

9                    RICHARD BONGORNO, SWORN

10                    DIRECT EXAMINATION

11  BY MR. PHILLIPS:

12  Q    Mr. Bongorno, what is your position with the debtor?

13  A    I'm currently the CEO of the company.

14  Q    And for how long have you held that position?

15  A    Since December 6th of 2004.

16  Q    Have you held other positions with the debtor prior to

17  that time?

18  A    Previous to that, I was the treasurer, and that was since

19  December of 2003.

20  Q    And you said December 6th of 2004 you became CEO.  What

21  occasioned you becoming CEO?

22  A    Our prior CEO resigned, effective December 3rd, I believe,

23  was the date of 2004.

24  Q    And who was that prior CEO?

25  A    Chris Deltorio (phonetic).

1 Q    where did Mr. Deltorio reside?

2 A    In North Carolina.

3 Q    And do you know where Mr. Deltorio is employed today?

4 A    I understand he's consulting with one of the Dunlop

5 entities.

6 Q    Would you describe the scope of your responsibilities as

7 CEO of the debtor briefly?

8 A    Yes. Responsible for all the day-to-day activities.

9 Currently -- since December 6th, significant a part of those

10 day-to-day activities have been relating to the bankruptcy

11 proceedings and the financial and legal aspects of that, as

12 well as the banking situation there. But in addition and more

13 recently, spending more time focusing on that which needs to

14 get done as far as making the company profitable, focusing on

15 obtaining inventory at reasonable prices and building up the

16 sales effort.

17 Q    What is your understanding of the debtor's key assets?

18 A    We have essentially three key assets. One is the -- I'll

19 call it one item, it's the combination of the license agreement

20 and supply agreement with Dunlop. We have significant

21 inventories, and we have significant accounts receivables.

22 Q    And where -- do the license agreements and the supply

23 agreement have any location?

24 A    They -- really, they're intangible, so they really have no

25 location.

Bongorno - Direct                           29

1  Q   And you mentioned accounts receivable.  Where are those

2  collected?

3  A   Those are collected in -- through a lockbox in Ohio.

4  Q   And the inventory of the company that you mentioned?

5  A   That is in Lyons, Georgia.

6  Q   For how long has the debtor been operating?

7  A   Since November, 2002.

8  Q   And during that time, has the ownership of the debtor been

9  consistent in terms of the members of the LLC?

10 A   Yes, two members since the beginning.

11 Q   And who are those members?

12 A   One member is SGP Resilience Investors out of Cleveland,

13 Ohio.  The other is Zapis Acquisition Partners, also

14 headquartered in Cleveland.

15 Q   Does the debtor have a Board of Directors, a Board of

16 Members?

17 A   We have a Board of Managers, pursuant to our operating

18 agreement.

19 Q   And who is on that Board of Managers?

20 A   There are five members, three selected by the Zapis

21 Investor Group and two by the Resilience Investor Group, all --

22 those members are -- from the Zapis selection are myself, James

23 Wymer and Lee Zapis.  And from the Resilience Group, it is

24 Bassam Mansour and Steven Rosen.

25 Q   And where are those individuals located --

Bongorno - Direct                               30

1  A    All --

2  Q    -- if you know?

3  A    All in Cleveland, Ohio.

4  Q    Now, if you're the person responsible for the

5  reorganization of the debtor's business, where are you located?

6  A    Cleveland, Ohio, with an office in West Lake, which is a

7  suburb of Cleveland.

8  Q    Are there any other officers or employees of the debtor

9  that are involved in that reorganization effort?

10  A    We have one other officer, name of Brad Seibert, who is

11  our Vice President of Sales.  He's also located in Cleveland

12  working out of the West Lake Office.

13  Q    Besides the officers that you've mentioned, how many other

14  employees does the debtor pay at this time?

15  A    Thirteen other employees.

16  Q    And where are those employees located, if you know?

17  A    We have -- our sales force is geographically disbursed.

18  There's six other sales -- six salespeople that are employees

19  around the country, and we do have seven employees --

20  administrative people in Greenville.

