48

1        Which then leads me to a particular point made by the

2   Committee in its brief and on Pages 8 and 9 of its brief, it

3   identifies principal players and all the major professionals

4   located either in Cleveland or Chicago or New York or New York,

5   again.

6        And I'm sure everyone would agree that in terms of

7   court appearances and participation in the proceedings in

8   court, we see the professionals all the time and debtor

9   employees, including officers, only infrequently.  So, the list

10  that the Committee has set forth on Pages 8 and 9 clearly

11  suggests to me that transferring this matter to South Carolina

12  would create an awful lot of professionals traveling, many of

13  them at the expense of the estate.

14       I think we're also -- all of counsel familiar with

15  these cases, I'm sure, would agree that it is rare, indeed, for

16  rank and file employees to have to participate in a case and

17  even rare for them to come in and be heard as witnesses or

18  otherwise in a case.

19       And given the fact that the two principal managers

20  are located in Cleveland, I just don't think there's any merit

21  to assert inconvenience of employees as warranting transfer to

22  South Carolina.

23       Quite frankly, I think -- and let me finally observe

24  that on matters of venue transfer, I give great deference to

25  the position of the Creditors' Committee and the Committee

49

1  obviously opposes this motion.

2        Let me just add that the one thing that the movant

3  has going for it is that I don't need the work.  But I don't

4  think that, alone is a basis for transferring venue unless it's

5  demonstrated, and I don't think it can be demonstrated yet that

6  this Court is so burdened that a significant case such as this

7  would not be given adequate attention.

8        So, for those reasons, I'll deny the application.  Is

9  there anything else on the agenda?

10       MR. ROSNER:  No, Your Honor.

11       THE COURT:  Okay.  We stand in recess.

12            (Proceedings Adjourn at 5:49 P.M.)

13

14            C E R T I F I C A T I O N

15

16       I, Karen Hartmann, certify that the foregoing is a

17  correct transcript to the best of my ability, from the

18  electronic sound recording of the proceedings in the above-

19  entitled matter.

20

21

22  /s/ Karen Hartmann_____        Date:  January 22, 2005

23  TRANSCRIPTS PLUS

24

25

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SGP ACQUISITION, LLC, | ) | Case No. 04-13382 (PJW) |
|  | ) |  |
| Debtor. | ) | Hearing Date: June 27, 2005 @ 1:30 p.m. |
|  | ) | Response Deadline: June 16, 2005 @ 4:00 p.m. |

## NOTICE OF MOTION FOR AN ORDER UNDER 11 U.S.C. § 1112(b)
## CONVERTING CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7

TO:   Counsel to the Debtor
      Counsel to the Creditors' Committee
      Counsel to Provident Bank
      Office of the United States Trustee
      All parties requesting service of papers

On May 25, 2005, Slazengers Limited, Dunlop Slazenger International Limited, Dunlop Sports Group Americas Inc. and Dunlop Slazenger Manufacturing LLC filed the attached motion for an order under 11 U.S.C. § 1112(b) converting chapter 11 case to a case under chapter 7 (the "Motion"), which seeks entry of an order converting the debtor's chapter 11 case to a case under chapter 7.

You are required to file a response, if any, to the Motion on or before June 16, 2005 at 4:00 p.m. At the same time, you must serve a copy of the response upon the Movants' counsel:

| | | |
|---|---|---|
| Thomas G. Macauley ZUCKERMAN SPAEDER LLP 919 Market Street Suite 990 Wilmington, DE 19801 Telephone: (302) 427-0400 Facsimile: (302) 427-8242 tmacauley@zuckerman.com | Michael L. Cook David M. Hillman Sophie S. Kim SCHULTE ROTH & ZABEL LLP 919 Third Avenue New York, New York 10022 Telephone: (212) 756-2000 Facsimile: (212) 593-5955 michael.cook@srz.com david.hillman@srz.com sophie.kim@srz.com | Andrew J. White, Jr. Jesse C. Belcher HAYNSWORTH SINKLER BOYD, P.A. 75 Beattie Place Two Liberty Square Greenville, South Carolina 29601 Telephone: (864) 240-3200 Facsimile: (864) 240-3300 awhite@hsblawfirm.com jbelcher@hsblawfirm.com |

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: May 27, 2005
      Wilmington, Delaware

                    Zuckerman Spaeder LLP

                    By: _____
                        Thomas G. Macauley (ID No. 3411)
                    919 Market Street
                    Suite 990
                    Wilmington, DE 19801
                    Facsimile: (302) 427-8242
                    tmacauley@zuckerman.com

                        -and-

                    Schulte Roth & Zabel LLP
                    Michael L. Cook
                    David M. Hillman
                    Sophie Kim
                    919 Third Avenue
                    New York, New York 10022
                    Facsimile: (212) 593-5955
                    michael.cook@srz.com
                    david.hillman@srz.com
                    sophie.kim@srz.com

                        -and-

                    Haynsworth Sinkler Boyd, P.A.
                    Andrew J. White, Jr.
                    Jesse C. Belcher
                    75 Beattie Place
                    Two Liberty Square
                    Greenville, South Carolina 29601
                    Facsimile: (864) 240-3300
                    awhite@hsblawfirm.com
                    jbelcher@hsblawfirm.com

                    Counsel for Slazengers Limited,
                    Dunlop Slazenger International Limited,
                    Dunlop Slazenger Manufacturing LLC and
                    Dunlop Sports Group Americas Inc.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )<br><br>SGP ACQUISITION, LLC, )<br><br>Debtor. ) | Chapter 11<br><br>Case No. 04-13382 (PJW)<br><br>Hearing Date: June 27, 2005 @ 1:30 p.m.<br>Response Deadline: June 16, 2005 @ 4:00 p.m. |

## MOTION FOR AN ORDER UNDER 11 U.S.C. § 1112(b) CONVERTING CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7

TO THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE:

Slazengers Limited ("SL"), Dunlop Slazenger International Limited ("Dunlop International"), Dunlop Sports Group Americas Inc. ("Dunlop Sports") and Dunlop Slazenger Manufacturing LLC ("Dunlop Manufacturing" and together with SL, Dunlop International and Dunlop Sports, "Slazengers") move under § 1112(b) of the Bankruptcy Code ("Code"), for an order converting the chapter 11 case of SGP Acquisition LLC ("SGP") to a liquidation case under chapter 7 of the Code, as follows:

### Preliminary Statement

1. The evidence overwhelmingly supports conversion of SGP's chapter 11 case to a liquidation under chapter 7. When SGP commenced the bankruptcy case on November 30, 2004, SGP was admittedly insolvent – liabilities ($14 million) exceeded assets ($9.9 million) by

9878010.7

A   52

over $4 million.[1]   Six months later, after steady losses, SGP has neither proposed a reorganization plan nor a feasible exit strategy.  Instead, SGP has suffered massive losses and incurred huge administrative expenses.  Based on financial results for only January through March 2005 ($1,980,909 aggregate loss), annual losses may exceed $7.92 million, which is an eye-popping 344% greater than SGP's $2.3 million loss projection for the entire year.  Because management has yet to disclose financial results for April, which were required to be filed on May 20, 2005, the true severity of SGP's financial deterioration cannot be determined.  As a result of the alarming operating losses and professional fees (which exceed $1 million through March 2005), this case is most likely administratively insolvent, and has been for some time now.  The hemorrhaging must stop.

2.      Conversion is warranted because:

- SGP has suffered massive losses and cannot rehabilitate.

- SGP cannot propose a confirmable plan in a reasonable amount of time because its key asset is a trademark license that cannot be assumed or assigned factually and as a matter of law.  SGP can only dispute the legal issue.  But as a factual matter, no assignee has appeared in six months, and no rational assignee will assume SGP's license obligations.  Moreover, no assignee would pay fair value for a contract when, as here, the contract was terminated prior to bankruptcy.

- SGP has lost any chance of emerging from chapter 11 as a rehabilitated company.

- Management has repeatedly failed to file monthly operating reports on a timely basis.

- SGP's management has a conflict of interest because insiders have personally guaranteed a portion of The Provident Bank's undersecured claim.

- SGP's management has breached its fiduciary duties to creditors by (a) gambling with creditor recoveries so that insiders could avoid personal

---

[1]      See Summary of Schedules [D.I. 116].

A    53

liability on their personal guarantees, and (b) permitting massive losses to the estate with no end in sight.

3.    These facts lead to an inescapable conclusion: if this case remains in chapter 11, operating losses will fully erode any possible recovery to unsecured creditors and jeopardize payment of administrative claims like the professionals in the case and SL, which is owed at least $720,000 in unpaid royalties.    Accordingly, immediate liquidation will best serve the interest of all creditors.

### Background

4.    SGP filed a Chapter 11 petition on November 30, 2004 (the "Petition Date"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code ("Code"), SGP continues to manage its property as a debtor in possession. The United States Trustee appointed a five-member creditors' committee on December 15, 2004.

