# EXHIBIT 1

## SUPPLEMENTAL FUNDING AND SETTLEMENT AGREEMENT

This SUPPLEMENTAL FUNDING AND SETTLEMENT AGREEMENT (this "Agreement") is entered into as of this 24th day of June, 2005, by and among SGP Acquisition, LLC, debtor and debtor in possession (the "Debtor"), the Official Committee of Unsecured Creditors in the chapter 11 case of the Debtor (the "Committee"), The Provident Bank (the "Bank"), Kimolos II, L.P. ("Kimolos"), Zapis Capital ("Zapis") and Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch").

### RECITALS

WHEREAS, the Debtor filed a complaint against Dunlop Slazenger and its affiliates in December 2004, alleging various breach of contract, tort and other causes of action (the "Dunlop Litigation");

WHEREAS, the Debtor has entered into a settlement of, among other things, the Motion for an Order Under 11 U.S.C. § 1112(b) Converting Chapter 11 Case to a Case Under Chapter 7 filed by Dunlop Slazenger, Motion of Slazenger for Relief from the Automatic Stay filed by Dunlop Slazenger and two preference actions filed by the Debtor against Dunlop Slazenger and its affiliates, but not the Dunlop Litigation (the "Dunlop Settlement");

WHEREAS, the parties hereto have agreed, subject to the terms and conditions hereof, what portion of the Dunlop Settlement proceeds will be paid to the Debtor's estate on account of the preference actions and what portion of the Dunlop Settlement proceeds were on account of the collateral securing the Bank's claims;

WHEREAS, Benesch has agreed to defer its administrative claim in excess of the carve-outs, subject to the terms and conditions hereof;

WHEREAS, Kimolos and Zapis have agreed to subordinate their administrative claims, subject to the terms and conditions hereof;

WHEREAS, the Bank has agreed to release its security interest on the proceeds of the Dunlop Litigation payable to the Debtor's estate hereunder, subject to the terms and conditions hereof;

WHEREAS, Kimolos has agreed that Kimolos or its designee will provide $300,000 of supplemental post-petition financing to the Debtor, subject to the terms and conditions hereof;

NOW, THEREFORE, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1

CB\770525.1

A   216

## SECTION 1.  Provident Amendment and Partial Release of Lien.

The parties hereto shall support the approval by the Bankruptcy Court of the proposed amendment (the "Provident Amendment") to the Final Order (a) Authorizing Post-Petition Financing on a Superpriority Basis Under Section 364 of the Bankruptcy Code, (b) Use of Cash Collateral Under Section 363 of the Bankruptcy Code and (c) Granting Adequate Protection Under Sections 361 and 363 of the Bankruptcy Code (the "Provident Financing Order"), and the Bank shall fund the amounts, including the professional fee carve-outs, therein, on the terms and conditions therein.  The Bank hereby releases its pre-petition and post-petition liens and security interests, including any liens or security interests granted under the Provident Financing Order, on the portion of the Dunlop Litigation proceeds payable to the Debtor's estate hereunder.

## SECTION 2.  Cash Proceeds of Dunlop Settlement.

The first $285,000 of cash proceeds of the Dunlop Settlement shall be paid to the Debtor's estate and used to pay administrative claims in excess of the professional fee carve-outs.  The remaining cash proceeds of the Dunlop Settlement shall be paid to the Bank and applied to the Debtor's obligations to the Bank on the terms set forth in the Provident Financing Order.

## SECTION 3.  Payment and Deferral of Administrative Claims.

The Debtor shall promptly pay any amounts due for all allowed administrative claims for professional fees and expenses from, first, the professional fee carveouts provided in any approved post-petition financing for the Debtor and, second, from the $285,000 of cash proceeds of the Dunlop Settlement under section 2 hereof; provided, however, that if there are insufficient funds from such sources to pay all such allowed administrative claims in full, Benesch agrees to defer the payment of its allowed professional fees and expenses that remain after the exhaustion of such sources and to have such remaining fees and expenses paid from that portion of the proceeds of the Dunlop Litigation, if any, paid to the Debtor's estate pursuant to section 4 hereof.

## SECTION 4. Kimolos Supplemental Financing.

Kimolos agrees that *Kimolos or its* designee shall provide the Debtor's estate with $300,000 of supplemental post-petition financing (the "Supplemental Financing") for the purposes of paying the costs of administration of the Debtor's estate after termination of the Provident Financing Order as amended by the Provident Amendment and paying the costs of the Dunlop Litigation. Kimolos or its designee, the Debtor and the Committee shall agree on a budget pursuant to which the supplemental financing shall be used by the Debtor's estate and shall have the right, by written agreement, to alter, amend or extend the budget or increase the total principal amount of the Supplemental Financing. Kimolos or its designee shall be entitled to receive interest at the prime rate published in the Wall Street Journal plus 3 percent per annum and a fee payable from the proceeds of the Dunlop Litigation after the principal and interest on the Kimolos Supplemental Financing is paid *in full from* such proceeds, as follows:

(a)    The first $65,000 of the proceeds of the Dunlop Litigation after payment of the Kimolos principal and interest shall be paid to the Debtor's estate, free and clear of liens.

(b)    Kimolos or its designee shall receive the greater of 75% or the Kimolos Pro Rata Share of the next proceeds until the obligations of Kimolos under the Kimolos guarantee of the Debtor's pre-petition and post-petition obligations to the Bank (the "Kimolos Guarantee") are paid in full. The Debtor's estate shall receive the remainder of such next proceeds, free and clear of liens. "Kimolos Pro Rata Share" shall mean, as of the date of receipt of the Dunlop Litigation proceeds, the obligations under the Kimolos Guarantee divided by the sum of the obligations under the Kimolos Guarantee plus the aggregate amount of unpaid administrative claims.

