# EXHIBIT B

I. P. Phillips and D. J. Buchler, as Receivers, Plaintiffs, and Brian Chandler and Parkwood Limited, an Isle of Man corporation, as trustee, Intervenors, v. Insituform of North America, Inc., a Delaware corporation, Paul A. Church, Robert M. Leopold, Jack Massar, Eric Wood, Hershel Krasnow, Alfred B. Delbello and William D. Ruckelshaus, Defendants

Civil Action No. 9173

Court of Chancery of Delaware, New Castle

1987 Del. Ch. LEXIS 474

August 24, 1987, Submitted
August 27, 1987, Decided

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** [*1]

Opinion Modified September 1, 1987

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff receivers of certain class B stock (receivers) and intervenor shareholders of class B stock (shareholders) sought a preliminary order against defendant board of directors (directors) restraining a proposed merger between defendant corporation and its wholly-owned subsidiary in the receivers' action seeking an order to enjoin the proposed merger and a declaratory judgment that certain recent actions of the board were invalid.

**OVERVIEW:** The directors amended several by-laws and sold sufficient class B stock to the corporation's chief executive officer to remove control of vote of the class B stock, and thus control of the company's board, from the block of class B share held by the receivers. The directors then proposed to effectuate a merger between the corporation and its wholly-owned subsidiary. The receivers and shareholders sought a preliminary injunction, which was granted by the court. No justification was shown that made the issuance of stock for the admitted purpose of impeding the exercise of stockholder rights reasonable in light of the corporate benefit sought to be obtained. The directors did not demonstrate that their failure to hold the annual meeting at the time provided in the by-laws or to hold it with the time required by § 211 of the corporation law was necessary to protect an important corporate, as opposed to personal, interest. The directors failed to put forward a reasonable apprehension of injury to legitimate corporate interests to justify the exercise of the board of directors to amend by-laws. There was no palpable corporate benefit that was a motivating force for these amendments.

**OUTCOME:** The court granted the preliminary injunction against the directors that restrained a proposed merger between the corporation and its wholly-owned subsidiary.

**CORE TERMS:** stock, shareholder, by-law, merger, receiver, charter, issuance, stockholder, voting, proposed merger, annual meeting, invalid, preliminary injunction, deprive, voting power, common stock, partners, incumbent, written consent, pendente lite, board action, intervenor, scheduled, quorum, primary purpose, certificate of incorporation, executive committee, course of conduct, managing director, case law

**LexisNexis(TM) Headnotes**

*Mergers & Acquisitions Law > General Business Considerations > Duties & Liabilities of Directors & Officers*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN1]In negotiating or formulating the terms of a merger, a board owes a duty to exercise its judgment honestly and fairly in apportioning the merger consideration among classes of stockholders, but once it has done so it is no form of actionable wrong that a particular class of shares is particularly unhappy with its relative treatment in the merger.

*Mergers & Acquisitions Law > General Business Considerations > Duties & Liabilities of Directors & Officers*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

Page 1

[HN2]The powers of a board to deal with perceived threats to a corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat. However, it is extraordinary for the law to sanction the act of a fiduciary directed against the interest of his cestui que trust and, in such a case, it is necessary for a reviewing court to be satisfied that, in all of the circumstances, the act taken was justified, or was reasonable in relationship to the threat posed.

*Mergers & Acquisitions Law > General Business Considerations > Duties & Liabilities of Directors & Officers*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN3]The issuance, transfer or voting of shares of a defendant corporation's common stock, which if issued would reduce the plaintiff's stake to a minority position, is prohibited where no compelling purpose is presented that might otherwise justify such an unusual course.

*Mergers & Acquisitions Law > General Business Considerations > Duties & Liabilities of Directors & Officers*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN4]The issuance of shares by an incumbent board for the purpose of retaining control in the face of a newly assembled block of common stock amounting to more than fifty percent is invalid as a device that unjustifiably strikes at the very heart of corporate representation.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN5]The failure to hold an annual meeting at the time provided in the by-laws or to hold it within the time required by § 211 of the corporation law, at the barest minimum, requires defendants to demonstrate that their action was necessary to protect an important corporate, as opposed to a personal, interest.

*Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws*

[HN6]By-laws may not produce effects inconsistent with the plan of corporate governance envisioned by the charter. Section 109(b) of the corporation law codifies this basic proposition.

*Mergers & Acquisitions Law > General Business Considerations > Duties & Liabilities of Directors & Officers*

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*

[HN7]Given the great difficulty, and perhaps practical impossibility, of returning a merged corporation to its original constituent corporations, a preliminary injunction is the conventional remedy when a shareholder establishes that a proposed merger is likely to be found to be in violation of law or of the board's fiduciary obligations.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*

[HN8]Shareholders' loss of voting power constitutes irreparable injury.

**COUNSEL:** Lawrence A. Hamermesh, Esquire, Kenneth J. Nachbar, Esquire, Andrew M. Johnston, Esquire, and Palmer L. Whisenant, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, and PAUL, WEISS, RIFKIND, WHARTON & GARRISON, and LOVELL, WHITE & KING, Of Counsel, Attorneys for Plaintiffs.

