**Westlaw.**

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
(Cite as: 2000 WL 533492 (E.D.La.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In re BABCOCK & WILCOX Clyde Bergemann, Inc.
v.
BABCOCK & WILCOX CO., et al.
Nos. Civ.A.00-1154, 00-10992.

May 3, 2000.

*ORDER AND REASONS*

VANCE, J.

*1 Clyde Bergemann, Inc. moves the Court pursuant to Bankruptcy Rule 8005 for an emergency stay pending appeal of the Bankruptcy Court's order authorizing debtors to obtain post-petition financing. For the following reasons, Bergemann's motion is DENIED.

I. BACKGROUND

On February 22, 2000, debtors, the Babcock & Wilcox Co., Diamond Power International, Inc., Babcock & Wilcox Construction, Co., Inc. and Americon, Inc. filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Louisiana. Diamond Power, Babcock & Wilcox Construction and Americon are all subsidiaries of Babcock & Wilcox.

The debtors also moved for authorization from the Bankruptcy Court to obtain post-petition financing up to the principal amount of $300 million, pursuant to the terms of a Debtor In Possession Revolving Credit Facility. (*See* Debtors Opp'n Mot. Stay Ex. A, Shopf Aff., at 71-75.) Debtors aver, and the bankruptcy judge agreed, that access to a credit facility is critical in order for debtors to continue to operate their businesses, obtain goods and services, retain customer, vendor and supplier confidence, meet their payrolls, and pay other operating expenses. (*See* Bergemann Mot. Stay Ex. 5, Final Order Auth. Debtors Obtain Post-Petition Financing, dated March 24, 2000, at 2; Debtors' Opp'n Mot. Stay Ex. A, Shopf Aff. ¶ 199.)

Pursuant to section 364(c) of the Bankruptcy Code, the DIP Financing Agreement provides that all amounts owed under the credit facility will be given super-priority administrative expense status pursuant to section 364(c)(1) and approves a security interest in debtors' property in favor of the lenders under sections 364(c)(2) and (3). Notably, the debtors amended the DIP Financing Agreement to include a provision that, to the extent that Diamond Power is required to pay any amount disproportionate to its usage under the facility, it will be entitled to a section 364(c)(1) super-priority claim against the other debtors for the amount of the disproportionate usage, after full payment to the lenders. (*See* Bergemann Mot. Stay Ex. 5, Final Order ¶ 26.)

Clyde Bergemann, Inc., an unsecured creditor of Diamond Power, objected to the DIP Financing Agreement. Bergemann argued that the DIP Financing Agreement does not apportion the super-priority administrative expenses, or the collateral pledged, based upon the amounts used by each of the individual debtors, and, as a result, the agreement pledges the assets of Diamond Power for the benefit of other entities and to the detriment of its creditors. Bergemann's claim arises out of a patent infringement suit that it filed pre-petition against Diamond Power, one of its largest competitors, in the United States District Court for the Northern District of Georgia. (*See* Bergemann Mot. Stay ¶ 4, at 3.) In that suit, Bergemann seeks a judgment against Diamond Power in excess of $52 million. (*See id.*)

The Bankruptcy Court entered an Interim Order authorizing the credit facility on February 22, 2000. The court then held a hearing on the proposed DIP Financing Agreement on March 22, 2000, in which it considered Bergemann's objections. On March 24, 2000, the Bankruptcy Court entered a Stipulation and Final Order Authorizing the DIP Financing Agreement. The court found that the DIP financing is necessary in order to avoid immediate and irreparable harm to debtors' estates and to promote a successful reorganization. (*See* Bergemann Mot. Stay Ex. 5, Final Order, at 5.) The court also found that debtors could not secure financing without granting the lenders priority status under section 364(c). (*See id.* at 4.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 2
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
**(Cite as: 2000 WL 533492 (E.D.La.))**

*2 Bergemann filed a notice of appeal and a motion to stay pending appeal on March 31, 2000. The Bankruptcy Court denied the request for a stay on April 7, 2000. On April 17, 2000, Bergemann filed its Emergency Motion for Stay Pending Appeal in this Court. Debtors oppose the motion on the grounds that Bergemann has not addressed why the Bankruptcy Court did not grant the stay as required under Rule 8005, and Bergemann has not satisfied the legal criteria for a stay pending appeal.