21  Q    Now, the six employees that are the sales force, are any

22  of them located in South Carolina?

23  A    No.

24  Q    And the seven employees that you mentioned that work in

25  Greenville, do you anticipate that any of those employees would

Bongorno - Direct                                31

1  ever appear in this bankruptcy case as a witness or need to be

2  -- appear in this case?

3  A    No, I would not anticipate that.

4  Q    Now, why is that?

5  A    I will be handling the -- carrying the ball, so to speak,

6  on this.

7  Q    Do you travel to South Carolina?

8  A    Yes.

9  Q    Do you know how many flights, for example, from Cleveland

10 to Greenville there are?

11 A    Currently there's just one direct flight.

12 Q    And has that always been the case?

13 A    There have been more -- two recently, but they cut back,

14 Continental did, and we're down to one in the late afternoon.

15          MR. PHILLIPS:  If I may, Your Honor.

16                    (Pause)

17          MR. PHILLIPS:  Your Honor, I would, at this time, ask

18 the witness to identify two exhibits.  If I may approach?

19          THE COURT:  Yes.

20                    (Pause)

21 Q    Mr. Bongorno, I've placed before you two documents that

22 have not been previously marked, but marked them Debtor's

23 Exhibits 1 and 2.  The first one being -- with a cover sheet

24 dated November 8th, 2002, Slazenger Limited and Dunlop

25 Slazenger International Limited, and SGP Acquisition LLC, on

1 the cover I would mark that as Exhibit 1, have that marked.

2          And then the second with the notation at the top,

3 supply agreement.  And I would have that marked as Debtor's

4 Exhibit Number 2.

5          You mentioned before that the license agreement and

6 the supply agreement are significant assets of the debtor,

7 correct?

8 A    That's correct.

9 Q    As CEO of the debtor, are you familiar with the license

10 and the supply agreement?

11 A    Yes, I am.

12 Q    Looking at Exhibit 1, the document leading off with

13 Slazenger's Limited, if you would turn to Page 47 of that

14 exhibit, and I would draw your attention specifically to

15 Section 24.  Do you have that, Mr. Bongorno?

16 A    Yes, I have that.

17 Q    There's a section here entitled Governing Law and

18 Jurisdiction, correct?

19 A    That's correct.

20 Q    What does this section say is the governing law with

21 respect to these agreements?

22 A    That it will be governed and construed in accordance with

23 the laws of the State of New York.

24 Q    And does it refer to where actions with respect to this

25 agreement may be brought by the parties?

Bongorno - Cross                          33

1  A    It says, Jurisdiction of the United States District Court

2  for the Southern District of New York located in the Borough of

3  Manhattan.

4  Q    Does that section anywhere mention South Carolina?

5  A    No, it does not.

6  Q    Is this, in fact, the license agreement between the debtor

7  and Slazenger's Limited and Dunlop Slazenger International

8  Limited?

9  A    Yes, it is.

10  Q    And turning to Exhibit 2, the supply agreement, sir, I

11  draw your attention first to Page 23, Section 610.  Is this the

12  supply agreement between -- first off, between Dunlop Slazenger

13  Manufacturing and the debtor?

14  A    Yes, it is.

15  Q    Section 610, what does that provide as far as governing

16  law with respect to this agreement?

17  A    It says that the agreement shall be governed by and

18  construed in accordance with the laws of the State of New York.

19  Q    And if you would turn the page, Section 6.14, does this

20  refer, again, to where actions may be bought with respect to

21  this agreement?

22  A    Yes, it does.

23  Q    And what jurisdiction is that?

24  A    District Court for the Southern District of New York.

25          MR. PHILLIPS:  I have no further questions at this

Bongorno - Cross                                    34

1  time, Your Honor.

2           THE COURT:  Okay.  Cross examination.

3                   CROSS EXAMINATION

4  BY MR. COOK:

5  Q    Mr. Bongorno, do you work for any other affiliated entity

6  besides an affiliate of the debtor?