5.    SL and Dunlop International are counter-parties to a License Agreement, dated November 8, 2002, and amended on December 1, 2003 (the "License Agreement"), and hold an administrative expense claim in excess of $720,000 through May 2005 for unpaid postpetition royalties and an unsecured claim of at least $434,000 for prepetition royalties.    Dunlop Manufacturing is a counter-party to a Supply Agreement, dated November 8, 2002, and amended on December 1, 2003 (the "Supply Agreement"), and holds an unsecured claim for unpaid goods in excess of $2.4 million. Dunlop Sports is a counter-party to a related Technology Sharing Agreement (the "Tech Agreement").[2]

6.    SGP's chapter 11 case has been pending for six months, and SGP has yet to file a plan of reorganization.

---

[2]    In a suit before this Court, Slazenger has sought a declaratory judgment that the "executory contracts" (i.e., License Agreement, Supply Agreement and Tech Agreement) terminated prior to the bankruptcy filing.

9878010.7

- 3 -

A    54

<u>Jurisdiction</u>

7.    The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). The statutory predicate for the relief sought in this Motion is 11 U.S.C. § 1112(b).

## I.

## LEGAL STANDARD

8.    Section 1112(b) of the Code provides that, upon a motion of a party in interest, the court may convert a case under chapter 11 to a case under chapter 7 for "cause."  11 U.S.C. § 1112(b).  Section 1112(b) lists ten grounds constituting "cause" for conversion, including (i) "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;" (ii) "inability to effectuate a plan;" and (ii) "unreasonable delay by the debtor that is prejudicial to creditors," *See* 11 U.S.C. § 1112(b)(1)-(3).  "[T]he list ... is not exhaustive.  The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." <u>C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)</u>, 113 F.3d 1304, 1311 (2d Cir. 1997) (quoting H.R. Rep. No. 95-595, at 405-06, <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 6363-64).  As shown below, cause exists to convert SGP's case to a case under chapter 7.

## II.

## SGP IS SUFFERING MASSIVE LOSSES AND CANNOT REHABILITATE

9.    "Cause" under § 1112(b)(1) has two requirements: (i) "continuing loss to or diminution of the estate" and (ii) "absence of a reasonable likelihood of rehabilitation."  The purpose of section 1112(b)(1) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of

9878010.7                                    - 4 -

A   55

rehabilitation." Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (8th Cir. 2004) (quoting In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)). Both requirements of section 1112(b)(1) are met here.

### A.    SGP is Suffering From Massive Losses.

10.    "Continuing loss to or diminution of the estate" is shown by a debtor's continuing losses or negative cash flow position after the date of bankruptcy. Loop Corp, 379 F.3d at 515-516 ("negative cash flow situation alone is 'sufficient to establish continuing loss to or diminution of the estate.'"); In re Schriock Constr., Inc., 167 B.R. 569 (Bankr. D.N.D. 1994), at 575 (continuing loss to or diminution of the estate can be established by showing that debtor incurred continuing losses or maintained negative cash flow after entry of the order for relief); In re Northeast Family Eyecare, P.C., 2002 WL 1836307, at *3 (Bankr. E.D. Pa. 2002) ("negative cash flow postpetition and an inability to pay current expenses satisfies the elements of § 1112(b)(1)") (attached as Exhibit A).

11.    SGP was hopelessly insolvent on the Petition Date[3] and its post-bankruptcy losses are staggering. In December 2004, SGP's losses exceeded $513,000 and losses in January through March 2005 exceeded $1.98 million. At this stunning rate, annual losses for 2005 will exceed $7.92 million, which is 344% greater than its $2.3 million loss projection for the whole year.[4]

---

[3]    According to SGP's Summary of Schedules, SGP's liabilities ($14 million) exceeded its assets ($9.9 million) by over $4 million. (See D.I. 116.)

[4]    See DIP Financing Budget in Initial Monthly Operating Report [D.I. 167], attached as Exhibit B.

9878010.7                                        - 5 -

A    56

| Period | Projected Losses (Per Budget dated 2/14/05) | Actual Losses (Per Operating Reports) | Variance |
|--------|---------------------------------------------|----------------------------------------|----------|
| December | ($514,196) | ($513,361)[5] | $835 |
| January | ($541,217) | ($632,521)[6] | ($91,304) |
| February | ($270,588) | ($809,969)[7] | ($539,381) |
| March | ($288,850) | ($538,419)[8] | ($249,569) |
| April | ($208,195) | Not Disclosed | Not Disclosed |
| Total | ($1,823,045.97) [5 months] | ($1,955,851) [4 months] | ($879,419) [4 months] |

12.     In addition to the massive operating losses, professional fees and expenses are mounting at an alarming rate. In the four-month period of December 2004 through March 2005, fees and expenses exceeded $1.08 million, nearly double SGP's projection of $560,000.[9] Additionally, SGP is accruing other substantial administrative expenses. For example, if, as SGP asserts, the License Agreement was not terminated prior to the Petition Date, SGP owes SL royalties due under the License Agreement since the Petition Date, currently estimated at $720,000 ($120,000 per month) for the period between December 2004 through May 2005.

**B.      SGP Cannot Rehabilitate.**

13.     The second prong of § 1112(b)(1) requires the "absence of a reasonable likelihood of rehabilitation." "Rehabilitation" means something different from the term "reorganization" in chapter 11. <u>Northeast Family Eyecare</u>, 2002 WL 1836307, at *3. In this

---

[5]     Relevant pages of SGP's December 2004 operating report are attached as Exhibit C.

[6]     Relevant pages of SGP's January 2005 operating report are attached as Exhibit D.

[7]     Relevant pages of SGP's February 2005 operating report are attached as Exhibit E.

[8]     Relevant pages of SGP's March 2005 operating report are attached as Exhibit F.

[9]     <u>See</u> DIP Financing Budget (Exhibit B).

context, rehabilitation means to put back in good condition and re-establish on a sound basis. Id.; Lizeric, 188 B.R. at 503; In re Kanterman, 88 B.R. 26, 29 (Bankr. S.D.N.Y. 1988). "It signifies that the debtor will be reestablished on a secure financial basis, which implies establishing a cash flow from which its current obligations can be met." In re AdBrite Corp., 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003); In re D&F Meat Corp., 68 B.R. 39, 41 (Bankr. S.D.N.Y. 1986) (no "rehabilitation" existed when post-petition fire destroyed estate assets; only fire insurance claim proceeds to be distributed to creditors).

14.    SGP lacks the financial wherewithal to meet its current obligations. Indeed, at the last hearing on April 14, 2005, SGP's counsel candidly acknowledged that SGP lacks funds sufficient to meet even the basic obligations of being in Chapter 11 – paying its administrative professional fees:

> [Q]uite frankly, there aren't the funds in the estate to pay the
> interim comp – fee applications in full anyway. So, it would be
> silly to proceed on objections to interim fee apps. There's some
> funding available for interim compensation, but certainly the – not
> even enough to – were the objections lodged – limited objections
> to be allowed or granted, there still isn't enough funding. . . .

4/14/05 Hearing Transcript at 5:24 – 6:6 (relevant pages are attached as Exhibit G).

15.    Six months after the Petition Date, no settlement is in sight, and SGP's losses, administrative expenses and professional fees continue to soar. Moreover, SGP appears to be liquidating its business. SGP has admitted to Slazenger that: (i) SGP must liquidate its business and intends to litigate its claims against Slazenger; (ii) SGP has recently terminated all but approximately three of its sales representatives; (iii) SGP has recently terminated all but approximately five employees in its Greenville, South Carolina office; (iv) SGP must liquidate its remaining inventory; (v) SGP has notified the landlord of the premises in Greenville, South Carolina of its intent to terminate its lease at the end of August 2005; and (vi) the two SGP

9878010.7                               - 7 -

managers who are affiliated with Resilience Capital Partners, LLC ("Resilience"), one of SGP's two controlling insiders, recently resigned from SGP's board of managers.

16.    Accordingly, SGP is admittedly hanging its hopes for reorganization on its speculative litigation against Slazenger, rather than on the rehabilitation of its business.  "A debtor must have a viable business in place in order to have any potential for rehabilitation, and where . . . an ongoing lawsuit . . . is the only corporate activity of any kind, there is clearly no chance for corporate rehabilitation." Moody v. Security Pac. Bus. Credit, Inc., 85 B.R. 319, 344 (W.D. Pa. 1988) (unlike a reorganization, "rehabilitation" under Code § 1112(b)(1) requires a company to be put back on a "firm, sound basis," and does not include liquidation; case converted to chapter 7).  Like a fire that leaves only insurance proceeds for a debtor to distribute, speculative litigation can hardly be a basis for rehabilitation of SGP's business.  Moreover, if SGP's allegations have any merit, then there is no reason why a chapter 7 trustee could not step into SGP's shoes and prosecute the litigation.

III.

**SGP CANNOT CONFIRM A FEASIBLE PLAN**

17.    "Cause" exists under § 1112(b)(2) based upon SGP's "inability to effectuate a plan."  There is no reasonable likelihood that a plan can be confirmed here in a reasonable amount of time.  See In re Woodbrook Assocs., 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless."); In re All Denominational New Church, 268 B.R. 536, 538 (8th Cir. BAP 2001) ("cause" exists under section 1112(b)(2) when "it is unreasonable to expect that a plan can be confirmed in the case."); In re Moore Constr., 206 B.R. 436, 438 (Bankr. N.D. Tex. 1997) (cause to convert when debtor's financial statements showed no ability to pay estate's administrative claims in full on effective

date of proposed plan of reorganization, as required under Code § 507(a)(1)). As the Supreme Court has said, "[h]owever honest in its efforts the debtor may be, and however sincere its motives, [the court] is not bound to clog its docket with visionary or impracticable schemes for resuscitation." Tennessee Publ'g Co. v. American Nat'l Bank, 299 U.S. 18, 22 (1936). "'[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 376 (1988).