(c)    Kimolos or its designee shall receive 50% of the remaining proceeds of the Dunlop Litigation. The Debtor's estate shall receive the other 50% of the remaining proceeds of the Dunlop Litigation, free and clear of liens.

## SECTION 5. Settlement of Dunlop Litigation

Kimolos or its designee, the Debtor and the Committee must agree to any settlement of the Dunlop Litigation that will provide an aggregate recovery to unsecured creditors of less than $1 million. Kimolos or its designee, in its sole discretion, may cause the Debtor to enter into any settlement that will provide an aggregate recovery to unsecured creditors of $1 million or more.

## SECTION 6. Zapis/Kimolos Subordination of Administrative Claims

Zapis and Kimolos, on behalf of themselves and their affiliates, hereby subordinates all administrative claims against the Debtor's estate to all allowed claims of all other creditors of the Debtor's estate; provided, however, that this subordination shall not be deemed a subordination of any subrogation claims under the Kimolos Guarantee, any claims under the Supplemental Financing or any equity interests of Zapis, Kimolos or their affiliates.

## SECTION 7. Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF DELAWARE.

CIN770525.1

3

**SECTION 8. Headings.**

Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes.

**SECTION 9.  Construction.**

This Agreement and all other agreements and documents executed in connection therewith have been prepared through the joint efforts of all of the parties. Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity shall be interpreted or resolved against any party on the ground that such party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction. Each of the parties hereto represents and declares that such party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such party knows the contents thereof and signs the same freely and voluntarily. The parties hereby acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection therewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect.

**SECTION 10. Counterparts.**

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart. Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile transmission a signature page of this Agreement signed by such party, and any such facsimile signature shall be treated in all respects as having the same effect as an original signature. Any party delivering by facsimile transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement.

**SECTION 11. Further Assurances.**

The parties hereto agree to take all further actions and execute all further documents as are reasonably necessary to carry out the transactions contemplated by this Agreement, including seeking and supporting prompt Bankruptcy Court approval hereof.

**SECTION 12. Effectiveness.**

This Agreement shall become effective at the time that all of the following conditions precedent have been met (the "Effective Date").

    (a)    Agreement. This agreement shall have been fully executed.

    (b)    Bankruptcy Court Approval. The Bankruptcy Court shall have entered an order approving the Provident Amendment, the Supplemental Financing and the other terms and conditions of this Agreement on or prior to July 31, 2005.

4

CHY770525.1

## SECTION 13. Waiver Of Jury Trial.

EACH OF THE PARTIES HERETO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM, ACTION OR OTHER PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT.

CRI\770525.1

5

A   220

06/26/2005  19:32    2                          L&W MEETING                    PAGE  07/11

26 Jun 05 22:28      Steve Todd              020 7623 4494        p.1

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

SGP ACQUISITION, LLC

By: _____
Name: RICHARD P. SANGUINO
Title: CEO

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE CHAPTER 11 CASE OF SGP ACQUISITION, LLC

By: _____
Name: JOHN F. Athanas
Title: Attorney

THE PROVIDENT BANK

By: _____
Name: _____
Title: _____

KIMOLOS II, L.P.

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**SGP ACQUISITION, LLC**

By:_____
   Name:_____
   Title:_____

**THE    OFFICIAL    COMMITTEE    OF UNSECURED    CREDITORS    IN    THE CHAPTER    11    CASE    OF    SGP ACQUISITION, LLC**

By:_____
   Name:_____
   Title:_____

**THE PROVIDENT BANK**

By:_____
   Name: _Sharon L. Rector_
   Title: _Vice President_

**KIMOLOS II, L.P.**

By:_____
   Name:_____
   Title:_____

CHI7052151

A    222

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

SGP ACQUISITION, LLC

By:_____
   Name:_____
   Title:_____

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE CHAPTER 11 CASE OF SGP ACQUISITION, LLC

By:_____
   Name:_____
   Title:_____

THE PROVIDENT BANK

By:_____
   Name:_____
   Title:_____

KIMOLOS II, L.P.

By:_____
   Name:_____ Lee Zapis
   Title:_____ The Representative

A    223

JUN-27-2005  06:46      ZAPIS CAPITAL GROUP                              P.03

ZAPIS CAPITAL

By: _____
   Name: _____
   Title: _____

BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP

By: _____
   Name: _____
   Title: _____

TOTAL P.03

A    224

ZAPIS CAPITAL

By:_____
　　Name:_____
　　Title:_____

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:_____
　　Name: _MARK A. PHILLIPS_
　　Title: _PARTNER_

CIN7NES23.1

# EXHIBIT 2

**Slazenger Golf Products**
Cash Collateral Budget

| | WE 10/8/2005 | WE 10/15/2005 | WE 10/22/2005 | WE 10/29/2005 | WE 11/5/2005 | WE 11/12/2005 | WE 11/18/2005 | WE 11/26/2005 | WE 12/3/2005 | WE 12/10/2005 | WE 12/17/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | |
| Professional Fees - Special Litigation Counsel | | | | | | | | | | | |
| Professional Fees - Debtor Counsel | 10,000 | | | | | | | 10,000 | | | |
| Professional Fees - Committee Professionals | | | | | | | | 5,000 | | | |
| Expenses of Lender | | 42,668 | | | | | 42,668 | | | | 42,668 |
| Salaries | | 7,900 | | 7,900 | | 5,900 | | 5,900 | | 5,900 | |
| Health Care Benefits | | 759 | | | | | 760 | | | | |
| Payroll Taxes | | 694 | | 604 | | 451 | | 451 | | 451 | 750 |
| Office Rent | | | | | | | | | | | |
| Leases | | | | | | | | | | | |
| Office Expenses | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Insurance | | | | | | | | | | | |
| Travel & Entertainment | 1,000 | | | | | | | | | | |
| US Trustee Fees | 3,750 | | | | | | | | | | |
| Interest | | | | | 235 | | | | 716 | | |
| **Total Disbursements** | 14,950 | 52,122 | 200 | 8,704 | 435 | 6,551 | 43,618 | 21,551 | 916 | 6,551 | 43,618 |
| **Cash Flow** | (14,950) | (52,122) | (200) | (8,704) | (490) | (6,551) | (43,618) | (21,551) | (916) | (6,551) | (43,618) |
| | | | | | | | | | | | |
| **Supplemental Financing** | | | | | | | | | | | |
| Beginning Balance | | 14,950 | 67,072 | 67,272 | 75,977 | 76,413 | 82,964 | 126,582 | 148,134 | 149,050 | 155,601 |
| Net Cash Flow | 14,950 | 52,122 | 200 | 8,704 | 436 | 6,551 | 43,618 | 21,551 | 916 | 6,551 | 43,618 |
| Ending Balance | 14,950 | 67,072 | 67,272 | 75,977 | 76,413 | 82,964 | 126,582 | 148,134 | 149,050 | 155,601 | 199,219 |