Jesse A. Finkelstein, Esquire, Gregory V. Varallo, Esquire, Kevin G. Abrams, Esquire, Joseph J. Bodnar, Esquire and Anne F. Bugg, Esquire, of RICHARDS, LAYTON & FINGER, and KRUGMAN, CHAPNICK & GRIMSHAW, Of Counsel, Attorneys for Intervenors.

William Prickett, Esquire, Michael Hanrahan, Esquire, Joseph Grey, Esquire, Glenn D. Fugate, Esquire, and Philip B. Obard, Esquire, of PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, and PARKER, CHAPIN, FLATTAU & KLIMPL, Of Counsel, Attorneys for Defendants.

**JUDGES:** Allen, Chancellor.

**OPINIONBY:** ALLEN

**OPINION:** MEMORANDUM OPINION

ALLEN, Chancellor

Plaintiffs are receivers of certain Class B shares of defendant Instituform of North America, Inc. ("INA"), a Delaware corporation. They were appointed by order of the Chancery Division of the English High Court of Justice and thereafter were instructed by that court to institute this action. The action [*2] seeks an order enjoining a proposed merger that will recapitalize INA and a declaratory judgment that certain recent actions of the INA board are invalid. Among the acts specifically sought to be declared invalid are several by-law amendments and the sale of sufficient Class B stock to INA's chief executive officer to remove control of vote of the Class B stock (and, thus, under INA's structure, control of the company's board) from the block of Class B shares now held by the receivers.

The matter is now before the court on the motion of plaintiffs, joined in by intervenor Parkwood, Ltd. also an owner of INA Class B shares for a preliminary order restraining pendente lite the effectuation of a proposed merger between INA and its wholly-owned subsidiary, NU-INA, Inc. and for other preliminary relief. The stockholders' meeting to vote on the proposed merger is scheduled to be held on August 27, 1987. The proxy statement is dated August 6, 1987. This action was filed on August 17. Limited discovery has proceeded in the hurried way typical of proceedings of this type. The motion was presented on August 24.

In summary, the claim of the Class B shareholders is that the defendants are [*3] engaged in a course of conduct designed to deprive them of rights conferred upon them by INA's certificate of incorporation; that in order to protect the board's incumbency, the directors have proposed the merger and have taken improper steps in an attempt to thwart plaintiffs' exercise of their lawful rights. Claims by shareholders or their representatives that corporate action, while in good form legally, constitutes in the circumstances, a violation of the board's supervening fiduciary duty are common in this era in which the non-negotiated attempt to wrest control over a corporation through an unsolicited tender offer has become the prototypical corporate transaction. This case is, however, different from the usual case in which such allegations are raised. Here, there is no threat to existing policies or programs of the corporation posed by an outsider but, rather, an attempt by the existing board to promote a change in the distribution of corporate power among existing classes of stock assertedly in pursuit of the best interests of the corporate enterprise as a whole.

I.

INA was incorporated in Delaware in 1980 for the purpose of acquiring and exploiting a license on a proprietary [*4] process invented by defendant Eric Wood and developed by him and Messrs. Brian Chandler, an intervenor, and Douglas Chick. The process . the Instituform process is a technique for the repair of cracks in sewer or water pipes that permits such repair without the need to excavate the pipes. The process was originally developed by Wood, Chick and Chandler in the 1970's. Relatively early in the course of their venture, they came to depend upon the advice and assistance of defendant Paul Church, then a member of an accounting firm and a financial advisor to Mr. Chick. All of these men are residents of the British Isles and all except Chick, who is a U.S. citizen, are English.

On the advice of Mr. Church, the three principals transferred their rights to the Instituform process to a corporation formed under the laws of the Isle of Man, International Group, Ltd. ("IGL") with the thought that IGL would license other corporations to use the process. INA was incorporated for the purpose of taking a license from IGL (or an IGL subsidiary) and exploiting it commercially in the U.S. Church appears to have been the active agency in causing INA to be formed and structured as it is.

INA's common [*5] stock is of two classes. The rights, powers and privileges of each class are identical except that the holders of Class B are entitled to elect 2/3 of the board of directors of the Company. The Class A stock was underwritten publicly in the U.S. through the offices of defendant Krasnow, an officer of a brokerage firm and a friend and associate of Mr. Church. Class B was issued to Ringwood Limited, an Isle of Man corporation owned (through yet another entity) by Chick, Chandler and Wood. n1

> n1 I will pause for a moment to mention the proportions of their respective interests. Originally (or almost so) each of the three held an equal interest in Instituform Pipe & Structures, the first Instituform enterprise. Sometime in the 1970's Chick, whose role was chiefly as a source of seed capital, suggested that his commitments had been greater than all had originally envisioned and, as a consequence, the original equal allocation of interests, by then held in part in Ringwood, should be adjusted to 50 % for him and 25 % for each of Messrs. Chandler and Wood. They agreed.

Presently, the board of INA is composed of seven members. The B stock claims to have elected five directors: Messrs. [*6] Church, until recently Chairman of the Board, Krasnow and Wood and two officers of INA, Mr. Leopold, now CEO and Chairman of the Company, and Mr. Massar. Two outside directors, Messrs. DelBello and Ruckelshaus identify

themselves as A directors. To evaluate the arguments presented, it is essential to have in mind the setting within which the directors of INA took the actions under attack. As that action was admittedly a reaction, in part at least, to developments in the English litigation which gave rise to the appointment of plaintiffs as receivers for Ringwood, a brief summary of that involved litigation will be helpful.