II. DISCUSSION

The decision to grant or to deny a stay pending appeal falls within the district court's sound discretion. See In re First South Savings Ass'n, 820 F.2d 700, 709 (5 th Cir.1987). Federal Rule of Bankruptcy Procedure 8005 governs motions to stay pending appeal of bankruptcy court orders. Rule 8005 permits such a motion to be made to the district court when (1) the motion is presented to the bankruptcy judge in the first instance, and (2) the motion demonstrates why the stay was not obtained from the bankruptcy judge. In addition, the party seeking a stay pending appeal under Rule 8005 must satisfy the four criteria required for issuance of a preliminary injunction. See In re Blackwell, 162 B.R. 117, 119 (E.D.Pa.1993); In re Tulane Hotel Investors Ltd. Partnership, 68 B.R. 145, 147 (E.D.La.1986); In re Ba-Mak Gaming Int'l, Inc., 1996 WL 411610, at *1 (E.D.La. July 22, 1996); In re Overmeyer, 53 B.R. 952, 955 (Bankr.S.D.N.Y.1985). The movant must show that (1) it is likely to succeed on the merits; (2) it will suffer irreparable injury if the stay is denied; (3) the other parties would not suffer substantial harm if the stay is granted; and (4) issuance of the stay would serve the public interest. First South Savings, 820 F.2d at 709 (citing Ruiz v. Estelle, 666 F.2d 854, 856 (5 th Cir.1982)); Tulane Hotel, 68 B.R. at 147 (citations omitted); In re Norris, 192 B.R. 863, 866 (Bankr.W.D.La.1995) (citing United States v. Baylor Univ. Med. Ctr., 711 F.2d 38 (5 th Cir.1983)). The party seeking the stay must satisfy all four of these criteria in order to prevail. See Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472 (5 th Cir.1985); Mitchell v. Secretary of U.S. Dep't of Educ., 1998 WL 564310, at *2 (E.D.La. Sept. 3, 1998); Harding v. City of Houma, 1998 WL 171515, at *1 (E.D. La. April 9, 1998).

A. Rule 8005

At the outset, the Court observes that Bergemann's motion fails to comply with Rule 8005. As indicated above, Rule 8005 provides that a motion for stay of a bankruptcy court order "shall show why the relief ... was not obtained from the bankruptcy judge." A moving party's failure to meet this requirement violates Rule 8005. See In re Drislor Assocs., 110 B.R. 937, 939 (D.Colo.1990); In re Duncan, 107 B.R. 758, 759 (W.D.Okla.1988). Here, neither Bergemann's motion nor its reply brief addresses why the bankruptcy judge denied its application for a stay. Moreover, Bergemann has not included in the record before this Court any briefs submitted to the Bankruptcy Court in support of its motion to stay, and the Court cannot determine what arguments, if any, Bergemann raised before that court. Bergemann has therefore failed to comply with Rule 8005.

B. Legal Standard for Stay Pending Appeal

1. *Likelihood of Success on the Merits*

*3 Bergemann does not dispute that the approval of the DIP Financing Agreement involved a core proceeding under 28 U.S.C. § 157(b)(2)(D). Accordingly, although the Court reviews the Bankruptcy Court's conclusions of law de novo, the Court reviews its findings of fact under the more stringent clearly erroneous standard. See First South Savings, 820 F.2d at 711 (reviewing bankruptcy court approval of debtor's postpetition financing agreement). The Court must accept the bankruptcy judge's findings of fact unless "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948)).

Bergemann conclusorily asserts that the DIP Financing Agreement violates bankruptcy and non-bankruptcy laws by (1) fraudulently conveying Diamond Power's property to other entities without a corresponding benefit; (2) violating the absolute priority rule in section 1129(b)(2)(B) of the Bankruptcy Code; and (3) substantively consolidating the debtors' assets to the prejudice of Diamond Power's pre-bankruptcy creditors. The Court notes that although Bergemann bears the burden of demonstrating that it is likely to succeed on the merits, it has cited no legal authority to support the application of the aforementioned arguments to the circumstances of this case. The Court will nevertheless address Bergemann's arguments in turn.