7  A    I work for an affiliate of an investor of the debtor.

8  Q    And which entity is that?

9  A    The entity I work for is Zapis Capital Group.

10 Q    Zapis Capital.  And what is -- how is Zapis Capital

11 affiliated with the debtor?

12 A    The ownership of Zapis Capital is the same ownership as

13 Zapis -- similar ownership as Zapis Acquisition Partners.

14 Q    What do you do for this affiliate in your other position?

15 A    I'm the Chief Financial Officer.

16 Q    Chief Financial Officer.  And how much time do you spend

17 on that job?

18 A    Less than 20 percent of my time currently.

19 Q    How long have you been doing that?

20 A    Just since -- uh, all of my service to Zapis Capital Group

21 commenced in October of 2003.

22 Q    You started working for Zapis in 2003?

23 A    Correct.

24 Q    And you just started working for the debtor -- as I

25 understand your testimony, on December 3rd --

1  A    No.

2  Q    -- 2004?

3  A    I began working for the debtor in December of 2003 as its
4  treasurer.

5  Q    Okay.  And I believe you testified that the intellectual
6  property has no location, that was your testimony, correct?
7  Wasn't it?

8  A    That's correct.

9  Q    And you testified also that the inventory is in Georgia,
10  isn't it?

11  A    That's correct.

12  Q    And you mentioned somebody named Seibert, Brad Seibert.
13  He's based in Ohio, I believe, you testified on direct, didn't
14  you?

15  A    That's correct.

16  Q    He's related to Mr. Zapis, isn't he?

17  A    That's correct.

18  Q    In fact, he's his son-in-law, isn't he?

19  A    Son-in-law of the -- of Xenophon Zapis.

20  Q    And you're familiar with the -- this motion for -- to
21  implement a key executive to the program, you were in court
22  today when that was brought up, weren't you?

23  A    Yes.

24  Q    Okay.  And the two people who are the primary
25  beneficiaries of the up-front cash payment are Messrs. Sloan

Bongorno - Cross                        36

1 and Belfor, aren't they?

2 A    That's correct.

3 Q    And they're located in South Carolina, aren't they?

4 A    That's correct.

5 Q    Now, you've also testified that the only time one --

6 excuse me -- one nonstop flight from Cleveland to

7 Greenville/Spartanburg, isn't that -- isn't that what you

8 testified?

9 A    That's correct.

10 Q    All right.  Did you --

11         MR. COOK:  Strike that.

12 Q    You're aware -- and what airline was that?

13 A    Continental.

14 Q    And there are nonstop -- I'm sorry -- other airlines that

15 fly from Cleveland to Greenville/Spartanburg, aren't there?

16 A    I'm not aware of any other direct flights.

17 Q    You don't know that Independence Air has 11 flights daily

18 to Greenville/Spartanburg?

19 A    From Cleveland?

20 Q    Yeah.

21 A    I'm definitely not aware.

22 Q    Okay.  Are you aware that United Airlines has 14 flights

23 daily to Greenville/Spartanburg?

24 A    From Cleveland, Ohio?

25 Q    Yes.

Bongorno - Cross                    37

1  A    No, I'm not aware of that.

2  Q    Are you aware that American Airlines has five flights from
3  Cleveland to --

4  A    Direct flight from Cleveland to Greenville?

5  Q    No.  No.  Flights.

6  A    Oh, a flight to me is a flight from the location, landing
7  in one other location.

8  Q    Right.  You mean nonstop, that's what -- you only take
9  nonstop?

10 A    Nonstop or direct flights.

11 Q    Okay.

12 A    That's --

13 Q    You don't take connecting flights?

14 A    I testified that there was one direct flight.

15 Q    Okay.  But you're not aware of the connecting flights, are
16 you?

17 A    I'm aware of probably thousands of combinations of
18 connecting flights that could go to Greenville.

19 Q    Fine.  I'll stop right there.  But you only take nonstop
20 direct flights?

21 A    No.

22 Q    Okay.  I'll stop there.  Now, you made -- you testified
23 something about the license agreement and supply agreement,
24 Exhibits 1 and 2 having a choice of law provisions, New York
25 law.