18.     The chapter 11 case has been pending for nearly six months. In that time, SGP has filed no plan, and SGP has failed even to devise a feasible exit strategy. SGP cannot confirm a feasible plan because the License Agreement, a "key asset,"[10] is neither assumable nor assignable legally or factually. See Stay Memo at 13-27.[11] Even assuming, *arguendo*, that SGP could assume or assign the License Agreement, SGP still cannot confirm a feasible plan because: (i) SGP lacks the financial wherewithal to cure monetary defaults under the License Agreement ($720,000 postpetition, plus at least $434,000 prepetition) and the related Supply Contract ($2.4 million), and (ii) six months have passed since the case was commenced and no prospective assignee has expressed interest in taking an assignment of the License Agreement without modification. As a practical matter, SGP cannot propose a plan.

---

[10]     SGP's CEO, Richard Bongorno, testified that the License Agreement and Supply Agreement are SGP's "key asset[s]." (See 1/7/05 Hearing Transcript at 28:18-20, relevant pages are attached as Exhibit H.)

[11]     Stay Memo refers to the Memorandum in Support of Slazenger's Motion for Relief from the Automatic Stay, dated February 28, 2005 [D.I. 181]. As more fully set forth in the Stay Memo (incorporated herein by reference), additional grounds to support relief from the stay include: (i) SGP's inability to assume the License Agreement due to incurable defaults; (ii) SGP's failure to protect Slazenger's interest in the trademarks licensed under the License Agreement; and (iii) SGP's inability to assume the License Agreement because the Agreements comprise one integrated transaction, and SGP cannot, as a matter of law assume the Supply and Technology Sharing Agreements. Slazenger's motion is presently scheduled for hearing on June 27, 2005.

IV.

## SGP'S UNREASONABLE DELAY

19.    "Cause" exists under Code § 1112(b)(3) because of "unreasonable delay [by SGP] that is prejudicial to creditors." 11 U.S.C. § 1112(b).   The case has been pending for nearly six months, and SGP has yet to file a reorganization plan.  This delay has resulted in significant administrative expenses, eroding any recovery to creditors.

V.

## SGP'S FAILURE TO FILE TIMELY OPERATING REPORTS

20.    SGP has repeatedly failed to file operating reports in a timely manner.  Operating reports are due within 20 days after the end of each month, as stated on the face of the form report.  As shown below, SGP has consistently failed to comply with this reporting obligation.

| Month | Date Due | Date Filed | Days Late |
|---|---|---|---|
| Initial | 12/15/04 | 2/14/05 | 63 days |
| December 2004 | 1/20/05 | 2/14/05 | 25 days |
| January 2005 | 2/21/05 | 3/17/05 | 24 days |
| February 2005 | 3/21/05 | 4/20/05 | 30 days |
| March 2005 | 4/20/05 | 5/23/05 | 33 days |
| April 2005 | 5/20/05 | Not filed | 6 days as of 5/26/05 |

21.    A debtor's failure to file operating reports constitutes cause to convert the case. All Denominational New Church, 268 B.R. 536 at 538 (8th Cir. BAP 2001) (held, that "failure to file monthly operating reports, whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceeding"); In re Robino, 243 B.R. 472, 485-86 (Bankr. N.D. Ala. 1999) (same); Moore Constr., 206 B.R. 436 at 438 (same); In re Berryhill, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991)

A    61

(same); In re Chesmid Park Corp., 45 B.R. 153, 159 (Bankr. E.D. Va. 1984) (same); In re Modern

Office Supply, Inc., 28 B.R. 943, 945 (Bankr. W.D. Okla. 1983) (same).

      22.    According to one court, "[t]imely and accurate financial disclosure is the life

blood of the Chapter 11 process.  Monthly operating reports are much more than busy work

imposed upon a Chapter 11 debtor for no reason other than to require it to do something.  They

are the means by which creditors can monitor a debtor's post-petition operations. As such, their

filing is very high on the list of fiduciary obligations imposed upon a debtor in possession.  Thus,

the failure to file operating reports in itself constitutes 'cause' for dismissal." Berryhill, 127 B.R.

at 433 (internal citations omitted).[12]

<h3 style="text-align:center">VI.</h3>

<h3 style="text-align:center">SGP HAS BREACHED ITS FIDUCIARY DUTIES</h3>

      23.    A debtor-in-possession is a fiduciary to the estate, creditors and the Court.

Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("[I]f a debtor

remains in possession. . .the debtor's directors bear essentially the same fiduciary obligation to

creditors and shareholders as would the trustee for a debtor out of possession."); In re United

Healthcare System, Inc., 200 F.3d 170, 177 (3d Cir. 1999) (citing Weintraub for proposition that

debtor-in-possession is fiduciary for its estate and its creditors); In re Shop N' Go P'ship, 261

B.R. 810, 814 (Bankr. M.D. Pa. 2001) (same).

      24.    Accordingly, a debtor-in-possession has a duty to "exercise that measure of care

and diligence that an ordinary prudent person would exercise under similar circumstances." See

In re Rigden, 795 F.2d 727, 730 (9th Cir. 1986) (by analogy, trustee must exercise care and

---

[12]    Section 1112(b), as amended in April 2005, would effectively codify this case law by including as "cause" the failure to furnish information to the Office of the United States Trustee.

diligence of an ordinary prudent person). A debtor-in-possession is also bound by a duty of loyalty, and has a fiduciary obligation to conserve the estate's assets and maximize distributions to creditors. See Wolf v. Weinstein, 372 U.S. 633, 649-53 (1963) (debtor-in-possession is bound by duty of loyalty); Rigden, 795 F.2d at 730 (by analogy, trustee has "fiduciary obligation to conserve the assets of the estate and to maximize distributions to creditors"); In re Combined Metals Reduction Co., 557 F.2d 179, 197 (9th Cir. 1977) ("A trustee should not only avoid impropriety, but also, even the appearance of impropriety, in all of his fiduciary dealings."); In re Coram Healthcare Corp., 271 B.R. 228, 235 (Bankr. D. Del. 2001) ("A debtor-in-possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety.). A debtor-in-possession's fiduciary duty to preserve the value of an estate includes the duty to "cease operations where continued operations would deplete the estate with no reasonable prospect of rehabilitation." State of Ill., Dep't of Revenue v. Schechter, 195 B.R. 380, 384 (N.D. Ill. 1996); see also United States ex rel. Harrison v. Estate of Deutscher, 115 B.R. 592, 597 (M.D. Tenn. 1990).

25.    As discussed, SGP incurred staggering losses in January through March, 2005, and has masked the true magnitude of the losses by failing to timely file operating reports. The prudent course of action, given SGP's awful operating results and inability to assign the license, is to stop the bleeding, conserve assets for the benefit of creditors, and convert the case to a liquidation under chapter 7. Instead, SGP has chosen to drift in chapter 11 with no immediate prospect for reorganization.

26.    One apparent reason for SGP's self-interested commitment to the Chapter 11 process in the face of escalating monthly losses is the guaranty given by one of its insiders,

Kimolos II L.P. ("Kimolos").[13]    Kimolos guaranteed almost $2.4 million of SGP's pre-bankruptcy "Overadvance Facility" to The Provident Bank.[14]  In addition to the Overadvance Facility, SGP owes close to $5 million to The Provident Bank under a pre-bankruptcy revolving credit facility (together with the "Overadvance Facility," the "Credit Facility").[15]  SGP's obligations under the Credit Facility are secured by a lien on certain of SGP's assets.[16] Accordingly, to the extent that the value of the assets securing SGP's obligations under the Credit Facility is insufficient to satisfy the Overadvance Facility, Kimolos is liable for any deficiency.

27.    Kimolos is an affiliate of Xenophon Zapis and Zapis Acquisition Partners LLC ("Zapis"), one of SGP's two controlling insiders. See Exhibit I (Ohio Secretary of State records of Kimolos and its general partner); 1/7/05 Hearing Transcript at 29:8-14 (Exhibit H). With the resignation of the two Resilience board members, SGP's board of managers is now comprised solely of three Zapis-appointed managers. Id. at 29:19-24. Richard Bongorno, SGP's Chief Operating Officer and Treasurer, is also the Chief Financial Officer of a Zapis affiliate. Id. at 27:12-29, 34:5-15. Another of SGP's officers, Brad Seibert, is Mr. Zapis's son-in-law. Id. at 30:10-11, 35:12-19. In a very real sense, therefore, the guarantor of The Provident Bank debt also manages SGP. Accordingly, as a result of the Kimolos guaranty, SGP's management has at least a potential conflict of interest due to the guaranty; and if The Provident Bank is undersecured, as appears to be the case, that conflict of interest is actual because of the

---

[13]    See Statement of Financial Affairs [D.I. 115], response to Question 3.b (listing Kimolos as an insider).

[14]    See Motion of Debtor and Debtor in Possession for Entry of Interim and Final Orders (i)(a) Authorizing Postpetition Financing on a Superpriority Basis Under Section 364 of the Bankruptcy Code, (b) Use of Cash Collateral Under Section 361 and 363 of the Bankruptcy Code and (ii) Scheduling Final Hearing Under Bankruptcy Rule 4001(c) ("DIP Financing Motion") [D.I. 12, ¶ 8].