Office expenses include telephone, communication, supplies, postage and other.

**Slazenger Golf Products**
Cash Collateral Budget



| Receipts | WE 12/24/2005 | WE 12/31/2005 | WE 1/7/2006 | WE 1/14/2006 | WE 1/21/2006 | WE 1/28/2006 | Total |
|---|---|---|---|---|---|---|---|
| **Disbursements** | | | | | | | |
| Professional Fees - Special Litigation Counsel | | | | | 42,668 | | 170,672 |
| Professional Fees - Debtor Counsel | | 10,000 | | | | 10,000 | 30,000 |
| Professional Fees - Committee Professionals | | 5,000 | | | | 5,000 | 15,000 |
| Expenses of Lender | | | | | | | 10,000 |
| Salaries | 5,900 | | 5,900 | | 5,900 | | 51,200 |
| Health Care Benefits | | | | | 750 | | 3,000 |
| Payroll Taxes | 451 | | 451 | | 451 | | 3,977 |
| Office Rent | | | | | | | |
| Office Expenses | 200 | 200 | 200 | 200 | 200 | 200 | 3,400 |
| Leases | | | | | | 1,000 | 1,000 |
| Insurance | | | 1,000 | | | | 2,000 |
| Travel & Entertainment | | | | | | | 2,000 |
| US Trustee Fees | | | 3,750 | | | | 7,500 |
| Interest | | | 1,358 | 200 | | | 2,311 |
| Total Disbursements | 6,551 | 15,200 | 12,659 | 200 | 49,999 | 16,200 | 300,000 |
| | | | | | | | |
| Cash Flow | (6,551) | (15,200) | (12,659) | (200) | (49,999) | (16,200) | (300,000) |
| | | | | | | | |
| Supplemental Financing | | | | | | | |
| | | | | | | | |
| Beginning Balance | 199,219 | 205,771 | 220,971 | 233,630 | 233,830 | 283,630 | 199,219 |
| Net Cash Flow | 6,551 | 15,200 | 12,659 | 200 | 49,999 | 16,200 | 100,000 |
| Ending Balance | 205,771 | 220,971 | 233,630 | 233,830 | 283,630 | 300,000 | 300,000 |

Office expenses include telephone, communication, sup

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF DELAWARE

IN RE:                              .   No. 04-13382 (PJW)
                                    .
SGP ACQUISITION, L.L.C.,            .
                                    .   HEARING
                                    .
              Debtor                .   JULY 14, 2005

. . . .  .  .  .  .  .  .  .  .  .

              Wilmington, Delaware

              - - - - -

      BEFORE THE HONORABLE PETER J. WALSH
      UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor, SGP:          H. JEFFREY SCHWARTZ, ESQ.
                              MARK A. PHILLIPS, ESQ.
                              BENESCH, FRIEDLANDER, COPLAN &
                              ARONOFF, LLP
                              2300 BP Tower
                              200 Public Square
                              Cleveland, OH   44114-2378

For Dunlop Slazenger:         MICHAEL COOK, ESQ.
(Creditor)                    SCHULTE ROTH & ZABEL
                              919 Third Avenue
                              New York, New York   10022

For the Provident Bank:       TODD SCHLITZ, ESQ.
                              WOLF, BLOCK, SCHORR & SOLIS-COHEN
                              Wilmington Trust Center
                              1100 N. Market Street, Ste. 1001
                              Wilmington, DE   19801

For OCUC:                     JOSEF S. ATHANAS, ESQ.
                              LATHAM & WATKINS
                              Sears Tower, Suite 5800
                              233 South Wacker Drive
                              Chicago, Illinois   60606

Audio Operator:               Jason Smith

Transcriber:                  DIANA DOMAN TRANSCRIBING
                              P. O. Box 129
                              Gibbsboro, NJ   08026-0129

                              Telephone: (856) 435-7172
                              Fax:       (856) 435-7124
                              E-mail:  DianaDoman@Comcast.net

2

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

I N D E X

PAGE

ARGUMENT BY:

      Mr. Schwartz                    3
      Mr. Phillips                    4
      Mr. Cook                        9
      Mr. Athanas                    17
      Mr. Schwartz                   19

Schwartz - Colloquy                                    3

1    MOTION GRANTED:                                          21

2    MOTION FOR STAY PENDING APPEAL:        Denied            25

3

4

5

6

7

8

9

10

11

12

13          THE COURT:  Ready to proceed?

14          MR. SCHWARTZ:  Good morning, Your Honor.  Jeffrey

15   Schwartz from Benesch, Friedlander, Coplan & Aronoff, LLP on

16   behalf of the debtors in possession.  And started with

17   uncontested agenda items number one.  We have the second

18   application of Benesch, Friedlander, Coplan & Aronoff for

19   Allowance of Interim Compensation For Services Rendered and

20   Reimbursement of Expenses Incurred for the period indicated.

21          There are no objections.  Also there's the

22   application of Latham & Watkins as Committee Counsel and the

23   application I think that -- or the application of Monzack and

24   Monaco as local counsel to the Committee Counsel.

25          THE COURT:  Okay.  I'll approve them.

Phillips - Argument                          4

1        MR. SCHWARTZ:  Pardon me, Your Honor?

2        THE COURT:  I'll approve them.

3        MR. SCHWARTZ:  Thank you, Your Honor.  You have an

4    order to present which encompasses all three of the

5    applications.