A. The English Litigation

Mr. Church is apparently an energetic businessman. Once brought on the scene as an advisor, he seems to have rapidly become the principal actor in the effort to exploit the Instituform process. He organized INA, designed its dual classification of common stock, arranged with his friend Krasnow for the public sale of the Class A stock and served as managing director of Ringwood, the holder of the B stock. Mr. Chick's apparent penchant for anonymity and Mr. Wood's disinterest in the legal and financial aspects of business helped to clear [*7] the way for Church to assume the role of energetic "front man" for the enterprise. By 1981, Church thought his efforts entitled him to an equity participation in the business. In that year, the partners agreed to cede to him (pro rata) a 10 % share in their Instituform businesses. Thus, Church, Who had acted as the managing director of Ringwood, came to own beneficially a 10 % interest in the INA B stock owned by Ringwood.

For reasons that are not altogether plain, at some point in 1984 Messrs. Chandler and Wood decided to hold their INA B stock directly. Church, now an equity participant, resisted on the ground that the control of INA afforded by the single holding might be threatened. Chandler and Wood, and ultimately Mr. Chick as well who joined them in seeking to remove his B shares from Ringwood, finally succeeded in extracting a portion of their interest from Ringwood after they agreed to enter into a voting agreement which bound Chick, Chandler, Wood and Church not to dispose of their B stock for 5 years and to either abstain from voting or to vote that stock in unanimity for the existing INA B directors for a similar period.

Not all of Ringwood's holdings of INA B stock [*8] were distributed, however. With the prospect of the distribution of the B stock from Ringwood to its beneficial owners on the horizon, Mr. Church saw his control of INA (through his influence with the "partners" and his status as managing director of Ringwood) slipping; he announced to the partners his receipt of a claim to certain of Ringwood's INA B shares from a British Virgin Islands attorney. The claim was asserted on behalf of a Liberian corporation called Chimera Securities, Inc. Church told the partners that the claim arose out of some dealings by him for the account of INA or Ringwood with certain Asian residents of Kenya. He urged that the claim be resisted but that 52 % of the 1,000,000 B shares held by Ringwood, plus some cash, be kept in Ringwood in the event it became necessary to satisfy the claim. The partners agreed. Thus, while Chick, Chandler and Wood sought to remove their B shares from Ringwood, Mr. Church nevertheless persuaded them to agree to a course that left the control mechanism in place, with Mr. Church still in charge of Ringwood's affairs and thus in continued control of INA.

Suspicion of various sorts caused Chandler and Chick in 1986 to commission [*9] an audit by Touche Ross of Ringwood's affairs. In turn, the audit led to the filing of suit by Chick and Chandler against Church and others, including Wood, n2 in the High Court of Justice, Chancery Division, in London. That suit is a quite complex matter. The March 10, 1987 opinion of Hoffmann, J. sustaining his jurisdiction in the matter of Chandler, et al. v. Church, et al. (Ch.1986C.6596), lays out a great deal of the background. Suffice it to say for the moment that much evidence has come to light indicating that Chimera Securities, Inc. is simply the audaciously named creature of Church himself and that the claim it asserted was simply a complex deception and an attempted fraud. The English Chancery Division suit therefore seeks, inter alia, an accounting of Ringwood's business from Church and a distribution of the B stock to its beneficial owners. These matters, however, are to be determined in a trial in the High Court now scheduled for early 1988.

> n2 It is not altogether clear why Wood is joined as a defendant in the English action. I do not understand plaintiffs in that action to be claiming that Mr. Wood participated in the alleged wrongs of Church. As that action seeks, among other things, to set aside the 1985 voting agreement restricting the voting of the INA B stock in its signatories' hands and for commercial reasons of his own, Mr. Wood is content to let that agreement stand it may be that Wood was simply added as a party defendant in the High Court action in his capacity as a signatory to that agreement.

[*10]

On December 17, 1986, the English court extended plaintiff's receivership, earlier created, to Ringwood's INA B shares. However, that order did not reach the whole of Ringwood's 52 % holding of the INA stock.

Mr. Church had earlier brought an action in the British Virgin Islands ("BVI") against Ringwood claiming a personal right to 52,500 shares of the B stock. The BVI

court preliminarily enjoined the transfer of that number of shares. Accordingly, the December, 1986 order of the English court did not require the transfer of those shares to the receiver. The balance transferred constituted 49 % of the INA Class B shares. Thus, through his Virgin Island action, Church succeeded in preventing potential control of INA, through control of a majority of the B shares, from moving into other hands. However, the BVI court thereafter dissolved its order and the High Court on March 24, 1987 modified its own order to require transfer of the remaining Class B shares to the receivers.

B. INA Board's Reaction

While defendants Church and Wood presumably learned of this March 24 order promptly, the INA board did not learn of it until its next meeting on April 26, 1987. Its reaction to the prospect [*11] that "strangers" n3 might come to control the election of the INA board was immediate. At that very meeting, the board acted to defer the 1987 annual meeting then planned for June. It is admitted that the board so acted because it could not be sure how the Class B shares would now be voted (Leopold Dep. at 235; Wood Dep. at 106).