First, Bergemann asserts that the DIP Financing Agreement works a fraudulent conveyance because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 3
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
**(Cite as: 2000 WL 533492 (E.D.La.))**

Diamond Power will not benefit from the DIP Financing Agreement to the extent it has put up collateral. A fraudulent conveyance or transfer occurs when a debtor transfers property or incurs an obligation (1) with the actual intent to hinder, delay or defraud a creditor, or (2) without receiving a reasonably equivalent value in exchange for the transfer. *See* Uniform Fraudulent Transfer Act § 4(a) (1984); 15A Fletcher Cyclopedia of Private Corp. § 7404 (2000) (noting that most jurisdictions have statutes modeled after UFTA). *See also* Uniform Fraudulent Conveyance Act §§ 5, 6, 7 (1918) (same standard as UFTA but referring to "fair consideration" rather than "reasonably equivalent value"). Pretermitting the issue of whether a prejudgment creditor has standing to bring a fraudulent conveyance action, [FN1] the Court finds no evidence in the record that the DIP Financing Agreement does not benefit Diamond Power. Indeed, Bergemann does not refute the fact that the debtors, including Diamond Power, need the financing in order to continue to issue letters of credit and to operate their businesses and that they could not obtain such financing by means of unsecured credit. The Bankruptcy Court made an express finding pursuant to 11 U.S.C. § 364(c) that the debtors, including Diamond Power, could not obtain post-petition financing without granting the DIP lenders super-priority status as provided for in Section 364(c). (*See* Mot. Stay Ex. 5, Final Order, at 4.) *See* 11 U.S.C. § 364(c) (bankruptcy court, after notice and hearing, may authorize obtaining of credit or incurring of debt with priority if trustee is unable to obtain unsecured credit as an administrative expense). Bergemann's failure to refute this finding belies the argument that the DIP Financing Agreement constitutes a fraudulent conveyance of Diamond Power's property. The Court finds no basis in the record for finding that Diamond Power will not benefit from the DIP financing or that it will benefit so little that it will not have received reasonably equivalent value. Moreover, Bergemann does not contend that Diamond Power acted to hinder, delay or defraud its creditors. For all of these reasons, the Court cannot conclude that Bergemann is likely to succeed on the merits of its fraudulent conveyance claim.

FN1. *See generally* Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 119 S.Ct. 1961, 1970 n. 7 (1999) (noting that "[s]everal states have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfers Act), which has been interpreted as conferring on a non-judgment creditor the right to bring a fraudulent conveyance claim").

*4 Second, Bergemann argues that the DIP Financing Agreement violates the absolute priority rule codified in Section 1129(b)(2)(B). Section 1129 outlines the requirements to be followed when the Bankruptcy Court confirms a reorganization plan. At the hearing on the DIP Financing Agreement, the bankruptcy judge rejected Bergemann's argument based on the absolute priority rule because that rule applies "upon confirmation of a plan," which will occur at a much later stage in the proceedings. (*See* Debtors' Opp'n Mot. Stay Ex. C, Tr. at 24.) The absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a plan. *See* 11 U.S.C. § 1129(b)(2)(B); *In re Elmwood, Inc.*, 182 B.R. 845, 852 (D.Nev.1995). Notably, section 1129(b)(2)(B) applies only when a class of claims or interests has not accepted the plan, or is impaired under the plan. *See* 11 U.S.C. §§ 1129(b)(1); 1129(a)(8); *Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485, 493 (N.D.N.Y.1997) (absolute priority rule sets forth statutory standard for determining whether a "cram down" is "fair and equitable" with respect to the class of unsecured creditors that has not accepted the reorganization plan); *In re 641 Assocs., Ltd.*, 140 B.R. 619, 629 (Bankr.E.D.Pa.1992) (section 1129(b)(2)(B)(ii) "refers only to the consequences of the failure of a class of unsecured creditors to accept a plan").

Bergemann cites, and the Court has found, no authority requiring the bankruptcy judge to consider the absolute priority rule in pre-confirmation proceedings. Additionally, by the time this case reaches confirmation, Bergemann may no longer have a claim against Diamond Power. It is therefore speculative, at best, whether the absolute priority rule would ever be invoked in this case.

Further, Bergemann fails to cite any law giving unsecured creditors a right to adequate protection under section 364(c). Sections 364(c) and (d) provide for adequate protection of lienholders of senior or equal rank on the collateral securing the post-petition financing, and they do not provide for adequate protection to unsecured creditors. *See* 11 U.S.C. §§ 364(c) & (d). In addition, there is authority that unsecured creditors are not entitled to claim adequate protection under sections 364(c) and (d).
There is no express statutory requirement that