Bongorno - Cross                    38

1  A    A requirement for New York law.

2  Q    Right. Now Delaware law, is it?

3  A    No.

4  Q    Okay. And you're aware, are you not, that in the petition

5  filed -- commencing this case, that the debtor listed its

6  principal -- I'll quote the language in the petition,

7  "Principal place of business in Greenville, South Carolina,"

8  aren't you?

9  A    I'm -- I don't recall where we would have indicated that.

10 Q    Okay. And you're aware that the debtor described its

11 physical assets when asked in the petition as 105 East North

12 Street in Greenville, South Carolina?  Didn't the petition say

13 that?

14 A    Again, I don't recall --

15 Q    You don't recall.

16 A    -- exactly what the petition said.

17 Q    And the petition doesn't mention anything about the

18 intellectual property, does it?

19 A    Again, I don't recall.

20 Q    You don't recall. Okay. And you're aware in your

21 affidavit, which you filed with this Court in Paragraph 5, your

22 affidavit was sworn to under penalty of perjury on December

23 6th, 2004 that SGP is, quote, "headquarters in Greenville,

24 South Carolina," is that correct?

25 A    I don't recall that.

1  Q    You don't recall that.  Did you see the notice commencing

2  this Chapter 11 case that your counsel sent out to creditors on

3  December 16th?

4  A    I believe so, yes.

5  Q    Okay.  And you saw that it listed the debtor's address as

6  Greenville, South Carolina?

7  A    That's generally the address we use, correct.

8  Q    Right.

9                         (Pause)

10         MR. COOK:  No further questions, Your Honor.

11         THE COURT:  Any redirect?

12         MR. PHILLIPS:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. PHILLIPS:

15  Q    Mr. Bongorno, at the time that this petition -- the

16  petition in this case was filed, was, in fact -- were, in fact,

17  the officers of the organization located in Greenville, South

18  Carolina?

19  A    Two -- three other -- I'm sorry.  Two other officers were

20  located in Greenville at that time.

21  Q    Okay.

22  A    Yes.

23  Q    And that has since changed, correct?

24  A    That's correct.

25  Q    Sir, with respect to the licensing agreement and supply

1  agreement, you're aware of the adversary proceeding that has

2  been brought in this court?

3  A    Yes, I am.

4  Q    Can you describe briefly what the issues are in that

5  adversary proceeding pursuant to your understanding?

6  A    Well, there are a number of issues that we had with

7  respect to -- under the supply agreement with the timeliness

8  and the quantities of golf balls to be supplied to us from

9  Dunlop.  There were numerous issues with respect to -- what I

10  understand is called tortuous interference with our employees,

11  a number of whom are now working for Dunlop or Dunlop

12  affiliated entities.  There was a significant, we believe, sale

13  of golf balls by Dunlop that bore our -- used our packaging in

14  sale and were sold and ended up being delivered into our

15  territory in violation of the license agreement, those types of

16  matters.

17  Q    And are you aware of any attempt by Dunlop Slazenger

18  manufacturing or Slazenger's Limited or Dunlop Slazenger

19  International Limited to terminate these agreements?

20  A    Yes, they have sent letters to that effect previously.

21  Q    And in what context were those letters sent?

22  A    Based on proceed defaults on our behalf.

23  Q    Am I correct that there were discussions between the

24  parties as -- prior to those letters being sent as to the

25  purchase of the debtor's assets by a Dunlop affiliate?

Bongorno - Redirect/Recross                    41

1    A    Yes, significant discussion.

2    Q    Does -- is it your understanding that the Dunlop entities

3    seek to terminate the agreements under which the debtor's

4    business has been operating?

5    A    We believe that to be the case.  I believe that, yes.

6    Q    And what would be the impact of that on the debtor's

7    opportunities for reorganization, in your opinion?

8    A    Our significant value in our product that we sell is

9    during the trade dress and the logo and name of Slazenger.  And

10   if we did not have that asset our ability to survive would be

11   highly, highly in doubt.