[15]    Id. ¶ 7.

[16]    Id. ¶ 8.

deficiency. SGP cannot be allowed to continue draining the assets of this estate in violation of its fiduciary duty, in order to protect an insider.

## VII.

## CONVERSION IS IN CREDITORS' BEST INTERESTS

28.    "A motion filed under Section 1112(b) necessitates a two-step analysis:  (1) to determine if 'cause' exists to either dismiss the Chapter 11 case or convert the Chapter 11 case to a Chapter 7 [case] and (2) to determine which option, dismissal or conversion, is in the 'best interest of creditors and the estate.'" In re Camden Ordnance Mfg. Co., 245 B.R. 794, 798 (E.D. Pa. 2000) (citing In re Superior Siding & Window, 14 F.3d 240, 242 (4th Cir. 1994). SGP has no viable business now and no cash flow with which to pay its creditors. Conversion of the case with the supervision of a Chapter 7 trustee would best serve the estate and its creditors.

**WHEREFORE**, Slazenger requests that the Court (i) enter an order converting SGP's chapter 11 case to a case under chapter 7 and (ii) grant it such other relief as is necessary and just.

Dated: May 27, 2005
        Wilmington, Delaware

                    Zuckerman Spaeder LLP

                    By: _____
                        Thomas G. Macauley (ID No. 3411)
                    919 Market Street
                    Suite 990
                    Wilmington, DE 19801
                    (302) 427-0400

                    -and-

                    Schulte Roth & Zabel LLP
                    Michael L. Cook (MLC-7887)
                    David M. Hillman (DMH-8666)
                    Sophie S. Kim
                    919 Third Avenue
                    New York, New York 10022
                    (212) 756-2000

                    -and-

                    Haynsworth Sinkler Boyd, P.A.
                    Andrew J. White, Jr.
                    Jesse C. Belcher
                    75 Beattie Place
                    Two Liberty Square
                    Greenville, South Carolina 29601
                    (864) 240-3200

                    Counsel for Slazengers Limited,
                    Dunlop Slazenger International
                    Limited, Dunlop Slazenger
                    Manufacturing LLC and Dunlop
                    Sports Group Americas, Inc.

9878010.7

**EXHIBIT A**

Westlaw.

Not Reported in B.R.                                                      Page 1

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

c
United States Bankruptcy Court, E.D. Pennsylvania.
In re NORTHEAST FAMILY EYECARE, P.C.,
Debtor.
No. 01-13983DWS.

July 22, 2002.

United States Trustee (UST) moved to dismiss Chapter 11 case based, inter alia, on debtor's inability to effectuate plan. The Bankruptcy Court, Sigmund, J., held that: (1) "cause" existed to dismiss or convert Chapter 11 case; and (2) court would exercise its discretion to dismiss rather than convert.

Motion granted; case dismissed.

West Headnotes

[1] Bankruptcy ☜3592
51k3592 Most Cited Cases
Chapter 11 case would be dismissed, for continuing loss to or diminution of estate and absence of reasonable likelihood of rehabilitation, where debtor had not operated profitably from time that its Chapter 11 petition was filed, nearly one-and-one-half years earlier, and debtor had not provided any evidence suggesting that its business would be more financially successful when it emerged. Bankr.Code, 11 U.S.C.A. § 1112(b)(1).

[2] Bankruptcy ☜3591(4)
51k3591(4) Most Cited Cases
Chapter 11 case would be dismissed based on debtor's inability to effectuate plan, where debtor did not have adequate cash position to fund plan and operate profitably, even giving debtor's principal the benefit of doubt that she would have money to make cash infusion in three weeks. Bankr.Code, 11 U.S.C.A. § 1112(b)(2).

[3] Bankruptcy ☜3591(4)

51k3591(4) Most Cited Cases

[3] Bankruptcy ☜3592
51k3592 Most Cited Cases
"Cause" existed to dismiss Chapter 11 case, based on court's denial of confirmation of every plan that debtor had proposed and inability, after nearly one-and-one-half years, to reorganize. Bankr.Code, 11 U.S.C.A. § 1112(b)(5).

[4] Bankruptcy ☜3591(2)
51k3591(2) Most Cited Cases
Where United States Trustee (UST) had established requisite "cause," bankruptcy court would exercise its discretion to dismiss rather than convert Chapter 11 case, where Chapter 7 trustee could not operate debtor's business and there were no unencumbered assets to liquidate for creditors. Bankr.Code, 11 U.S.C.A. § 1112(b).
Allen B. Dubroff, Esquire, Philadelphia, Counsel for Debtor.

Bonnie R. Golub, Esquire, Weir & Partners, LP, Philadelphia, Counsel for Seiderman.

Dave P. Adams, Esquire, Office of the U.S. Trustee, Philadelphia, United States Trustee.

MEMORANDUM OPINION

SIGMUND, Bankruptcy J.

*1 Before the Court is the Motion of the United States trustee ("UST") to dismiss or convert this Chapter 11 case (the "Motion"). The Motion was originally filed on October 1, 2001 and has been continued from time to time to provide the Debtor with the opportunity to file and confirm a plan of reorganization. At the contemporaneously scheduled confirmation hearing, the Debtor acknowledged that the class of unsecured creditors had rejected the Third Amended Plan of Reorganization (the "Plan") and absent the infusion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                Page 2

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

**(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))**

of new value by the Debtor's sole shareholder, Janet Wilamowski, O.D. ("Wilamowski"), the Plan could not be confirmed as it did not comply with the absolute priority rule of 11 U.S.C. § 1129(a)(8). Purporting to learn on the eve of the hearing that Wilamowski had the prospect of securing a loan to meet that requirement, the Debtor asked for a three week continuance. Having agreed to allow the Debtor time to file the Plan after its Second Amended Plan of Reorganization was rejected by creditors, the UST, with the concurrence of the largest creditor Dr. Arthur Seiderman ("Seiderman"), refused the requested continuance and a hearing was held on the Motion.

BACKGROUND

The Debtor provides optometry and vision development services to patients at offices in King of Prussia and Bensalem, Pennsylvania. Its principal is Wilamowski who, with Dr. Adam Perlin, [FN1] purchased two existing practices from Dr. Arthur Seiderman ("Seiderman") and Dr. Steven Marcus in December 1997 and October 1998, respectively. The purchases were financed by the Money Store through SBA loans guaranteed by Drs. Wilamowski and Perlin. Debtor has reached agreement with the Money Store on the treatment of its secured claim in this bankruptcy case. The secured creditor has reduced its claim from $1,058,000 to $300,000 to be repaid by monthly installments of $3,585.24 for twelve years.

Contemporaneously with the purchase of the Seiderman practice, the Debtor entered into an employment contract with Seiderman which the Debtor rejected during the bankruptcy case. The Debtor acknowledges Seiderman's $4,300 priority claim for wages and his unsecured claim for rejection damages and two note obligations of approximately $100,000. [FN2] In short, Seiderman holds the key to acceptance of the Debtor's plan of reorganization. His claim controls the class of unsecured creditors, and not surprisingly given his contentious relationship with Wilamowski, he voted to reject the Plan which proposes to pay unsecured creditors 20% in six installments over 30 months out of the revenues of the reorganized business. The

requirement that Seiderman's priority wage claim be paid upon the Plan effective date also presents an impediment to confirmation since the Debtor only had $5,000 in its bank account at the time of the hearing. [FN3] The inadequacy of the Debtor's cash reserves also renders the Debtor's ability to make the first Plan installment to unsecured creditors in the amount of $13,000-$14,000 due within thirty days of the Effective Date highly improbable.

Indeed the Debtor is struggling to operate profitably without regard to Plan funding requirements. Upon examination by the UST, Wilamowski acknowledged that the Debtor was unable to pay its bills in certain months. The operating reports filed in this case from October 2001 through May 2002 reveal operating losses for every month but February 2002. [FN4] Exhibit T-1. A further review shows that Debtor failed to make its $3,500 payment to the Money Store in February, April and May, and its bank statements reflect repeated service charges for checks drawn on insufficient funds (e.g., 9 checks aggregating $656 in April). [FN5] Attempts to elicit an explanation from Wilamowski as to the Debtor's current financial obligations were for the most part unsuccessful. She demonstrated only the most cursory knowledge of the Debtor's budget. The Debtor's accountant to whom she deferred on much of the financial information contained in the Disclosure Statement was not present to testify. [FN6]

*2 Wilamowski's proffered solution to the Debtor's insufficient financial resources to fund the Plan is to offer to forgo one month's wages or $5,800 and accept the offer of her employees to do likewise with one paycheck aggregating $6,500. With these concessions and current business revenues, Wilamowski would have the Court conclude that the initial Plan payments can be funded and the Plan is therefore feasible. [FN7] As to future Plan dividends to unsecured creditors, she noted that she had six months to raise the $6,000 installment and if need be, she would take another salary cut. She is unable to state when or how the deferred professional fees will be paid.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                Page 3

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

Inexplicably Wilamowski claims that Seiderman's rejection of the Plan was unanticipated [FN8] and accordingly she made no effort to raise any new capital. Contending that she "didn't expect to have to do this" (i.e., borrow money), she only started to seek financing early the week before the hearing. The extent of her progress at the time of the hearing was to consult with Dr. White, a professional colleague for the names of some bankers and to provide him with her business information which he purportedly took to the banks. [FN9] Additionally she secured the agreement of her brother-in-law to guarantee a loan obligation of $30,000-$35,000. Obviously the efforts to date prove nothing about her ability to secure the funds. On this record, it is not surprising that the UST and Seiderman pressed to hold the hearing, viewing Debtor's counsel's request for a three week continuance to complete the loan process as too little, too late.