6        THE COURT:  Okay.

7        MR. SCHWARTZ:  And that brings us to Item No. 4

8    which although it's denominated -- at least in one version of

9    the Amended Notice of Agenda as uncontested, it is contested,

10   and that's the Motion for an Entry of Order Approving

11   Settlement Agreement Between the Debtor and Other Key Parties

12   in Interest in this Chapter 11 Case.  And by the way, for the

13   record, although your courtroom deputy had come out asking

14   where committee counsel was, they did arrive right after she

15   had left the courtroom.

16        So with regard to presenting then, I will defer to

17   my partner, Mark Phillips.

18        MR. PHILLIPS:  Good morning, Your Honor.

19        THE COURT:  Yes, sir.

20        MR. PHILLIPS:  Less than three weeks ago we were

21   before you on essentially two matters, one being a settlement

22   between the debtor and the Dunlop Slazenger entities that

23   resolved all issues with and all claims of the Dunlop

24   Slazenger entities in this Chapter 11 case.  And provided

25   $575,000 in cash consideration to the debtor.

A   232

Phillips - Argument                    5

1          The other matter was an amendment to the debt

2     financing order which extended the financing provided by

3     Provident Bank to the debtor through September of this year.

4     The Court approved both of those on both motions and the order

5     on June 27th.

6          The agreement before you this morning resolves, if

7     you will, the loose ends from those two matters that remained

8     after those matters were approved.  It was negotiated and

9     agreed to by all of the parties that now have a stake in the

10    outcome of this Chapter 11 case, it resolves any disputes that

11    could have arisen as to the allocation of the settlement cash

12    proceeds from the Dunlop settlement, specifically with respect

13    to what portion of those proceeds constituted collateral of

14    the secured lender and provides for a funding mechanism for

15    the continued administration of the estate beyond September of

16    this year and allows for the prosecution of the debtors claims

17    against the Dunlop Slazenger entities in the one remaining

18    adversary proceeding with those entities.

19          With respect to the allocation of the settlement

20    proceeds, I believe all of the matters are detailed in the

21    papers, Your Honor.  With respect to the allocation of the

22    settlement proceeds the first 285,000 of the 575,000 would be

23    allocated to the debtor's estate for -- principally for

24    payment of administrative expenses above the professional fee

25    carve out amounts that are provided in the budget for the

1      Provident financing.

2              The remaining $290,000 under the agreement is deemed

3      to be collateral of the bank and will be paid to the secured

4      lender pursuant to the terms of the financing.  These amounts

5      were agreed to by all of the parties, the bank, the debtor,

6      the committee, the administrative claimants that are going to

7      be deferring, specifically our firm, Your Honor, they're going

8      to be deferring payment of certain amounts of their

9      administrative claims and were agreed to by those parties in

10     light of the nature of the consideration exchanged in the

11     Dunlop settlement and the status of the respective parties in

12     the case at this point.

13             The second part of the settlement deals with the

14     supplemental financing of the case beyond September of this

15     year.  That is to be provided by Keymoulos Partners II

16     (phonetic), which is an affiliate of the debtor or at least an

17     equity holder in the debtor.  The terms of that financing are

18     detailed in the agreement in the proposed order.  Basically it

19     would provide up to $300,000 in financing that would allow for

20     the continued administration of the estate as well as the

21     prosecution of the remaining adversary with Dunlop Slazenger.

22             I will in a few moments cede the podium to Mr.

23     Athanas on behalf of the committee to describe in further

24     detail the terms of the financing and what we're seeking here.

25     I would not that we had contemplated at the time that the

Phillips - Argument                                    7

1    motion for approval of the agreement was entered, was filed

2    with the court that we would be filing supplemental financing

3    documents and seeking the Court's approval on those as a

4    result of further negotiations between the parties.  It has

5    been suggested that those financing terms given the amount

6    involved could be incorporated in the proposed order and I

7    believe that was submitted to you yesterday.  As I said, Mr.

8    Athanas will address that in greater detail.

9                I would note that the need for and the rationale for

10   this financing with respect to Keymoulos Partners II arises

11   from -- really out of necessity that Provident Bank has

12   indicated that its -- despite its agreement to continue

13   financing through September, that it is unwilling to continue

14   to finance the case when the primary asset of the case and the

15   primary issue in the case that will continue beyond that date

16   will be the litigation itself with respect to the Dunlop

17   entities.  And efforts by the debtor to identify and locate

18   counsel who might take this on a non-funded basis, on a

19   contingency basis, were unsuccessful.

20               Therefore, the necessity for this financing.  It

21   would provide not only for financing for counsel for the

22   litigation, but also for what we anticipate to be the minimal

23   activities of the estate going forward after September.

24   Despite the agreement of all of the relevant constituencies to

25   these terms, we do have an objection from the Dunlop Slazenger

A   235

Phillips - Argument                                    8

1    entities themselves.  And as indicated in our brief response

2    that was filed yesterday, the debtor believes that the Court

3    should not entertain that objection because we question and

4    believe that the Dunlop Slazenger entities at this point lack

5    standing to prosecute that objection.

6              THE COURT:  Well, let me ask you about that because

7    I'm confused.  Slazenger says they have a $12 million claim,

8    that's what they say in their objection.  And you say they

9    have no claim?