> n3 Wood Dep. at 100. Chick and Chandler were, of course, not strangers to Wood or Church. But, they each had reasons not to want to see Chick or Chandler assume an active part in INA. Church, of course, by this time is a committed adversary. Wood simply believes that Chick and Chandler have poor business judgment and should be kept out on that basis. See, e.g., Wood Dep. at 57-58, 84-85. Messrs. Chick and Chandler are, however, strangers to others on the INA board. Mr. Leopold, for example, INA's current CEO, did not even know of the existence of Chick, who claims to own beneficially 45 % of the Class B stock.

Further and more complete reaction to the perceived threat followed. First, on June 17, 1987 the board met by telephone. The board then addressed the threat that Ringwood or another "putative holder" of Class B might seek to act by written [*12] consent and might remove the existing board. The minutes of that meeting recite that legal counsel advised:

> . . . that a means of avoiding the possibility that a written consent could create doubt as to the validity of actions by. . . the board . . . would be to issue sufficient authorized but unissued shares of Class B Common Stock so that the Class B shares currently held . . . by Ringwood . . . would not constitute a majority.

The board took that advice and on June 17 authorized the sale of 51,000 shares of Class B stock to defendant Leopold allowing him to pay only 10 % of the price in cash.

Having thus stilled fears of immediate stockholder action by reducing the proportion of B stock in the receiver's hands to 49 %, n4 defendants next took up a number of matters designed to deal with the "problem" on a more permanent basis. At a special meeting on July 2, 1987, the board approved several by-law changes and resolved to recommend to the shareholders approval of a merger that would have the effect of eliminating the B stock. In the proposed merger between INA and a wholly-owned subsidiary, NU-INA, each of the 1,051,000 shares of B stock would be converted to 1.05 shares [*13] of NU-INA. Each of the 7,889,158 n5 outstanding shares of Class A stock would be converted into a single share of new common. The date of the special meeting called to vote on this proposal was scheduled for August 27.

> n4 This step may, of course, be viewed as a reaction by the board to the Virgin Island courts releasing its injunction and the resulting extension of the receivership by the Chancery Division. The game, however, did not conclude at this point. On August 21st, the English court answered this step by requiring Mr. Church to provide to the receivers a proxy for some 47,000 shares of INA B stock that he owned personally (i.e., the approximately one-half of his 10 % interest in Ringwood's holding that was distributed at the time of the 1985 voting agreement). Thus, the receivers now claim to once more control more than 50 % of the vote of the outstanding B shares, a fact that will doubtless lead to further developments in this litigation.

> n5 As of July 2, 1987. See INA Aug. 6, 1987 Proxy Statement, p11.

The by-law amendments adopted that day did several significant things. First, they determine that a quorum of the board is present only when a majority [*14] of the two A directors are present. Second, they dictate that the board may act only with the concurrence of a majority of the two A directors. They constitute the A directors and the Chairman of the Board as an executive committee. This committee is given power to call meetings, jurisdiction over certain matters

Page 5

relating to officers and power to call shareholder meetings.

None of these July 2 actions were publicly disclosed and, when the English High Court later, on July 10, directed the receiver to vote the B shares for the existing board, including Mr. Church were he to be nominated, and to vote for Mr. Chandler and a representative of Mr. Chick as well, the court was apparently not informed of the board's action of July 2nd.

II.

Plaintiffs and intervenors attack all of this as a violation of a duty that the B directors (or, alternatively, all directors) owe to them as controlling shareholders to treat them fairly and not to use the power of their directorial offices to intentionally harm their interests. More specifically, it is contended that the board has engaged in a four-step scheme to destroy the special rights of the B shareholders conferred by the INA charter and implicitly [*15] agreed to by the A shareholders at the time of the original underwriting of the A shares.

First, the board manipulated the machinery of corporate governance in order to give the directors time to take steps to deprive the receivers of the power that the Ringwood stockholders possessed, by deferring the annual meeting for the admitted reason that the board could not know on April 26th how the receivers would vote. Second, the defendants issued new B shares to Mr. Leopold admittedly in order to deprive the Ringwood receivers of the ability to act by written consent in lieu of a meeting under Sec. 228 of Delaware's General Corporation Law. Third, the board adopted by-laws which give A directors power to veto any board action and authority over day-to-day operations. These by-laws, it is charged, stand the power relationship contemplated by the charter on its head and are invalid. Finally, the board proposed the merger with NU-INA assertedly for the express purpose of destroying the special rights of the B shareholders and, in reality, for no other reason.

Plaintiffs contend that the proffered justifications for the actions -- a need to restructure the capital of the firm in order to [*16] facilitate raising additional capital -- is a transparent pretext and that the real purpose of it all is to remove the threat to their incumbency that a majority of the board sees in the B shares now that they are not controlled by Mr. Church who, although he may be a malefactor insofar as Chick and Chandler's affairs are concerned, was a person with whom a comfortable modus vivendi had evolved for the defendants.

Defendants respond that the board acted with a view towards the obligations to shareholders as a whole. The proposed merger is said to be for the benefit, certainly, of the 86 % of INA's equity owned by the A shares and for the benefit of the Company, as a distinct entity, since it will permit the Company's stock to be listed on the New York Stock Exchange and to be sold in California. Moreover, in the view of Mr. Wood at least, the merger is a good business idea because it will prevent Chick and Chandler from taking control of the Company. Their business judgment is regarded by Mr. Wood as deplorable. It is admitted, with respect to the capital raising point, that the Company has no current need for additional capital and that there are no plans to list the Company's [*17] stock.