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
**(Cite as: 2000 WL 533492 (E.D.La.))**

holders of unsecured claims be provided "adequate protection." Adequate protection within the meaning of Bankruptcy Code [section] 361 need be provided only as expressly required under section 362, section 363, or section 364. There is no requirement of adequate protection in respect to credit obtained under Bankruptcy Code [section] 364(c)(2).
*In re Garland Corp.*, 6 B.R. 456, 462 (1 st Cir. BAP 1980) (rejecting argument of unsecured creditors' committee that post-petition financing secured by unencumbered assets of debtor violated section 364(c)(2)); *accord In re Simasko Prod. Co.*, 47 B.R. 444, 448 (Bankr.D.Colo.1985) (unsecured creditor objecting to interim financing agreement authorized under section 364(d) did not have an interest for which adequate protection had to be provided). Because Bergemann has not shown that the bankruptcy judge erroneously applied section 364(c) or that he should have applied the absolute priority rule to a pre-confirmation order, the Court finds that Bergemann has failed to establish a likelihood of success on the merits.

*5 Finally, Bergemann baldly asserts that the DIP Financing Agreement substantively consolidates the assets of the debtors without meeting the criteria therefor, to the prejudice of the pre-bankruptcy creditors of the individual debtors. Bergemann does not explain how the DIP Financing Agreement amounts to a substantive consolidation, nor does it identify the criteria that the agreement allegedly violates. Furthermore, assuming arguendo that the agreement did work a substantive consolidation, Bergemann presents no authority that gives it the right to relief in such a situation. Based on this record, the Court finds that Bergemann is not likely to succeed on the merits.

2. *Irreparable Harm*

Bergemann has also not demonstrated that it will suffer irreparable harm if the stay is denied. Bergemann argues that it will suffer irreparable injury if the Bankruptcy Court's order is not stayed because the debtors continue to incur debt under the DIP Financing Agreement, thereby increasing the exposure of Diamond Power to expenses of other entities to the detriment of Diamond Power's pre-petition creditors. The Court recognizes that a reversal on appeal of the Bankruptcy Court's order would not invalidate any of the debts previously incurred under the DIP Financing Agreement unless the order is stayed pending appeal. *See* 11 U.S.C. § 364(e). However, as noted in the discussion of Bergemann's fraudulent conveyance claim, *supra*, the Court has no basis, on the record before it, to assess the likelihood that Diamond Power will make payments under the facility in excess of its actual usage. In response to Bergemann's objections, debtors included an amendment to the DIP Financing Agreement which provides that, to the extent Diamond Power pays out more than it uses under the credit facility, it shall be entitled to a super-priority claim under section 364(c)(1) against the other debtors, after full payment to the lenders. Bergemann concedes that this provision improves its position. (*See* Mot. Stay, at 8.) Nevertheless, Bergemann asserts that "[a] super-priority administrative claim in favor of Diamond Power for excessive loan payments only has value to the extent the beneficiary Debtors are truly solvent and able to repay the claims in full." (*Id.*) The record contains absolutely no indication that the other debtors might default under the agreement or that they do not have sufficient resources to satisfy the $300 million loan. Any injury that Bergemann may suffer as a result of the agreement is thus hypothetical.

3. *Harm to Other Parties*

By contrast, the Court finds that granting the stay would substantially harm the other parties to this action. Debtors attached to their opposition memorandum the affidavit of R.J. Shopf, which they submitted to the Bankruptcy Court in support of their motion to approve the DIP Financing Agreement. (*See* Debtors' Opp'n Mot. Stay Ex. A, Shopf Aff.) Shopf, the Chief Restructuring Officer of Babcock & Wilcox, avers that debtors need immediate access to post-petition financing in order to avoid an acute liquidity crisis that will threaten their ability to maintain business operations in the short term. (*See id.* ¶ 208, at 75.) In particular, Shopf asserts that, without financing, debtors cannot obtain letters of credit essential to the operation of their businesses. (*See id.* ¶ ¶ 199, 201.) The availability of post-petition financing is necessary to instill confidence in debtors' suppliers, customers, and employees, thereby improving the likelihood of a successful reorganization. (*See id.* ¶ 207.) Bergemann does not contest that Diamond Power, and all of the debtors, would suffer immediate harm if the credit now available under the DIP Financing Agreement were frozen pending appeal. Rather, Bergemann merely asserts that debtors can obtain a revised credit facility. "There is ... no assurance[, however,] that financing of [this] magnitude will again be available, at the same rates, if a stay is granted and the appeal ultimately fails." *In re Public Service Co. of New*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
**(Cite as: 2000 WL 533492 (E.D.La.))**

*Hampshire,* 116 B.R. 347, 350 (Bankr.D.N.H.1990) (denying stay pending appeal of confirmation order when stay would jeopardize $1.5 billion in financing under negotiation). Additionally, a stay pending appeal would significantly harm other creditors by delaying payments until a revised financing agreement can be obtained. *See id.* (delay to creditors receiving payments is significant harm warranting denial of stay) (*citing In re Charter Co.,* 72 B.R. 70, 72 (Bankr.M.D.Fla.1987); *In re Great Barrington Fair and Amusement, Inc.,* 53 B.R. 237, 240 (Bankr.D.Mass.1985)).