12              MR. PHILLIPS:  No further questions, Your Honor.

13              THE COURT:  Anything else for the witness?

14                        RECROSS EXAMINATION

15   BY MR. COOK:

16   Q    As I understood your direct testimony, Mr. Bongorno, and I

17   realize you're not a lawyer, but as you described the SGP

18   complaint, it has to do with, as you put it, something to the

19   effect of -- something about inference with employees.

20   A    Yes.

21   Q    Okay.  And where are those employees?

22   A    I'm sorry?

23   Q    Where were those employees located?

24   A    Those employees were in Green -- two of them -- all worked

25   out of the Greenville office.

Bongorno - Recross                    42

1  Q    And you're aware that the Dunlop entities moved for the
2  transfer of the venue of that suit from this Court to South
3  Carolina, are you not, on December 23rd, aren't you?
4  A    Frankly, I was only aware of the transfer -- I would
5  assume everything would come together, but the transfer of
6  venue for the bankruptcy proceedings.
7  Q    Um-hum.  Okay.
8            MR. COOK:  No further questions, Your Honor.
9            THE COURT:  You may step down.
10                       (Pause)
11           MR. PHILLIPS:  Your Honor --
12           THE COURT:  Yes?
13           MR. PHILLIPS:  Your Honor, just briefly, some closing
14  remarks from the debtor's perspective with respect to this
15  testimony.
16           Clearly the locus of the debtor's activities has
17  shifted since the filing of the petition and, in fact, pre-
18  petition activities.  And, in fact, the company is today, for
19  all intents and purposes, headquartered in Cleveland, Ohio,
20  both the -- the members, the managers of the LLC are located in
21  Cleveland, Ohio and the two officers of the company are located
22  in Cleveland, Ohio.
23           I would point out -- and while I -- and I try not to
24  in examinations to have witnesses simply read into the record
25  statements provided in documents, I would point out in simply

43

1 looking, for example, at Exhibit 1 and, again, Section 24,
2 which carries over to Page 48, the last line of that section,
3 which is, in fact, identical to the provisions of Section 6.14
4 of the supply agreement also. "Each of the parties irrevocably
5 and unconditionally waives any objection to delaying a venue of
6 any action, suit or proceeding arising out of this agreement or
7 the license agreement or the transactions contemplated hereby
8 or thereby in an approved court and hereby further irrevocably
9 and unconditionally waives and agrees not to plead or claim in
10 an approved court that any such action, suit or proceeding
11 brought in any such court has been brought in an inconvenient
12 forum."
13      The only approved court that is described or courts
14 that are described in this agreement are the United States
15 District Court for the Southern District of New York or,
16 alternatively, the Supreme Court in the Borough of Manhattan,
17 New York City.
18      It is curious to us that at this point, the Dunlop --
19 the Dunlop entities are seeking to transfer venue on a claim of
20 convenience when, in fact, they waive venue and any objection
21 to the convenience of the Court when we were talking about the
22 Southern District of New York by virtue of the agreements.
23      The fact is, Your Honor, as Mr. Bongorno testified,
24 the key assets here, the -- of the debtor are intangible in
25 nature. They represent these agreements, these agreements are

44

1 under attack by the Dunlop entities.

2          The reason for the request for transfer is clear, to

3 bring -- to bring that action, this case, to the home turf of

4 Dunlop where, in fact, they will seek to, in fact, terminate

5 the business of the debtor and thwart the reorganization.  That

6 is the clear purpose here of Dunlop.  It is not to assist in

7 the reorganization of the debtor, but instead to terminate this

8 business relationship and terminate the central business of the

9 debtor.

10          For all the reasons that we've given in our papers,

11 Your Honor, and based upon the testimony that you've heard here

12 today, we would ask that the motion to transfer venue be

13 denied.

14          MR. COOK:  Two minutes and 11 seconds, Your Honor.

15          THE COURT:  Okay.

16          MR. COOK:  One thing you noticed in the testimony and

17 the argument from the other side, no mention of the creditors,

18 the de facto owners of the company.  Totally, utterly ignored.