DISCUSSION

Section 1112(b) governs the conversion or dismissal of chapter 11 cases. Section 1112 provides the bankruptcy court with the necessary power to promptly administer chapter 11 cases on its docket. United Sav. Assoc. v. Timbers of Inwood Forest, Ltd., (In re Timbers of Inwood Forest, Ltd.), 808 F.2d 363 (5th Cir.1987). The ten examples of "cause" to convert or dismiss a chapter 11 case listed in § 1112(b) are illustrative, not exhaustive. As stated by Congress when it drafted § 1112(b):

Subsection (b) gives wide discretion to the court to make an appropriate disposition of the case when a party in interest requests. The court is permitted to convert a reorganization case to a liquidation case or to dismiss the case, whichever is in the best interests of the creditors and the estate, only for cause.... The list [of ten grounds that constitute cause set forth in § 1112(b)] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

*3 H.R. Rep. No. 595, 95th Cong., 1st Sess. 405-06 (1977). See also Official Committee of Unsecured Creditors v. SGL Carbon Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 160 (3d

Cir.1999). The moving party has the burden to establish cause under § 1112(b). In re Sheehan, 58 B.R. 296, 299 (Bankr.D.S.D.1986).

Bankruptcy courts should proceed in a deliberate manner when confronted with a motion under § 1112(b) and should not "precipitously sound the death knell for a Chapter 11 debtor by prematurely converting or dismissing the case." In re Tracey Service Company, Inc., 17 B.R. 405, 409 (Bankr.E.D.Pa.1982). However, if the Chapter 11 case cannot achieve a reorganization within the statutory requirements of the Code, then there is no point in expending estate assets on administrative expenses, or delaying creditors in the exercise on their nonbankruptcy law rights. In re Brown, 951 F.2d 564, 572 (3d Cir.1991). See also In re L.B.G. Properties, 72 B.R. 65, 68 (Bankr.S.D.Fla.1987) (Chapter 11 does not provide an unlimited opportunity to seek a successful reorganization).

[1] I find cause to dismiss or convert this Chapter 11 case under § 1112(b)(1), (2) and (5). Section 1112(b)(1) codifies a two-prong test: continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation. In re Denrose Diamond, 49 B.R. 754, 756 (Bankr.S.D.N.Y.1985). Courts have held that a negative cash flow postpetition and an inability to pay current expenses satisfies the elements of § 1112(b)(1). "Obviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, the [elements of § 1112(b)(1) are] satisfied." In re Route 202 Corporation t/a Lionti's Villa, 37 B.R. 367, 374 (Bankr.E.D.Pa.1984). See also In re Galvin, 49 B.R. 665, 669 (Bankr.D.N.D.1985) ("Post-petition negative cash flow is considered by courts to be evidence of continuing losses required by section 1112(b)(1)"); Diamond, 49 B.R. at 756 (citing In the Matter of 3868-70 White Plains Road, Inc., 28 B.R. 515 (Bankr.S.D.N.Y.1983)) ("negative cash flow and an inability to pay current expenses has ... prompted conversion.") While short term postpetition operating losses where there exists a realistic possibility of rehabilitation do not warrant conversion, "a positive cash flow will not guard against conversion when it masks a static enterprise

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

whose financial statements do not account for costs necessary to doing business." *Id. See also In the Matter of Nugelt, Inc. t/a Alyson's Restaurant*, 142 B.R. 661, 667 (Bankr.D.Del.1992) (where the Debtor's shareholders and insiders were using property of the estate for postpetition expenses, the court concluded that "there is no other way to characterize these payments" except as a "continuing loss to or diminution of the estate.") The evidence adduced by the UST demonstrates the Debtor's failure to operate profitably in Chapter 11, and the Debtor has not provided any evidence that suggests that the business will be more financially successful when it emerges. The Debtor made certain reductions to its payroll and advertising budget during the bankruptcy case which apparently improved the bottom line but without generating a profitable enterprise. In the absence of any indication from Wilamowski as to anticipated cost reductions or increased revenues, there is no reason to conclude that the diminution of the estate will be reversed.

With respect to the second prong of § 1112(b)(1), I note that "rehabilitation" does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include a complete liquidation. *In re Rundlett*, 136 B.R. 376, 380 (Bankr.S.D.N.Y.1992). "Rehabilitation signifies that the debtor will be reestablished on a second [*sic*] financial basis, which implies establishing a cash flow from which current obligations can be met." *Id.* (*citing In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y.1988)). Courts have held that the occurrence of short term postpetition losses is not grounds to convert or dismiss a bankruptcy case where financial viability is reasonably likely in the near future. *See In re Garland Corp.*, 6 B.R. 456, 460 (1st Cir.BAP 1980). There is nothing in this record to suggest that financial viability is reasonably likely in the near future. The Debtor has operated in Chapter 11 for nine months during which it consistently lost money. While Wilamowski attributes the events of 9/11 as responsible for Debtor's financial losses in the fall, she testified that the business returned to financial health in January. There is therefore no explanation for the Debtor's inability to pay its secured lender in

February, April and May, and its continued operating loss in April and May and dishonored checks. While Wilamowski testified that June's operations were profitable, her statements were conclusory and failed to explain what accounted for the alleged profitability and whether it would continue. Wilamowski's grasp of the Debtor's finances was admittedly limited. However, the Debtor failed to produce any other evidence that would support the conclusion that the reorganized debtor would be profitable where the debtor had not been. Accordingly, I find both prongs of § 1112(b)(1) to have been satisfied by the UST.

*4 [2] Cause is also found under § 1112(b)(2). Generally, "inability to effectuate a plan" under § 1112(b)(2) means inability to effectuate a confirmable plan. *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr.E.D.N.Y.1992). Dismissal of a Chapter 11 bankruptcy case is appropriate where the court finds that the proposed plan is not feasible and that a feasible plan is not possible. *Fossum v. Federal Land Bank (In re Fossum)*, 764 F.2d 520, 521 (8th Cir.1985). *See also Michigan National Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 395 (6th Cir.1992) (*quoting Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991)) ("it is recognized that generally 'bankruptcy courts [have] substantial discretion to dismiss ... [where] the debtor files an untenable plan of reorganization.'"); *In re Brown*, 951 F.2d 564, 572 (3d Cir.1991) (*quoting Timbers*, 484 U.S. at 376) (discussing § 1112(b) and stating that "there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"); *In re Anderson*, 52 B.R. 159, 162-63 (Bankr.D.N.D.1985) (failure of the debtor to meet the confirmation prerequisite of 11 U.S.C. § 1129(a)(11) is cause for dismissal under § 1112(b)).

It is not clear to me how the Debtor intends to fund the proposed Plan given its inadequate cash position. Funding a plan through promised prospective wage concessions is a questionable proposition here. Notably Wilamowski and the employees have not yet directed the Debtor to withhold their wages to establish a plan fund. Indeed Wilamowski has taken her $5,800 monthly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

wage during the bankruptcy case while other creditors have not been paid. If, however, the conditional nature of the funding were the only defect, it would not stand in the way of a confirmable plan as I would order the funds to be deposited pursuant to Fed.R. Bank.P. 3020 as a condition of confirmation. However, future operating revenues intended to be the source for future plan payments and the payments of the deferred administrative claims of Debtor's professionals are clearly inadequate.

*5 Wilamowski also testified that the contemplated loan of $30,000 to $35,000 was to be earmarked for Plan funding and working capital. [FN10] She would be required to make this capital infusion in order to retain her ownership interest in the reorganized debtor over the objection of the senior dissenting unsecured creditor class that is not being paid in full. *In re Haskell Dawes, Inc.,* 199 B.R. 867 (Bankr.E.D.Pa.1996). Absent the infusion of such "new value," Debtor's Plan cannot be confirmed as it violates the absolute priority rule of 11 U.S.C. § 1129(a)(8). [FN11] However, in order for a capital contribution to qualify as new value, it must meet certain criteria. It must be (1) new; (2) substantial; (3) in the form of money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value of the interest received. The burden of proving each of these requirements is on the plan proponent. *Id.* at 872. To the extent that the cash necessary to fund the Plan is to be derived from this source, I am unable to conclude at this juncture whether Wilamowski can secure borrowed funds to contribute to the capital of the reorganized company. As I stated in Court, if the only impediment to a successful reorganization is the securing of financing to post the new value contribution, I could confirm the Plan with the requirement that it be posted by a date certain. However, on this record, I cannot conclude that a $30,000-$35,000 cash infusion will be sufficient to fund the Plan and operate profitably. Effective date payments aggregate in excess of $15,000, the accountant's fees are $5,000, the lawyer's fees are at least twice that amount given the number of hearings and the contested matter involving

Seiderman, and the second installment due unsecured creditors in six months is another $6,000. It appears that the contribution will be consumed by Plan payments without any reserve for working capital and the business continually loses money. I am therefore unable to conclude that this bankruptcy would not likely to be followed by a liquidation or the need for a further financial reorganization. 11 U.S.C. § 1129(a)(11). In short, a reorganization as proposed by the Plan is not feasible even giving Wilamowski the benefit of my considerable doubt that the capital infusion would be available in three weeks.