10             MR. PHILLIPS:  We are saying that, if you recall the

11   hearing on June 27th, Your Honor, with respect to the

12   settlement, as part of that settlement the Dunlop Slazenger

13   entities have waived and, if you will, withdrawn their claims

14   in the Chapter 11 case for collection purposes.

15             As part of the settlement agreement they were able

16   to retain those claims and I believe that those claims are

17   probably -- I'm not too sure where the $12 million comes from.

18   I believe that includes a rejection damage claim.  The

19   agreement was that they would retain those for purposes of

20   counterclaims in defenses in the adversary proceeding itself

21   but would have no opportunity to have a positive collection,

22   if you will, from the debtor's estate with respect to those

23   claims if they succeed on them.

24             So --

25             THE COURT:  Okay, let me discuss -- counsel, do you

1    agree with that interpretation?

2              MR. COOK:  Yes, absolutely, Your Honor, the deal.

3              THE COURT:  Okay, because quite frankly, I went back

4    and got the stipulation and I didn't really -- I wasn't

5    convinced that -- let me -- let me see if I can state my

6    understanding.  Any recovery that SG -- that Slazenger may

7    obtain in the litigation can only be used as an offset against

8    what the plaintiff may recover?

9              MR. PHILLIPS:  Correct, Your Honor.

10             THE COURT:  Okay.

11             MR. PHILLIPS:  But any positive recovery that -- on

12   a judgment that Slazenger's may obtain would not be asserted

13   in the Chapter 11 case as a -- as a claim against the estate.

14   And --

15             THE COURT:  Okay, well let me -- let's put it in

16   numbers.  If in the litigation you recover, plaintiff recovers

17   $2 million and the defendant is entitled to $12 million, then

18   each party just walks away with nothing?

19             MR. PHILLIPS:  That would be the results, Your

20   Honor, the theoretical result given those numbers.  You know,

21   again, I'm not too sure as to the $12 million figure but --

22   the source of that, but there would be the opportunity for

23   offset if, in fact, they were entitled to offset in the case.

24   And that is still an open issue.  But that they would be able

25   to assert a claim for offset, yes, Your Honor.  But that does

Cook - Argument                                        10

1    not give them a stake or an interest in this proceeding or

2    particularly in the matters that are dealt with in this

3    agreement, Your Honor.

4              They are at this point, if you will, strangers to

5    this case --

6              THE COURT:  Okay, well let me ask Mr. Cook his view

7    of this because I'm at this point confused, quite frankly.

8              MR. COOK:  Sure.

9              THE COURT:  Well, let me as you -- ask it this way.

10   At the end of the day you can't recover a nickle from the

11   estate, can you?

12             MR. COOK:  In this case and in the litigation what

13   we can do is affect, impair, diminish if not demolish the

14   major asset of the estate which remaining, so they say, the

15   litigation against our client.  That is a financial interest

16   and I think that is a sufficient stake.  I mean if they're

17   suing for $15 million and we knock out 12 million, I think

18   that's going to be very painful to the estate.  But if you

19   step back, Your Honor -- okay, I'm sorry.  I think that

20   answers your question.  I mean I don't know whether you're

21   satisfied with the result or you agree with me, but I think if

22   you step back and look at what they filed yesterday, what is

23   stunning to me  -- stunning is that they don't deny the

24   allegations in our response to their motion.

25             The only response is they don't have standing and

1    you shouldn't hear it.  And I think when you look at -- and

2    I'd start with the Third Circuit's Amotex decision, we are a

3    creditor.  We have --

4                THE COURT:  Why do you care?

5                MR. COOK:  Why do we care?

6                THE COURT:  Why do you care?

7                MR. COOK:  Okay, it's not -- I'll tell you why, Your

8    Honor.  Because, first of all, they served us.  They attacked

9    our client in their motion papers.  But remember, we're

10   litigating against --

11               THE COURT:  I'm sorry, how did they attack your

12   client?

13               MR. COOK:  Oh, they basically blamed -- if you look

14   at Paragraph 8, I think it's on page 3, they said that you're

15   aware -- Dunlop Slazenger is responsible for all of their

16   problems and that's what forced the bankruptcy in the first

17   place.

18               THE COURT:  So what?  You already settled with them.

19               MR. COOK:  Oh, I understand.  I understand.  But --

20   and forgive me, Your Honor, I generally don't talk in

21   abstractions, but this goes to the integrity of the process.

22   It's not only we who should care, but you should care.  First,

23   but let me answer your question as to why we care.  We're

24   litigating against them.  We're adversaries.  And we're in

25   this court in that law suit.  Our job in that law suit is to

Cook - Argument                                    12

1    get to the facts, the truth.  And if we can show that they

2    have breached their fiduciary duty, that they have self-dealt,

3    that they have mis-led the Court, that's our ethical

4    obligation to do that at every opportunity and they have given

5    us the ammunition right here, not just in the motion papers,

6    by what they've done.

7            They have compromised the interests of the estate.

8    And -- so that's our immediate interest because we --

9            THE COURT:  What are you, an amicus?

10           MR. COOK:  No, Your Honor, we're -- for openers, for

11   openers we are defendants in a law suit with a big financial

12   interest and -- so we had --

13           THE COURT:  That has nothing to do with this

14   settlement.  Doesn't it all relate to pre-petition conduct?

15           MR. COOK:  It relates to the law suit, relates to

16   pre-petition conduct.  But our job, because the suit is

17   pending in this Court, our job is to show you that this is a

18   pattern of conduct, what they did pre-petition, what they did

19   post-petition, we made these allegations before in the

20   conversion motion which is now withdrawn and here they're

21   doing it again.  And any trier of fact ought to know about

22   this.  And you can -- maybe it's because I went to Boy Scout

23   Camp and you can accuse me of being an amicus or a Boy Scout,

24   but I find this very, very troubling because any insider

25   transaction -- there's nothing inherently wrong with it -- but

Cook - Argument                                        13

1  when you come to a court and ask the Court to bless it, number

2  one, there has to be full disclosure.