The issuance of B stock to Mr. Leopold and the amendment of the by-laws are justified as necessary steps to permit the shareholders to have an opportunity to vote upon the merger. Without these steps, it was feared that the B stock, in pursuit of its own interests, might act to prevent such a vote.

Defendants claim that there was neither an entrenchment motive here nor entrenchment effect. They point to the fact that Mr. Church will not be a director of NU-INA to evidence their independence from him and claim the weighty protection of the business judgment rule in the circumstances of the case.

III.

Time, unfortunately, will not permit an analysis as detailed as this interesting case would otherwise demand. I am here required to set forth the basis of my decision more or less straightforwardly. For the reasons that follow, I conclude that defendants have here taken action of various kinds designed to thwart the exercise of perceived stockholder power; that, in quite a real sense, the board has become the committed adversary of a majority of the B shareholders and has taken action against them designed to thwart the B shares from exercising powers claimed by them under Section [*18] 228 of our corporation law (i.e., to act by written consent in lieu of meeting). Furthermore, I conclude that the extraordinary step of a corporation acting solely or primarily for the express purpose of depriving a shareholder of effective enjoyment of a right conferred by law, requires, when challenged, the board to demonstrate that the action taken was fair or justified given the particular business purpose sought to be achieved and the circumstances of the firm.

As explained below, I do not believe the various actions here taken can, in the light of the established case law of this jurisdiction and the nature of the threat perceived by the board on April 26th and thereafter, be

Page 6

made consistent with the board's obligation to the corporation and all of its shareholders. I am persuaded that plaintiffs have demonstrated a substantial likelihood that defendants have inappropriately manipulated the corporate machinery in several important ways for the purpose of removing the supervisory power conferred on the small group of B shares by the certificate of incorporation.

IV.

A more detailed statement of the reasoning that supports this conclusion begins with an acknowledgment that [*19] promoting and recommending the merger here proposed does not itself constitute a wrong of any kind. Simply because that merger would have the effect of redistributing shareholder power does not, of course, make it a wrong to the B shares; they will have a chance to vote on it according to the voting rights conferred by the charter. n6 It has long been established that [HN1]in negotiating or formulating the terms of a merger, the board owes a duty to exercise its judgment honestly and fairly in apportioning the merger consideration among classes of stockholders, MacFarlane v. North American Cement Corp., Del.Ch., 157 A. 396 (1928), but that once it has done so it is no form of actionable wrong that a particular class of shares is particularly unhappy with its relative treatment in the merger, Federal United Corp. v. Havender, Del.Supr., 11 A.2d 331 (1940). In this instance, nothing has been shown at this stage of the proceeding that indicates that the terms of the merger are such as to constitute a constructive fraud; it seems, in the abstract, a transaction that a reasonable director might conclude is fair to all sides and in the best interests of the Company. Mr. Wood's warm support [*20] of it helps support that conclusion. However, this is something that reasonable persons might differ upon; reasonable shareholders, particularly Class B shareholders, might as well conclude that the proposal is not in their best interests. Realizing this, the board acted in various ways to restrict the B stocks power to interfere with a vote on the proposal by all of the shareholders. It is the steps taken for that purpose and not the proposed merger itself that, in my opinion, give rise to a legitimate grievance on the part of the plaintiffs.

> n6 The charter does not confer on the B shares the right to a class vote on a merger or, indeed, in any circumstances, nor does our statute. Compare 8 Del.C. § 251 with 8 Del.C. § 242(b)(2).

Unocal Corp. v. Mesa Petroleum Co., Del.Supr., 493 A.2d 946 (1985) teaches that [HN2]the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat. [*21] However, it is extraordinary for the law to sanction the act of a fiduciary directed against the interest of his cestui que trust and, in such a case, it is necessary for a reviewing court to be satisfied that, in all of the circumstances, the act taken was justified. The Unocal court used the phrase "reasonable in relationship to the threat posed." 493 A.2d at 949, 955.

The actions taken by defendants to guarantee that the shareholders would have a chance to vote on the proposed recapitalization through merger were actions clearly directed against one class of shareholders and, in the circumstances, require the board to justify those actions by reference to a significant threat to an important corporate interest or to the achievement of a significant corporate benefit. n7 That burden is made somewhat difficult for defendants because the Class B shareholders do not represent a hostile outside force as in Unocal (the court there referred to "the threat posed by a corporate raider with a national reputation as a 'greenmailer,'" 493 A.2d at 956) who had only recently acquired an interest in the company. Here there is no threat from an outsider, but rather the prospect [*22] that the beneficial owners of the control stock will, having discovered their manager Church engaged in active fraud, assume direct management of their stock investment. Assuming, as I do, that the INA board is not simply reacting sympathetically to Mr. Church, the record supplies scant grounds to suppose that an affirmative injury to the corporation was to be reasonably apprehended in April through July, the period in which the steps were taken that are now under attack. Putting matters in their best light, it appears that the board acted at that time in order, not to save the company from a threatened injury, but to change the capital structure of the firm so that it would be fairer to the owners of 86 % of the company's equity and would make raising additional capital easier. If Unocal can be said to recognize that a board may take action specifically designed to injure the interests of specific stockholders only when such action is designed to promote a corporate goal and is reasonable in relationship to the end sought, we must ask if the steps here attacked satisfy that test.