4. *Public Interest*

*6 Finally, the Court finds that the public interest would not be served by the granting of a stay. "The public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization." *In re Lazarus Burman Assocs.,* 161 B.R. 891, 901 (E.D.N.Y.1993) (*citing In re Northlake Building Partners,* 41 B.R. 231, 234 (Bankr.N.D.Ill.1984)). By affidavit, debtors have testified that an inability to access the DIP Financing Agreement would have a materially adverse effect on their restructuring efforts by disrupting their business operations and impairing their going concern value. (*See* Debtors' Opp'n Mot. Stay Ex. A, Shopf Aff. ¶ ¶ 200, 208.) Further, the bankruptcy judge made an express finding that the DIP financing is necessary to promote debtors' successful reorganization. (*See* Bergemann Mot. Stay Ex. 5, Final Order, at 5.) The Court concludes that a stay would not serve the public's interest in a successful reorganization.

III. CONCLUSION

Bergemann has failed to comply with the procedural requirements of Rule 8005 and to establish the legal criteria for a stay pending appeal. Accordingly, the Court DENIES Bergemann's Emergency Motion for Stay Pending Appeal of the Bankruptcy Court's Order Authorizing Debtors to Obtain Postpetition Financing.

Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)

**Motions, Pleadings and Filings** (Back to top)

• 2002 WL 32698040 (Trial Motion, Memorandum and Affidavit) Brief of Appellants (Feb. 22, 2002)

• 2001 WL 34636982 (Trial Motion, Memorandum and Affidavit) Certain Underwriters at Lloyd's, London, and Turegum Insurance Company's Corrected Opposition to Joint Motion of Defendants, the Babcock & Wilcox Company and McDermott International, Inc., to Exclude the Expert Testimony of Neil A. Doherty and Michae l M. Sheppard (Dec. 12, 2001)

• 2001 WL 34636969 (Trial Motion, Memorandum and Affidavit) Asbestos Claimants' Committee's and Eric D. Green, the Future Claimants' Representative's, Joint Response to Certain Underwriters' at Lloyd's London and Certain London Market Companies' Motion to Dismiss (Dec. 03, 2001)

• 2001 WL 34636941 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Further Support of Travelers' Motion to Intervene (Nov. 15, 2001)

• 2001 WL 34636921 (Trial Motion, Memorandum and Affidavit) Memorandum of Asbestos Claimants' Committee ("ACC") in Opposition to Motion to Dismiss Counterclaims of the ACC Against Equitas (Nov. 06, 2001)

• 2001 WL 34636926 (Trial Motion, Memorandum and Affidavit) Asbestos Claimants' Committee's Memorandum in Response to Travelers' Motion to Intervene (Nov. 06, 2001)

• 2001 WL 34636883 (Trial Motion, Memorandum and Affidavit) Defendant the Babcock & Wilcox Company's Response to Plaintiffs' Statement of Needed Count I Discovery (Oct. 16, 2001)

• 2001 WL 34636871 (Trial Pleading) First Amended Answer of Certain Underwriters at Lloyd's, London and Certain London Market Companies to the Babcock & Wilcox Company's Counterclaims (Oct. 12, 2001)

• 2001 WL 34636865 (Trial Pleading) Answer of Certain Underwriters at Lloyd's, London and Certain London Market Companies to the Babcock & Wilcox Company's Counterclaims (Oct. 09, 2001)

• 2001 WL 34636855 (Trial Pleading) Asbestos Claimants' Committee's Answer and Counterclaims (Oct. 03, 2001)

• 2001 WL 34636839 (Trial Motion, Memorandum and Affidavit) The Asbestos Claimants' Committee's Memorandum in Reply to Underwriters' Response in Opposition to Motions to Intervene (Aug. 16, 2001)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 533492 (E.D.La.)
**(Cite as: 2000 WL 533492 (E.D.La.))**

Page 6

- 2001 WL 34636992 (Trial Pleading) Complaint (Apr. 05, 2001)

- 2:00cv01154 (Docket) (Apr. 17, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.