19          As far as the forum selection clause, Your Honor, I

20 think that counsel has the cart before the horse.  That's a

21 separate lawsuit.  If they want to argue that New York governs,

22 they can certainly make that argument in the lawsuit when the

23 issue was joined and deal with it then.

24          Now we're talking about the case and there hasn't

25 been a shred of evidence of any ill will or intent or --

45

1  there's not a shred of evidence -- and I'm talking about

2  evidence, of torpedoing this reorganization.  That's

3  exaggeration, paranoia, it's not there.

4      The fact of the matter is, the hard facts, whether

5  it's docket congestion, ease of getting to

6  Greenville/Spartanburg.  You saw Mr. -- you heard Mr. Bongorno

7  say that he hadn't even explored going -- taking a connecting

8  flight.  I'm sorry, life is tough and I doubt very much he's

9  going to have to travel that much to Greenville.

10     The fact of the matter is, his other employer has big

11 equity investment there and he should be spending more time

12 there, but I'll leave it at that.

13     Thank you.

14     MR. ATHANES:  Your Honor, Joe Athanes on behalf of

15 the Official Committee of Unsecured Creditors.

16     There is no mention of the creditors, but I am the

17 creditors, Your Honor.  And from our perspective, we think that

18 this motion should be denied.  We think that venue should stay

19 here in Delaware.

20     I've been crunching the numbers over there.  Mr. Cook

21 mentioned that there's $6.6 million of unsecured creditors in

22 this case and that 60 percent of them are located in the

23 Southeastern United States.  The catch is that 42 percent of

24 that 60 percent is the two Dunlop entities who are among the

25 largest unsecured creditors.

46

1      If you take them out of the equation, Your Honor,

2 Southern creditors constitute 1.12 million of 3.76 million of

3 unsecured debt, which is about 29 percent.  And this excludes,

4 of course, Provident Bank, who has another $7 million of debt

5 and happens to be located in Cleveland, Ohio.  And you know

6 there's only one direct flight from there to Greenville, South

7 Carolina.

8      Your Honor, I'd like to talk really briefly about

9 these joinders.  There's nothing wrong from my perspective,

10 although it's certainly unusual, for them to go out and get a

11 bunch of creditors to support their motion by filing joinders.

12 And there's nothing wrong with them even filing them on their

13 behalf, which they did.

14      However, one of our Committee members, to our

15 surprise, actually two of them, signed these joinders.  They're

16 both located in Hong Kong, we managed to get a hold of one.  We

17 asked them about it and he said, well, they told me I may get

18 my money faster if I moved the case to South Carolina so that's

19 why I signed it.  And then we explained that they were a

20 defendant in the lawsuit and that lawsuit is the basis for

21 unsecured creditors getting anything in this case.  And then he

22 quickly had us send him a withdraw and he withdrew that

23 joinder, and I wonder how many other creditors would withdraw

24 their joinders under those circumstances if they knew the whole

25 story.

47

1          Your Honor, the debtor's a Delaware LLC, venue in
2    Delaware is proper.  The inventory doesn't get up and walk to
3    court.  The intellectual property doesn't float over here.  The
4    individual creditors, the Chairman of the Committee is here
5    today and represented but they rarely come to court.  The
6    people who are going to be in bankruptcy court day after day
7    are almost all located in the Northeast or in the Midwest.  And
8    it's obviously much more convenient and there are many more
9    direct flights to Philadelphia and trains.
10          Your Honor, I don't even think it makes sense for the
11   adversary complaint to be transferred, much less the entire
12   bankruptcy case.  What you've got is a defendant in a lawsuit
13   saying don't just transfer the lawsuit, transfer the entire
14   bankruptcy case of the plaintiff to my home court.
15          And, Your Honor, balancing the equities, I don't
16   think that's the right way to go.  I think Delaware is the
17   place that venue is proper and I don't think it would be
18   appropriate to transfer venue.
19          Thank you.
20          THE COURT:  Okay.  I'm going to deny the motion.
21   Briefly, for the following reasons:
22          Number one, even getting back to the original two
23   contracts, I note that all notices, at least with respect to
24   the debtor are directed to Cleveland and their counsel in
25   Cleveland.