[3] Likewise dismissal is warranted under § 1112(b)(5). The Plan is not confirmable for the reasons stated above. To the extent confirmation is being sought, it is denied. Moreover, this is the second plan of reorganization for which the Debtor has solicited approval. This bankruptcy was filed in March 2001 for this small business. The Debtor has been afforded almost 1-1/2 years to reorganize. It appears Wilamowski may have squandered the time by not recognizing early on that she needed an alternative strategy should Seiderman not support her plan. More significantly, it appears that the issue was not merely a disgruntled former colleague and creditor but the need for financial reorganization of the business, an issue that simply is not being adequately addressed by the Debtor. On the record before me, I will not allow yet another plan to be proposed.

*6 [4] Once "cause" has been established, whether conversion or dismissal is more appropriate is a question Congress left to the sound discretion of the bankruptcy court. H.R. Rep. 989, 95th Cong., 1st Sess. 405 (1977), *reprinted in* 1978 U.S. Cong. Code and Ad. News 5787. *Accord, e.g., Matter of Sullivan Century Plaza I, Ltd.,* 935 F.2d 723, 728 (5th Cir.1991); *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir.1989). In so determining, a court is not required to provide an exhaustive discussion of its reasoning. *In re Koerner,* 800 F.2d 1358, 1368 (5th Cir.1986); *In re Nardi,* 1991 U.S. Dist. LEXIS 17179 (E.D. Pa. 1991). I exercise my discretion to dismiss this case. The Debtor's business is a medical practice which is dependent on the services of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

Wilamowski. Wilamowski has testified that she would seek employment elsewhere if the Debtor's reorganization were to fail. Moreover, the secured claim of the Money Store in excess of $1 million would presumably capture all the value of the Debtor's assets. This conclusion is based on Wilamowski's testimony that the practices were overpriced when purchased and Money Store's agreement to reduce its claim to $300,000. A Chapter 7 trustee could not operate this business nor are there any unencumbered assets to liquidate for creditors. Accordingly, this Chapter 11 case will be dismissed.

An Order consistent with this Memorandum Opinion shall issue.

### ORDER

AND NOW, this 22nd day of July 2002, upon consideration of the Motion of the United States Trustee to Dismiss or Convert this Chapter 11 Case (the "Motion"), after notice and hearing, and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby ORDERED and DECREED that the Motion is GRANTED. The Chapter 11 case is DISMISSED.

> FN1. Dr. Perlin appears to have no role in this reorganization other than his continued service on a part-time basis as a consultant.

> FN2. Seiderman had sought an administrative claim in the amount of $39,606 for post-petition services arising under his employment contract. After an evidentiary hearing, my Order dated May 14, 2002 denied the claim as an administrative expense but allowed it as an unsecured claim.

> FN3. Professional fees which Wilamowski could not quantify also are an unpaid administrative expense. She testified that her accountant and lawyer have agreed to defer payment but no terms have been reached.

> FN4. At the time of the hearing, the June operating report was not yet due. Wilamowski testified that the Debtor had been profitable in June although she could not be specific since "she forgot the bank statement." She testified that she was current on all post-petition tax obligations and the UST's fees.

> FN5. Wilamowski attributes the bounced checks to the failure of her staff to make deposits of the daily receipts. I find that explanation does not ameliorate the problem. At best it demonstrates a lack of good financial management. At worst it demonstrates how close to the line the Debtor's finances are that a missed deposit will result in the dishonor of small checks.

> FN6. Attached to the Disclosure Statement dated May 20, 2002 is a Pro-Forma Statement of Monthly Operations (the "Statement"). Wilamowski's testimony regarding business expenses was materially inconsistent with the Statement. For example, she claimed that the $5,000 monthly selling expense should be $2,000 because she cut back on advertising. If that were so, I would expect the business to have been profitable thereafter and it has not been. She could not explain the payroll or administrative expense. In short, the Statement which documents a projected monthly profit of $3,435 lacks foundation and reliability. Accordingly, I must look to the actual experience of the business and discount the Statement as unsubstantiated.

> FN7. The Debtor needs $15,800 within 30 days as follows: $8,000 unsecured dividend, $4,300 Seiderman wage claim and $3,500 Money Store. The bank balance of $5,000 plus the wage concessions of $12,300 would be sufficient to cover these obligations if the $5,000 was available for Plan payments and not needed to pay operating expenses.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                           Page 7

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

(Cite as: 2002 WL 1836307 (Bankr.E.D.Pa.))

FN8. Wilamowski testified that it was not until the ballot deadline that she learned Seiderman would reject the Plan. I find her surprise incredible given Seiderman's rejection of the Second Amended Plan, the failure of prior negotiations between the parties and their continued and present contentious relationship. The Second Amended Plan proposed a 10% dividend over twelve months while the Third Amended Plan proposes a 20% dividend over thirty months. While the Third Amended Plan secured an additional 5 votes in the unsecured class, Seiderman was not one of them. Did Wilamowski truly expect that increasing Seiderman's payment by $10,000 would secure his vote? He has probably paid his attorney more than that amount for participating in this case. Moreover since Seiderman has been the presenting creditor problem in this bankruptcy case, the new value requirement loomed during this entire proceeding. Indeed I even identified the issue on several occasions in open court.

FN9. The loan is intended to be a personal loan to Wilamowski. Why she would be providing financial information of the business and not her personal information was not explained.

FN10. Wilamowski did not indicate whether the contemplated loan which she stated would be used for plan funding would be in lieu of the wage concessions.

FN11. Since Debtor's Plan was not accepted by every impaired class of claims, it does not satisfy the requirements of § 1129(a)(8). As such, it may only be confirmed pursuant to the so-called cram down provisions of § 1129(b), which bring into play the absolute priority rule. The absolute priority rule, which is set forth in 11 U.S.C. § 1129(b)(2)(B)(ii), requires that "'a dissenting class of unsecured creditors ... be provided for in

full before any junior class can receive or retain any property [under a reorganization] plan."' Id. at 871 (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (quoting Ahlers v. Norwest Bank Worthington (In re Ahlers), 794 F.2d 388, 401 (8th Cir.1986)). See also Bank of America Nat'l Trust & Sav. Ass'n v. 203 LaSalle Street Partnership, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Since in this case, Wilamowski, as equity holder, is in a class junior to the dissenting unsecured creditors in Class D whose allowed claims are not being paid in full, application of the absolute priority rule would bar her from retaining any property, including her ownership interest, in the reorganized debtor. Thus, the newly stated intention to seek the loan to utilize the new value exception is designed to overcome this rule.

2002 WL 1836307 (Bankr.E.D.Pa.), 48 Collier Bankr.Cas.2d 1457

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A    74

**EXHIBIT B**

FEB-14-2005  15:25      ZAPIS CAPITAL GROUP                         P.02

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF _____

In re S&P Acquisition, LLC            Case No. 04-13382 (PJW)
         Debtor

## INITIAL MONTHLY OPERATING REPORT

File report and attachments with Court and submit copy to United States Trustee within 15 days after order for relief

Certificates of insurance must name United States Trustee as a party to be notified in the event of policy cancellation.
Bank accounts and checks must bear the name of the debtor, the case number, and the designation "Debtor in Possession."
Examples of acceptable evidence of Debtor in Possession Bank accounts include voided checks, copy of bank deposit
agreement/certificate of authority, signature card, and/or corporate checking resolution.

| REQUIRED DOCUMENTS | Document Attached | Explanation Attached |
|---|---|---|
| 12-Month Cash Flow Projection  (Form IR-1) | ✓ | |
| Certificates of Insurance: | | |
| Workers Compensation | ✓ | |
| Property | ✓ | |
| General Liability | ✓ | |
| Vehicle | ✓ | |
| Other: | ✓ | |
| Evidence of Debtor in Possession Bank Accounts | | |
| Tax Escrow Account | N/A | |
| General Operating Account | N/A | |
| Other: | | |
| Other: | | |

I declare under penalty of perjury (28 U.S.C. Section 1746) that this report and the documents attached
are true and correct to the best of my knowledge and belief.

_Richard P. Bongorno, CEO_                    2-14-2005
Signature of Debtor                            Date


Signature of Joint Debtor                      Date

_Richard P. Bongorno_                          2-14-2005
Signature of Authorized Individual*            Date

RICHARD P. BONGORNO                            C.E.O.
Printed Name of Authorized Individual          Title of Authorized Individual

*Authorized individual must be an officer, director or shareholder if debtor is a corporation; a partner if debtor
is a partnership; a manager or member if debtor is a limited liability company.