3          And after this full disclosure then the Court can

4  determine whether it's fair.  We don't think it's fair for the

5  reasons we've articulated.  But one thing for sure, there has

6  not been full disclosure.  And that's why, first of all, why

7  this is brought on an expedited basis because they -- the only

8  reason was instead of 20 days -- they didn't anticipate any

9  objection.  Okay.  But why -- why did they come up with this

10 foil?  Why the re-allocation?  If the insiders just --

11         THE COURT:  Why do you care?

12         MR. COOK:  Why do we care?  Because we have a

13 serious financial interest in our law suit.  They sued us for

14 a lot of money and if we can show this Court -- the same Court

15 that has our law suit, that these people are -- how shall I

16 put it?  They breached their fiduciary duty, they have self-

17 dealt, there's a pattern of conduct, and this is just one more

18 example of it.  That's what we, as lawyers, as advocates are

19 supposed to present to the Court.

20         THE COURT:  If you represented the committee I think

21 I would listen to you.

22         MR. COOK:  I understand your skepticism, Your Honor.

23 There's no question about it because we are -- we represent a

24 litigant in the law suit.  But I think -- let me -- let me

25 just -- just give you an example, and this is the Third

1    Circuit talking in a case called <u>Gersch against Jefferson</u>

2    (phonetic), it's a class action settlement where somebody

3    objected to the proposed settlement, and this is Judge Garth,

4    30 years ago, talking about where the Court has to approve a

5    settlement and class action settlements are cited

6    interchangeably with bankruptcy court settlements.  Where the

7    District Court, the trial court here, had a fiduciary

8    responsibility to look to make sure there was a complete

9    record here.

10          What we've asked for, and we've served notices of

11    deposition, we think that you should have a complete record

12    and we should be given the opportunity to develop it through

13    discovery on the integrity of the settlement negotiation

14    process.  No mortal looking at these motion papers can tell

15    how this allocation worked.  But right now we know that the

16    allocation provides the insiders with $290,000.  We think, we

17    don't know this for a fact, we suspect that the estate's

18    professionals have been hammered by the insiders.  The last

19    time we looked, and we deposed one of the insiders in

20    connection with the conversion motion, around the end of April

21    the estate's professionals were owed, the committee

22    professionals, the debtor's professionals owed at least

23    $800,000.

24          And we think they've been compromised here by the

25    insiders and --

1          THE COURT:  They're big boys.

2          MR. COOK:  -- we want to develop that record for

3     you.

4          THE COURT:  They're big boys.  They can take care of

5     themselves.

6          MR. COOK:  That may be so, but I go back to the

7     process, Your Honor.  And I don't think you have a complete

8     record here and I think we're entitled -- you can call our

9     interest remote, but we do have a financial interest and you

10    may be skeptical because we are litigants --

11         THE COURT:  Tell me what your financial interest it.

12         MR. COOK:  We're defending this law suit which seeks

13    a lot of money and we've got counter claims in that law suit

14    for a lot of money.  And I can assure you my client believes

15    that's a serious financial interest.  We -- I think we're

16    entitled to develop the record and I think, Your Honor, you

17    should have a complete record.  You're entitled to hear it

18    what went on here, you won't see on these papers --

19         THE COURT:  Tell me -- I'm not sure what else we

20    need to know.  A portion of the recovery is going to be used

21    to pay down a bank obligation upon which the insiders are

22    guarantors, correct?

23         MR. COOK:  Right, they benefit from that.

24         THE COURT:  Would you rather not pay off the bank

25    and use the full $500,000 to prosecute the law suit against

1   your client?

2            MR. COOK:  If that happened --

3            THE COURT:  Would you like that?

4            MR. COOK:  Your Honor, I wouldn't like it, but

5   that's the deal -- that is the reality and as we say in our

6   papers --

7            THE COURT:  But isn't that for the committee to

8   determine how much should be allocated to the law suit?  I

9   would guess the committee would favor that approach also.

10           MR. COOK:  Well, well, well, maybe it is and maybe

11  it is the right answer, but we don't know how they got there.

12  All the papers say is there was a dispute, who raised what

13  issues, what were the fact issues, what were the legal issues?

14  We don't know.  They don't say it.  How they got there, they

15  just say, "We agree."

16           I guess if nobody objects, then nobody objects.  But

17  we do have a financial interest and we are objecting and we

18  would like --

19           THE COURT:  I don't understand your financial

20  interest.

21           MR. COOK:  I think you -- at least -- I think you

22  stated it accurately.

23           THE COURT:  You cannot recover a nickle from this

24  estate, correct?

25           MR. COOK:  That's right.  But we can -- but we can

Athanas - Argument                                        17

1   diminish, if not demolish, the estate's major remaining asset,

2   the so-called Dunlop litigating.

3              THE COURT:  So what?  So what?

4              MR. COOK:  That is a key financial interest.  If the

5   holders of -- unknown holders of future claims have standing

6   to be heard, according to the Third Circuit in Amotex, for all

7   purposes, why not people who can demolish the future claim

8   with counterclaims and defenses as we can.  We're known, and

9   that is quantifiable, it's real.  And it's very real to this

10  estate.  Because if this estate has a $10 million claim, we

11  have a $12 million, they become a nothing.

12             THE COURT:  I hear you.

13             MR. COOK:  Okay.  Now -- and I think I told you why

14  we -- I think we need discovery, we're happy to do it on an

15  expedited basis.  We've served notices of deposition and we

16  think we're entitled to at least, as we read the law, to

17  develop a record here to show you how this settlement was

18  arrived at, what was the basis for the allocation, the

19  integrity of the settlement process, that we think it's

20  unfair.  Thank you, Your Honor.