> n7 In conceiving of this matter as one that fits conceptually into the Unocal framework, I reject defendants' claim that the business judgment rule with its limited form of judicial review applies to these actions which tend to insulate the board from the potential discipline that would

flow from the charter provisions granting the B stock the right to appoint a majority of the board. See Aprahamian v. HBO & Co., Del.Ch., C.A. No. 8989, Hartnett, V.C. (May 14, 1987).

[*23]

This is not, of course, a judgment that needs to be made abstractly. Delaware case law provides a well-developed setting in which exercise of that judgment can be made certain. That case law is particularly helpful when the specific steps of issuance of the shares of B stock to Mr. Leopold and the deferral of the annual meeting are considered. In all events, I turn now to a review of each of the actions taken in order to determine whether, in all of the circumstances, they appear reasonable in the light of the duty of the board to treat all shareholders even-handedly and in the light of any threat posed or benefit sought to be achieved.

A.

I turn first to those cases dealing with the issuance of stock that has the effect of reducing the voting power of a specific shareholder.

In Canada Southern Oils, Ltd. v. Manabi Exploration Co., Del.Ch., 96 A.2d 810 (1953), a 51 % shareholder brought an action to prevent the issuance, transfer or voting of shares of defendant's common stock, which if issued would reduce plaintiff's stake to a minority position. This action was attacked as improper since it was assertedly done simply to deprive plaintiff of clear voting control. Defendant [*24] answered that the shares were issued to raise capital in the face of the dire financial plight of the firm. Chancellor Seitz, after a factual analysis that supported the conclusion that the stock was issued for the primary purpose of depriving plaintiff of its voting power, presaged in the underscored passage below, the flexible Unocal-style analysis:

It is obvious that the only real justification for the issuance of these shares in the way they were issued is that defendants' financial condition required such action and even then I am doubtful whether it was here justified without first giving plaintiff an opportunity to purchase such shares.

96 A.2d 813 (emphasis added).

The Court concluded:

When the undisputed facts are viewed cumulatively, I find it reasonable to infer that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control.

This was held to be wrong and a preliminary injunction was entered. One may read Canada Southern as creating a black-letter rule prohibiting the issuance of shares for the purpose of diluting a large shareholder voting power, but one need not do so. [HN3]It may, as well, be [*25] read as a case in which no compelling corporate purpose was presented that might otherwise justify such an unusual course. Such a reading is, in my opinion, somewhat more consistent with the recent Unocal case. In all events, either reading indicates that the issuance of the Leopold shares which admittedly were issued for the sole purpose of impeding or preventing the exercise of legitimate shareholder rights was an invalid attempt to deprive a shareholder of the benefits of stock ownership contemplated by the corporate charter and the Delaware corporation law.

The later case of Condec Corporation v. Lunkenheimer Company, Del.Ch., 230 A.2d 769 (1967) also involved [HN4]the issuance of shares, in that instance by an incumbent board for the purpose of retaining control in the face of a newly assembled block of common stock amounting to more than fifty percent. This court held such issuance invalid as a device that "unjustifiably strikes at the very heart of corporate representation." 230 A.2d at 777 (emphasis added). See also EAC Industries, Inc. v. Frantz Manufacturing Co., Del.Ch., C.A. No. 8003, Walsh, V.C. (June 28, 1985) at p. 20-22.

In applying the teachings of these [*26] cases, I conclude that no justification has been shown that would arguably make the extraordinary step of issuance of stock for the admitted purpose of impeding the exercise of stockholder rights reasonable in light of the corporate benefit, if any, sought to be obtained. Thus, whether our law creates an unyielding prohibition to the issuance of stock for the primary purpose of depriving a controlling shareholder of control or whether, as Unocal suggests to my mind, such an extraordinary step might be justified in some circumstances, the issuance of the Leopold shares was, in my opinion, an unjustified and invalid corporate act.

B.

As for the failure to hold an annual meeting, INA's by-laws establish a date for the annual meeting in June of each year. The 1986 meeting occurred in June of that year. It is admitted that the 1987 annual meeting was delayed, upon the board's learning that Ringwood's Class B shares had passed out of Mr. Church's control, in order for the board to find out how the Ringwood shares would be voted. The only issue then considered to be likely to be before the meeting was the election of directors and it was therefore their own tenure in office that was [*27] of concern. n8

n8 As things turned out, this fear was, as of the April 26 date that the board set out in its course of action, completely unjustified. The English High Court in July (before it learned of the July 2 INA decision to attempt to remove the enhanced voting power of the B shares) authorized the receivers to vote for all incumbents, including Mr. Church if he were nominated. Later, in August, when the aggressive acts of the incumbents were known, the High Court changed the thrust of its directions and authorized the receivers to purport to exercise such powers as they have to promptly cause the removal of certain of the incumbents.