FORM IR
(9/99)

1 of 6

A   76

**Slazenger Golf Products**
**Off-Financing Budget**

| | December | January | February | March | April | May | June | July | August | September | October | November | December | Jan-Dec Totals | Oct-May Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | | | | | |
| Sales | | 425,000 | 2,257,000 | 1,488,000 | 1,565,000 | 1,890,000 | 1,200,000 | 1,500,000 | 1,500,000 | 2,400,000 | 2,500,000 | 1,500,000 | 900,000 | 18,915,000 | 7,515,300 |
| Cost of Sales | | 360,750 | 1,910,990 | 957,976 | 625,000 | 931,300 | 708,000 | 930,000 | 990,000 | 1,068,000 | 1,050,000 | 1,500,000 | 900,000 | 12,135,315 | 4,995,315 |
| Trade & Promotion | | 11,250 | 67,950 | 65,540 | 85,500 | 70,000 | 60,000 | 90,000 | 50,000 | 78,000 | 50,000 | 55,000 | 20,000 | 694,540 | 337,540 |
| Gross Profit | | 53,000 | 318,860 | 461,385 | 561,000 | 804,800 | 432,000 | 450,000 | 460,000 | 704,000 | 660,000 | 380,000 | 344,000 | 5,811,845 | 2,232,645 |
| **Salaries & Benefits** | | | | | | | | | | | | | | | |
| Salaries | | 79,617 | 78,617 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 78,283 | 942,065 | 496,082 |
| Bonus | | 51,750 | 21,500 | 150,000 | 155,000 | 166,000 | 85,000 | 60,000 | 60,000 | 70,000 | 60,000 | 25,000 | | 118,250 | 73,150 |
| Commission | | 26,000 | 64,000 | 120,000 | 90,000 | 60,000 | 60,000 | 60,000 | 60,000 | 70,000 | 90,000 | 25,000 | 10,000 | 870,000 | 554,000 |
| Benefits | | | 10,000 | 16,000 | 10,000 | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | 110,000 | 40,000 |
| Taxes | | 11,653 | 12,517 | 18,813 | 37,593 | 38,841 | 18,250 | 9,814 | 9,814 | 12,199 | 8,814 | 7,901 | 7,918 | 149,397 | 85,192 |
| Total Salaries & Benefits | | 169,420 | 195,120 | 240,596 | 362,328 | 279,124 | 196,533 | 148,097 | 148,097 | 139,932 | 148,097 | 146,184 | 118,652 | | |
| **Expenses** | | | | | | | | | | | | | | | |
| Office Rental | | 5,652 | 2,800 | 2,800 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 37,752 | 23,304 |
| Leases | | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,350 | 2,150 | 2,550 | 2,850 | 2,950 | 55,400 | 14,750 |
| Supplies | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 | 8,000 |
| Postage | | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,000 | 7,150 |
| Telephone/Data | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | 12,500 |
| Insurance | | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 7,367 | 88,002 | 44,644 |
| Bank Fees | | | | | | | | | | | | | | | 5,346 |
| Audit Fees | | | | | | | | | | | | | | | 5,846 |
| Credit & Collection Expense | | | | | | | | | | | | | | | 1,076 |
| Marketing Expenses | | 5,000 | | | | | | | | | | | | 5,000 | 30,000 |
| Other | | | | | | | | | | | | | | | 9,900 |
| Travel & Entertainment | | 15,000 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 207,500 | 90,000 |
| Total Expenses | | 45,619 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 34,967 | 506,054 | 254,967 |
| **Operations** | | | | | | | | | | | | | | | |
| Warehouse Fee | | 23,880 | 23,540 | 18,630 | 17,550 | 15,437 | 15,159 | 11,399 | 9,505 | 8,353 | 7,500 | 7,500 | 7,500 | 165,992 | 135,256 |
| Fulfillment Fee | | 9,653 | 18,971 | 16,275 | 25,459 | 24,342 | 22,337 | 19,551 | 13,252 | 31,918 | 22,727 | 11,344 | 9,041 | 277,356 | 129,659 |
| Embroidery Fee | | 14,268 | | 53,000 | 63,000 | 67,562 | 45,816 | 45,816 | 48,822 | 74,465 | 84,409 | 20,838 | 22,888 | 133,000 | 123,000 |
| Freight-In | | | 125,000 | | | | | | | | | | | 133,000 | 53,278 |
| Freight Out Bnd | | 2,185 | 11,166 | 7,440 | 7,880 | 8,405 | 6,000 | 7,500 | 7,500 | 17,000 | 17,500 | 17,500 | 4,600 | 54,393 | 54,385 |
| Total Operation | | 49,986 | 227,088 | 117,392 | 121,554 | 123,906 | 129,693 | 270,498 | 211,477 | 343,915 | 280,020 | 211,191 | 104,768 | 3,857,769 | 693,378 |
| **Total Expenses** | | 264,984 | 446,125 | 386,915 | 418,888 | 439,861 | 323,746 | | | | | | 194,286 | | 2,250,393 |
| **Income Before Royalty** | (192,196) | (227,264) | 70,732 | 62,470 | 143,314 | 164,509 | 108,244 | 125,304 | 595,582 | 380,045 | 378,800 | 166,849 | 43,322 | 1,659,678 | 31,446 |
| **Royalty Expense** | 225,515 | 120,833 | 120,833 | 120,833 | 120,833 | 164,909 | 108,933 | 120,833 | 595,582 | 120,833 | 378,800 | 166,833 | 120,833 | 1,450,000 | 714,557 |
| Operating Income after Royalty | (220,705) | (348,313) | (50,101) | (58,364) | 22,560 | 44,076 | (12,591) | 88,069 | 87,696 | 201,261 | 258,967 | 46,016 | (77,833) | 209,878 | (682,732) |
| **Other Items** | | | | | | | | | | | | | | | |
| Professional Fees | | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 900,000 | 450,000 |
| Legal Counsel | | 40,000 | 40,000 | 40,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 480,000 | 240,000 |
| Creditors Committee Professionals | | 25,000 | 25,000 | 23,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 480,000 | 160,000 |
| Accounting & Advisory | | | 34,585 | 34,585 | 34,475 | 33,443 | 33,423 | 33,000 | 16,721 | 16,721 | 16,721 | 16,721 | 16,721 | 271,560 | 136,160 |
| CAM Payroll and Taxes | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 21,500 | 10,000 |
| CAM Travel and Entertainment | | 4,000 | 10,000 | | 10,000 | | | | | | | | | 18,000 | 8,000 |
| Company Start Expenses | | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 | 24,000 |
| Trustee Fee | | | | | | | | | | | | | | | 24,000 |
| Depreciation | | | | | | | | | | | | | | 48,000 | 48,000 |
| Amortization | | | | | | | | | | | | | | | 17,000 |
| Interest Fee | | | | | | | | | | | | | | | 12,000 |
| Other Non-Operating Expenses | | 45,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 430,000 | 235,000 |
| Interest | | | | | | | | | | | | | | | |
| Total Other Items | 217,000 | 220,400 | 730,085 | 230,273 | 230,373 | 218,943 | (231,632) | 201,521 | 201,521 | 60,031 | 201,121 | 201,021 | 201,251 | 2,315,460 | 1,305,100 |
| **Net Income** | (514,198) | (641,217) | (720,618) | (288,820) | (228,168) | (174,867) | (231,632) | (122,852) | (173,533) | 63,051 | 57,745 | (155,006) | (272,823) | (2,324,541) | (1,987,512) |

2 of 6

**Slazenger Golf Products**
DIP Financing Budget

| | December | January | February | March | April | May | June | July | August | September | October | November | December | Jan-Dec Total | Dec-May Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow** | | | | | | | | | | | | | | | |
| Cash Receipts | | 500,000 | 900,000 | 1,291,531 | 1,063,250 | 1,788,750 | 1,464,000 | 1,570,000 | 1,250,000 | 1,230,000 | 1,450,000 | 1,925,000 | 2,450,000 | 17,282,531 | 7,230,838 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Net Income | | | | | | | | | | | | | | | |
| - Gross Profit | | | | | | | | | | | | | | | |
| - Inventory/Purchases | | | | | | | | | | | | | | | |
| + Adjustments | | | | | | | | | | | | | | | |
| Disbursements | | | | | | | | | | | | | | | |
| Receipts less Disbursements | | | | | | | | | | | | | | | |
| **Adjustments** | | | | | | | | | | | | | | | |
| Royalty Accrual | | | | | | | | | | | | | | | |
| Royalty Payment | | | | | | | | | | | | | | | |
| Restructuring/Past Accrual | | | | | | | | | | | | | | | |
| Depreciation | | | | | | | | | | | | | | | |
| Insurance Payment | | | | | | | | | | | | | | | |
| Warehouse Expense Prepay | | | | | | | | | | | | | | | |
| Prepaid Insurance Write off | | | | | | | | | | | | | | | |
| Total Adjustments | | | | | | | | | | | | | | | |
| **Balance Sheet - Selected Items** | | | | | | | | | | | | | | | |
| **Accounts Receivable** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | | | | | |
| Add Sales | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | |
| Less Receipts | | | | | | | | | | | | | | | |
| Ending Balance | | | | | | | | | | | | | | | |
| Ineligible | | | | | | | | | | | | | | | |
| Eligible | | | | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | | | | | |
| Add Purchases | | | | | | | | | | | | | | | |
| Add Inventory not Paid but LC Posted | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | |
| Less Cost of Sales | | | | | | | | | | | | | | | |
| Ending Balance | | | | | | | | | | | | | | | |