21             MR. ATHANAS:  Good morning, Your Honor.  Joe Athanas

22  on behalf of the committee.  From all the yelling and

23  screaming I did in this negotiation I'm surprised to hear that

24  this wasn't an arm's length settlement.  Essentially, Your

25  Honor, where the parties started in the settlement was that

Athanas - Argument                                    18

1    the committee took the position that all $575,000 should be

2    allocated to the preference actions and the debtors and the

3    banks took the position that the allocation to the preference

4    and fraudulent conveyance action should be roughly 225,000,

5    and the way they arrived at their number was to say there are

6    two assets here.  There's the license, which is being handed

7    back without further litigation, and that's a license upon

8    which the bank has a lien, and there is the preference and

9    fraudulent conveyance litigation.  You know, I very vigorously

10   took the position that no, all the money should be allocated

11   to the preferences and fraudulent conveyance actions.  I spoke

12   to Mr. Cook about it and he agreed with me as you can see from

13   his pleading.

14          But ultimately in this case were we to recover that

15   $575,000, the case would be over.  We went out and looked for

16   law firms to take on a contingency basis the law suit against

17   Dunlop.  There was no firm willing to do so.  We worked with

18   the debtor on this.  We collectively went to I think four law

19   firms.  No law firm was willing to take it on a contingency.

20   No law firm was willing to take it on a contingency even if

21   all their expenses were paid.

22          And so ultimately, Your Honor, the only way the

23   estate can get more than a couple of pennies for unsecured

24   creditors in this case is if we're victorious in the law suit

25   and the only way we can ever win that law suit is if we have

1    money to fund it.  So instead of taking the position that I

2    want the 575,000 which will pay off administrative claims and

3    then we'll have a Chapter 7 and maybe unsecured creditors will

4    get a penny, we had a vote of the committee and the committee

5    decided we were better off taking a lower allocation up front,

6    285,000, and then getting a $300,000 loan for starters to

7    pursue the litigation against the Dunlop entities and an

8    agreement by the Benesch firm to defer their administrative

9    claims, they don't need to be paid immediately so that the

10   case remains administratively solvent while we pursue the

11   litigation.

12          Ultimately, Your Honor, you know, there may be

13   additional money left.  There may be additional budgets over

14   time.  This is just the initial amount.  But we ultimately

15   think as a committee that it's in the best interest of

16   creditors in this case, rather than take the penny and go

17   home, to seek a larger recovery.

18          And in exchange for that, because this is obviously

19   a very risky loan, given that no law firm would even take this

20   case on a contingency, you know, we had to pay Keymoulos, we

21   had to compensate them well.  They're getting three percent

22   over prime and they're getting a large cut of the only asset

23   we have to give, which is the litigation proceeds.

24          And ultimately that was the deal we cut.  That's why

25   we cut the deal.  The committee voted unanimously in favor of

Schwartz - Argument                          20

1    the deal and we think it's in the best interest of creditors

2    of the estate.  Obviously if you're the Dunlop defendants

3    you'd rather have us just have a finite amount of money that's

4    essentially nothing to be able to litigate with them, and no

5    deferral of the administrative claims because in that case

6    they win.

7              Now the allegations against them, if Your Honor will

8    recall, is that they violated the license agreement and

9    destroyed the company.  And if those allegations are true this

10   is a big dollar law suit and there will be a good recovery for

11   unsecured creditors in the case.

12             So ultimately the unsecured creditors have made

13   their decision through the committee and we'd ask that the

14   settlement be approved.

15             MR. SCHWARTZ:  Your Honor, simply with respect to

16   one of the points that Mr. Cook made questioning why this was

17   done on an expedited basis, it's provided in the agreement

18   itself and this was one of the terms that the committee

19   negotiated.  We had to have approval of this agreement by July

20   31st.  That is precisely why we sought it on an expedited

21   basis.  We did not anticipate an objection precisely because

22   of the fact that all of the constituencies in this case have

23   entered into this agreement, the administrative claimants, the

24   secured creditor, the unsecured creditors, and equity are all

25   in agreement with respect to these terms.

Schlitz / Phillips - Colloquy                    21

1        And this is not the product of self-dealing or any

2   sort of breach of fiduciary duty.  This is a matter that was

3   negotiated by the parties in order to serve the best interests

4   of all creditors of the estate.  I would simply point out in

5   terms of the position that Mr. Cook articulated regarding the

6   interest of the Dunlop Slazenger entities that -- and I've

7   thought about this -- let us say that the debtor had sued

8   Calloway Golf for interfering with its business relations and

9   ultimately destroying its business.

10       And Calloway Golf had brought counterclaims.

11  Calloway Golf, who's a complete stranger to the -- to this

12  Chapter 11 case or any other just defendant in an adversary

13  proceeding would, in fact, have -- may actually have standing

14  as opposed to Dunlop to actually participate in these

15  proceedings because they would still have the right to a

16  positive recovery from the estate, something that Dunlop has

17  given up here.

18       There is no possible way that Dunlop has a stake in

19  the outcome of the allocation, in the outcome of the

20  financing.  And for those reasons we would ask the Court to

21  enter the proposed order that has been offered.  Thank you.

22            THE COURT:  Okay, I'll grant the motion.  I'll enter

23  the order.  Let me just make some final comments on --

24            MR. SCHLITZ:  Your Honor, I apologize for

25  interrupting at this point.  Todd Schiltz here on behalf of

1    the Provident Bank.  The proposed order that has been

2    submitted to the Court was circulated yesterday late in the

3    day to my client.  We have had some comments to that proposed

4    order.  We have provided those to counsel for the debtor and I

5    have been advised prior to the hearing that in fact a revised

6    order would be submitted.

7              And based on that representation we were ready to

8    proceed, so it's a very minor point and we believe that it can

9    be resolved quite quickly and we should be able to get you

10   something this afternoon, I would assume.