[HN5]The failure to hold the annual meeting at the time provided in the by-laws or to hold it within the time required by Section 211 of the corporation law, at the barest minimum, requires, in these circumstances, defendants to demonstrate that their action was necessary to protect an important corporate, as opposed to a personal, interest. See Schnell v. Chris-Craft Industries, Inc., Del.Supr., 285 A.2d 437, 439 (1971). This, in my opinion, has not been done in this instance. On this record, it is impossible to conclude that the court-appointed [*28] receivers of the commanding block of B shares represented a threat to existing policies, programs or interests of INA as to justify, if ever it could be justified, ignoring the command of Section 211 to hold an annual meeting within 13 months of the last such meeting. Certainly the subsequent action of the English Court in authorizing the receivers to attempt to exercise such power as they have to reconstitute the board in part (about which much was made at argument of this motion) does not justify the April 26 action; it is explained readily as a reaction to the course of conduct initiated by the defendants at that time.

C.

I turn finally to a review of the law treating by-law amendments to help assess whether the action of amending the by-laws taken as an act directed toward thwarting the potential exercise of stockholder power by a specific class of stock is reasonable in light of a threat posed by that class of stock to the corporation or is justified by a benefit sought to be achieved for the corporation. Recall that the by-law amendments in question do several things:

FIRST: They require that a majority of the (2) A directors be present before a quorum is present and a [*29] majority of these (2) directors are required to take any action.

SECOND: Any newly created directorship is to be filled by a majority vote of stockholders of the class entitled to elect and not by directors.

THIRD: An Executive Committee is created consisting of the Chairman of the Board and the two Class A directors.

FOURTH: The Executive Committee is empowered to call Board meetings and to set the date for shareholder meeting and given jurisdiction over certain matters concerning officers.

It is, of course, elementary that [HN6]by-laws may not produce effects inconsistent with the plan of corporate governance envisioned by the charter. Section 109(b) of the corporation law codifies this basic proposition. See also Essential Enterprises Corp. v. Automatic Steel Products, Inc., Del.Ch., 159 A.2d 288 (1960).

Treated individually and as an abstract matter, it a close question whether each of these by-law amendments is inconsistent with the basic scheme of corporate power created by INA's certificate of incorporation. Much of plaintiffs' argument that the by-law amendments are invalid seems premised on an assumption that a right to designate a majority of the board [*30] involves legally the right to control the board's action and thus the corporation. However, so long as the law demands of directors, as I believe it does, fidelity to the corporation and all of its shareholders and does not recognize a special duty on the part of directors elected by a special class to the class electing them, such a premise must be regarded as legally incorrect. Thus, I would not, for example, think a by-law requiring certain action be authorized by a unanimous board to be inconsistent with a certificate provision of the kind contained in INA's charter. Such a by-law may be viewed as a technique governing the exercise of board power which is not inconsistent with a certificate provision providing a technique for designating board members.

The amended provision requiring, for board action, concurrence of a majority of the (two) A directors is, of course, very much like such a requirement of unanimity and, standing alone, would not seem to be inconsistent with INA's charter. The quorum provision also strikes me, when considered in isolation, as a supplementary provision consistent with the letter of the charter; it is designed to balance power between the A and B shareholders [*31] in a way not necessarily inconsistent with the charter's grant of special right to the B shareholders to designate the persons to fill a majority of board positions. However, when these two provisions are placed in context with each other and

Page 9

with the third amendment that creates an executive committee comprised predominantly of A directors, a realistic evaluation leads to the conclusion that a fundamental shift in the allocation of power between the A shareholders and the B shareholders has taken place and that that new arrangement is inconsistent with what would have been the reasonable understanding of the effect of the provisions of the certificate.

Moreover, consideration of these amendments must take into account the fact that these by-laws were adopted as a second line of defense against the exercise of power under Section 228 by the B shareholders. They were designed to equip the A class of stock with an effective veto over future board action. In adopting this interrelated series of amendments, the board became, or rather continued as, intense partisans waging war against the Class B stockholders. Whether regarded as individual owners of Class A stock, n9 as office-holders [*32] acting pursuant to a plan to remove the supervising power of control shares (with a concomitant entrenchment effect) or simply as directors choosing to favor the A shares over the B shares, this particular exercise of the legal power to enact by-laws, in this setting, requires a specific justification. Schnell v. Chris-Craft, supra. I am persuaded that no reasonable apprehension of injury to legitimate corporate interests has been put forward that would justify, in these circumstances, this exercise by the board of the power conferred on it by the charter to amend by-laws. Nor does it appear that any palpable corporate benefit was actually a motivating force for these amendments. I therefore conclude that the by-law amendments adopted on July 2, 1987 will likely be found to be invalid.

> n9 Of the seven existing board members, five own A stock or options in A stock and two, Church and Wood, own B stock.

V.