3 of 6

Slazenger Golf Products
DIP Financing Budget

| | December | January | February | March | April | May | June | July | August | September | October | November | December | Jan-Dec Totals | Dec-May Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Borrowing Base Availability** | | | | | | | | | | | | | | | |
| **Summary** | | | | | | | | | | | | | | | |
| Total Collateral Value | 5,232,189 | 3,744,688 | 4,283,946 | 4,224,056 | 4,252,514 | 3,872,971 | 3,455,271 | 3,138,004 | 3,042,466 | 3,756,000 | 4,500,000 | 4,132,500 | 3,000,000 | 3,000,000 | 3,871,971 |
| Permitted Overadvance | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Total Borrowing Base | 5,744,668 | 3,744,668 | 7,283,946 | 7,224,056 | 7,252,514 | 6,872,971 | 6,135,271 | 6,138,004 | 6,042,466 | 6,756,000 | 7,500,000 | 7,132,500 | 6,000,000 | 6,000,000 | 6,871,971 |
| | | | | | | | | | | | | | | | |
| Loan Balance | 7,244,722 | 5,881,626 | 7,068,928 | 6,955,322 | 7,024,742 | 6,379,058 | 5,800,390 | 5,531,882 | 5,348,873 | 6,070,078 | 7,101,341 | 6,672,356 | 5,283,009 | 5,283,009 | 6,378,006 |
| Less: L/C Credit | | 757,000 | 214,318 | 268,714 | 327,072 | 493,915 | 634,882 | 606,112 | 678,693 | 673,974 | 348,019 | 490,114 | 736,991 | 736,991 | 493,915 |
| Borrowing Base Usage | 7,356,722 | 6,622,852 | 7,282,546 | 7,224,036 | 7,283,514 | 6,872,971 | 6,235,271 | 6,138,004 | 6,043,566 | 6,744,000 | 7,500,000 | 7,162,500 | 6,000,000 | 6,000,000 | 6,872,971 |
| | | | | | | | | | | | | | | | |
| Availability / (Shortall) | 603,467 | 122,056 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Collateral Value** | | | | | | | | | | | | | | | |
| A/R Collateral Value | 1,228,335 | 1,155,341 | 2,193,818 | 2,395,500 | 2,522,583 | 2,425,500 | 2,182,500 | 2,292,500 | 2,137,500 | 3,091,000 | 3,675,000 | 3,317,500 | 2,175,000 | 2,175,000 | 2,425,500 |
| Inventory Collateral Value | 2,507,670 | 2,389,447 | 2,360,318 | 1,830,538 | 1,730,031 | 1,447,471 | 1,252,771 | 1,043,504 | 911,146 | 825,300 | 825,000 | 835,000 | 825,000 | 825,000 | 1,447,471 |
| Total Collateral Value | 3,735,189 | 3,744,668 | 4,263,946 | 4,224,056 | 4,252,514 | 3,872,971 | 3,435,271 | 3,138,004 | 3,042,466 | 3,756,000 | 4,500,000 | 4,132,500 | 3,000,000 | 3,000,000 | 3,872,971 |
| | | | | | | | | | | | | | | | |
| **Eligible A/R** | 1,637,762 | 1,542,321 | 2,631,171 | 3,038,200 | 3,316,720 | 3,234,000 | 2,910,000 | 2,790,000 | 2,850,000 | 3,030,000 | 4,500,000 | 4,430,000 | 2,900,000 | 2,900,000 | 3,234,000 |
| Times: 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% | 75% |
| A/R Collateral Value | 1,228,322 | 1,156,741 | 2,103,818 | 2,543,500 | 2,502,583 | 2,425,500 | 2,182,500 | 2,292,500 | 2,137,500 | 2,820,000 | 3,675,000 | 3,337,200 | 2,175,000 | 2,175,000 | 2,425,500 |
| | | | | | | | | | | | | | | | |
| Inventory | 4,777,835 | 4,708,085 | 3,927,881 | 3,710,895 | 3,127,366 | 2,630,764 | 2,277,786 | 1,900,919 | 1,664,665 | 1,500,000 | 1,500,000 | 1,300,000 | 1,500,000 | 1,500,000 | 2,630,765 |
| Times: 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| Inventory Collateral Value | 2,857,870 | 2,389,447 | 2,160,316 | 1,830,538 | 1,730,031 | 1,447,471 | 1,252,771 | 1,043,504 | 911,146 | 825,000 | 825,000 | 835,000 | 825,000 | 825,000 | 1,447,471 |
| | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 99,843 | 1,378,054 | | 123,506 | (89,400) | 645,683 | 578,009 | 286,498 | 182,913 | (721,100) | (1,031,244) | 428,085 | 1,429,377 | 1,378,054 | 99,843 |
| Receipts less Disbursements | 1,278,111 | 127,042 | (1,283,003) | 213,906 | 735,083 | (66,693) | (284,608) | (286,426) | (904,014) | (310,144) | 1,021,254 | (929,460) | 11,478,271 | (21,529,713) | 660,721 |
| Increase/(Decrease) in Last Balance | | | 1,203,009 | | 88,403 | | | | | | | | | | |
| Ending Cash Balance | 1,378,054 | 1,378,054 | | 123,506 | (89,400) | 578,009 | 578,009 | 182,913 | (721,100) | (1,031,244) | 428,085 | 1,429,377 | 1,378,054 | 1,378,054 | 1,378,054 |
| | | | | | | | | | | | | | | | |
| **Loan Balance** | | | | | | | | | | | | | | | |
| Beginning Balance | 7,244,722 | 7,244,722 | 5,881,626 | 7,068,928 | 6,955,322 | 7,024,742 | 6,379,058 | 5,800,390 | 5,531,882 | 5,348,873 | 6,070,078 | 7,101,341 | 6,672,356 | 7,244,722 | 7,244,722 |
| Increase/(Decrease) in Loan Balance | | | 1,193,019 | | 69,419 | | | | | | | | | | |
| Ending Balance | 7,244,722 | 5,881,626 | 7,066,928 | 6,955,322 | 7,024,742 | | 5,800,390 | 5,531,882 | 5,348,873 | 6,070,078 | 7,101,341 | 6,672,356 | 5,283,009 | 5,283,009 | 6,378,006 |

4 of 6

Stategic Golf Products
DIP Financing Budget

Analysis

Net Cash Flow
Operating Income after Royalty
Professional Fees
Other Financing Costs
Interest Expense
Cash Flow from Working Capital
Adjustment (x Actual)
Net Cash Flow

Cash Flow from Working Capital
Increase (Decrease) in A/R
Cost of Sales - Purchases
Decrease/ (Increase) in Prepaids
Increase/ (Decrease) in Accrued Royalty
Increase/ (Decrease) in Accrued Prof. Fees
Cash Flow from Working Capital

Liquidity
Beginning Availability
Availability Increase/ (Decrease) before L.C's
L.C. Effect
Adjustment to Actual
Ending Availability

Operating Income after Royalty
Professional Fees
Interest Expense
Availability Incr/ (Decr) from Working Capital
Availability Increase/ (Decrease) before L.C's

Decrease/ (Increase) in A/R
Cost of Sales - Purchases (Incr.) 41%
Decrease/ (Increase) in Prepaids
Increase/ (Decrease) in Accrued Royalty
Increase/ (Decrease) in Accrued Prof. Fees
Decrease/ (Increase) in Working Capital
Availability Incr/ (Decr) from Working Capital

L.C. Effect
Decrease/ (Increase) in L.C. Outstanding
Inventory in FM W/LC Posted
L.C. Effect

5 of
6

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY) 01/25/2005

PRODUCER
rsh Advantage America
200 Public Square,  suite 1100
Cleveland, OH 44114
216 937 1315

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

INSURED
SGP Acquisition. LLC A Delaware
Corporation DBA Slazenger Golf Products
105 East North Street
Greenville, SC 29601

| INSURERS AFFORDING COVERAGE | NAIC# |
|---|---|
| INSURER A: Federal Ins. Co. | |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY  [X] COMMERCIAL GENERAL LIABILITY  [ ] CLAIMS MADE  [X] OCCUR | 35756631 | 11/12/04 | 11/12/05 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $1,000,000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:  [ ] POLICY  [ ] PRO-JECT  [ ] LOC | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | AUTOMOBILE LIABILITY  [ ] ANY AUTO  [ ] ALL OWNED AUTOS  [ ] SCHEDULED AUTOS  [X] HIRED AUTOS  [X] NON-OWNED AUTOS | 73518986 | 11/12/04 | 11/12/05 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY  [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC / AUTO ONLY: AGG | $ |
| A | | EXCESS/UMBRELLA LIABILITY  [X] OCCUR  [ ] CLAIMS MADE  [ ] DEDUCTIBLE  [ ] RETENTION  $ | 79782676 | 11/12/04 | 11/12/05 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | AGGREGATE | $1,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| A | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  If yes, describe under SPECIAL PROVISIONS below | 71653099 | 11/12/04 | 11/12/05 | [X] WC STAT-UTORY LIMITS  [ ] OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | | OTHER  Property | 35756631 | 11/12/04 | 11/12/05 | Special Form Deductible $1,000 24 Hrs. Ded/Bus. Income | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Property Blanket Limit Business Income $1,600,000 Both Locations
Loc.#2 725 South Victory Dr. Lyons, Georgia Personal Property $5,750,000
Loc.#3 105 East North St. Greenville, S.C Personal Property $250,000 and
     Dependent Business Premises $750,000/24 Hr. Waiting Period

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| United States Trustee  844 King Street, Room 2207  Lockbob #35  Wilmington, DE 19899-0035 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.  AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)    Marsh Advantage America A Service of Seabury & smith    © ACORD CORPORATION 1988