11             MR. PHILLIPS:  Mr. Schiltz is correct, Your Honor.

12   And the only point is, I believe there would be one sentence,

13   basically, in the order affirming the fact that under the

14   settlement agreement $290,000 of the Dunlop settlement

15   proceeds would be allocated to payment of Provident Bank.  And

16   which simply reflects the agreement between the parties and I

17   believe the committee is in agreement and we'll submit a

18   amended order to that effect this afternoon.  Thank you.

19             THE COURT:  Okay, well, let me just finish up with

20   my remarks.  For the reasons I've indicated in my questioning

21   of Mr. Cook, I conclude that the Slazenger Group is a stranger

22   to this settlement agreement.  But aside from that in looking

23   at the objection that they filed and I'm looking at Page 3,

24   Paragraph 6, it says, "The Court cannot approve the proposed

25   insider financing for at least the following reasons.  First

1    bullet point, "SGP failed to disclose all of the financing

2    material terms."  I think they are now disclosed in the

3    proposed form of order.

4           The next bullet point is, "SGP failed to describe

5    let alone mention any attempt to obtain alternative

6    financing."  And then the last point is that they didn't --

7    failed to explain why Provident Bank wouldn't do it.

8           The comments by counsel for the committee I think

9    clearly demonstrate why nobody else is going to finance this

10   litigation because it's risky.  Mr. Cook, your experience is

11   probably longer than mine in bankruptcy matters and have you

12   ever heard of a bank financing litigation?  I haven't.

13          So I think the objections themselves are basically

14   unfounded and for those reasons I'll grant the motion.  I

15   assume you'll circulate the revised proposed order including

16   to Mr. Cook.

17          MR. PHILLIPS:  Yes, we will.

18          MR. COOK:  One think, Your Honor, of course the

19   comments -- I'm not re-arguing.  I just to point out -- just

20   to add something here -- when we filed our motion on Monday I

21   think those facts were true at the time.  We didn't get the

22   terms of the financing and the order until yesterday

23   afternoon.  Everybody had --

24          THE COURT:  You make a good point.  I didn't see

25   them until I saw the order either and I was, quite frankly, a

Colloquy                                                    24

1       bit puzzled by the lack of detail in the motion itself.

2               MR. COOK:  And I don't know what my client's going

3       to but to preserve the record here, Your Honor, ordinarily if

4       my client wanted to appeal from this we wouldn't have to seek

5       a stay.  It was just a settlement order.  But because it's now

6       a financing order we have to ask for a stay pending appeal.

7               Just as to the financing, and we're prepared to

8       expedite it if my client wants to go forward, but we do have

9       to make that request, and I heard Your Honor and I'm not

10      arguing with your ruling on the merits.

11              THE COURT:  Any response?

12              MR. ATHANAS:  Good morning again, Your Honor, Joe

13      Athanas on behalf of the committee.  First of all, Your Honor,

14      I think that the terms of the financing -- all the salient

15      terms were set forth in the settlement agreement as well.

16      It's a $300,000 deal that's set forth in the settlement

17      agreement.

18              The interest rate of prime plus three is set forth

19      in the settlement agreement.  The fee structure is set forth

20      in the settlement agreement.  Frankly, the order has, you

21      know, almost no additional terms.  It has the standard, you

22      know, defaults for dismissal of the case or conversion to

23      Chapter 7, things of that nature, but really the order just

24      effectuates the settlement agreement.  I think all the

25      material terms of the financing were in the settlement

A   252

1      agreement itself, so I disagree with Mr. Cook's objection that

2      there weren't enough facts for people to evaluate the

3      financing already in the settlement agreement which was

4      attached to the motion.

5          Also, Your Honor, obviously if there's a stay

6      pending appeal we cannot finance the law suit against Dunlop

7      which will slow down the litigation with them which is, of

8      course, what a defendant always wants. So from the

9      committee's point of view we'd ask their motion for a stay

10     pending appeal be denied.

11         MR. SCHWARTZ: Your Honor, Jeffrey Schwartz on

12     behalf of the debtor in possession. The debtor objects to the

13     granting of any stay pending appeal. Obviously to grant a

14     stay requires a finding that there's a substantial likelihood

15     of success on the merits of the appeal. The fact of the

16     matter is, and I tried to get this out, and did get this out

17     at the prior hearing and Mr. Cook has reaffirmed it, if you

18     look at Section 101-5 of the code claim means right to

19     payment. They waived any right to payment in this Chapter 11

20     case. So the standing issue is as clear as it could possibly

21     be.

22         The movant's agenda here is to prohibit the funding

23     of a claim against it. That is not a -- there -- to put it in

24     plain English it's a blatantly self-interested transparent

25     motive that they don't want to be sued. Who does? Who wants

1   a $300,000 war chest to sue it?  But the estate's interest is

2   --

3           THE COURT:  And I think one could argue that their

4   objective is also to burden the estate with additional legal

5   expenses and duties and trouble in order to wear them out.

6   One could make that argument.

7           MR. SCHWARTZ:  And I would adopt that argument but

8   that's exactly what's occurred here.  And I enjoy coming to

9   Wilmington, but this estate is very small, very thin.  It's

10  down essentially to one claim and it's, you know, it's been a

11  great effort to unify the bank, the guarantor, the equity, the

12  debtor and the committee and we have.  So they're setting up

13  obstacles to the prosecution of the estate's claim against

14  them arguing that -- on whatever basis.

15          So that their motives are inappropriate and quite

16  frankly we can't afford much of a war of attrition.  We need

17  to get to the merits of the claims in the adversary.  So we

18  would respectfully request that the motion for a stay pending

19  appeal be denied.

20          THE COURT:  Okay.  I'll deny it.

21          MR. PHILLIPS:  Thank you, Your Honor.

22          THE COURT:  Let me just make one final comment.  In

23  matters such as this where there is allegations of insider

24  preferences or insider special treatment et cetera, where the

25  committee has examined the matter and concluded that this is