For the foregoing reasons, I conclude that plaintiffs and the intervenors have established a clear probability of ultimate success on the merits of their claims. [HN7]Given the great difficulty, and perhaps practical impossibility, of returning a merged corporation to its [*33] original constituent corporations, a preliminary injunction is the conventional remedy when a shareholder establishes that a proposed merger is likely to be found to be in violation of law or of the board's fiduciary obligations. See, e.g., Gimbel v. Signal Cos., Del.Ch., 316 A.2d 599, aff'd Del.Supr., 316 A.2d 619 (1974). In this instance, 'unscrambling the eggs' might not be as difficult as it typically would be since the merger here is, in effect, a recapitalization of an existing enterprise and not a consolidation of distinct businesses. Nevertheless, assuming the merger proposal is approved by the shareholders and implemented, plaintiffs will lose the enhanced vote their shares currently possess. If, as currently appears, it is determined that the board engaged in conduct wrongful to plaintiffs in order to get that proposal to a shareholder vote, any approval thus obtained will necessarily be invalidated. In that event, plaintiffs will be deprived during the period before a dissolution of the merger were ordered, of their right, created by the INA charter, to designate a majority of the board of that company. [HN8]This loss of voting power constitutes irreparable injury. [*34] See, e.g., Datapoint Corp. v. Plaza Securities Co., Del.Ch., C.A. 7932, Brown, C. (March 5, 1985) at p. 15 aff'd, Del.Supr., 496 A.2d 1031 (1985). Therefore, it is appropriate to enjoin, pendente lite, the effectuation of the merger proposed. I see no reason why the meeting itself should not go ahead for the limited purpose of taking the vote, so that a record of that vote can be made. If the grant of this injunction is hereafter found on appeal to be improvident or predicated upon an incorrect view of the applicable law, the merger may then be accomplished without the delay and expense of an additional proxy solicitation.

As to the B stock issued to Mr. Leopold, the form of preliminary injunction order shall prohibit him from voting those shares (or any shares derived therefrom), individually or by proxy, or transferring any interest therein; and the corporation shall not consider those shares as outstanding shares for any purpose associated with the voting of stock (including meeting any quorum requirement). n10

> n10 The Leopold B shares will not therefore be included in any calculation for purposes of Section 228 since they will not be "shares entitled to vote" at a "meeting". See 8 Del.C. § 228(a).

[*35]

Turning finally to the relief appropriate at this stage with respect to the by-law amendments, which I am frank to say presents to my mind the most difficult aspect of the current application. I have concluded for the reasons above set out that, taken as a whole, those amendments affect such a fundamental change in the structure of this corporation's governance that, so taken, they must be considered fundamentally inconsistent with the corporation's charter and, in the circumstances, an inequitable exercise of the delegated power to adopt by-laws. A response to the reasoning that led to that conclusion could be predicated upon the assertion that the A directors owe fiduciary duties to the B shares as well as to the A shares and, thus, no irreparable injury can be posited from the by-laws

conferring an effective veto on any board action by either of the A directors. I find this response unsatisfying because I have already concluded that the A directors along with the other defendants have already appeared to have adopted an adversarial relationship to the B shares. Thus, I do not think that plaintiffs should at this point be required to depend on the fidelity of those directors to [*36] their interests. In these circumstances, I conclude that equity requires the return pendente lite to the status quo ante and that the defendants be directed to act, in their capacity as directors of INA, pursuant to the by-laws of the Company as they existed on July 1, 1987 and that, until such preliminary injunction order is reversed, modified or withdrawn, action taken in conformity with such by-laws be deemed in compliance with valid by-laws of the Company.

An order in conformity with the foregoing will be entered upon notice. Bond will be in the customary form, without surety, in the amount of $ 5,000. Because the stockholder meeting is scheduled for today and the entry of a formal order on this opinion may require a little time to draft, defendants should, of course, in the interim, regard themselves as bound by the rulings here made. Time has not permitted consideration of the issues from the perspective of the pending motions for summary judgment. I will therefore depend on the parties to raise that matter afresh following appeal of the order here granted, should that motion require judicial determination in any party's view.

Note upon Application for Entry of Order [*37] and for Certification of Interlocutory Appeal

The parties have submitted alternative forms of implementing order and defendants have moved for certification of an interlocutory appeal of the order to be entered.

The only matter with respect to the form of implementing order that I believe deserves explanatory comment concerns the meaning of the language appearing at p. 33 of the foregoing opinion that "until such preliminary injunction order is reversed, modified or withdrawn, action taken in conformity with such by-laws be deemed in compliance with valid by-laws of the Company." This determination is said by defendants to constitute an advisory opinion that ought not to be implemented by order.

Interpreted in the way I intended, I do not think this is a valid criticism, but my language was not as well chosen as it might have been. I did not mean to suggest that a validly constituted board of INA should be disabled by injunction pendente lite from duly amending the by-laws of the Company but, rather, that unless and until such a board does so, an effect of the preliminary injunction to be entered enjoining action under the July 2nd amendments would be to reinstate for the [*38] time being the effectiveness of the early version of those by-laws.

As to the injunction of the proposed merger, while I have preliminarily held that "in the abstract" (p. 18) its terms do not seem to constitute "a wrong of any kind" (p.17), the court here is not presented with a proposed merger in the abstract but with one that is a part of a course of conduct that I believe has been shown preliminarily to be improperly motivated and to constitute a violation of duty to the B shareholders. In these circumstances, it is appropriate that consummation of the merger should be enjoined pendente lite.

I will decline to stay the effectiveness of the order pending appeal. With respect to the application for certification of interlocutory appeal, as suggested by the language of the opinion itself, I am inclined to certify the questions here raised to the Supreme Court for immediate review pursuant to Supreme Court Rule 42. However, that Rule contemplates that the party opposing such certification shall have ten days to file papers in opposition. In this instance, circumstances suggest a shortening of such time is warranted. I do regard myself as having the power under Rule to [*39] shorten time in an appropriate case. Therefore, I will direct that any paper in opposition be served and filed by the close of business on September 3rd. A reply, if desired, may be filed by noon of the following day.

A form of order on the foregoing opinion is being entered this 1st day of September.